IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| TPI COMPOSITES, INC., *et al.*, | § § § | Case No. 25-34655 (CML) |
| Debtors.[1] | § § § § | (Jointly Administered) Docket Nos. 37 & 73 |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO EMERGENCY MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS AND (III) GRANTING ADEQUATE PROTECTION TO THE SENIOR SECURED PARTIES, (IV) MODIFYING AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the chapter 11 bankruptcy cases (the "**Chapter 11 Cases**") of the above-captioned debtors in possession (collectively, the "**Debtors**"), by and through its undersigned proposed counsel, hereby files this objection (the "**Objection**") to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status and*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: TPI Texas, LLC (4000), TPI Composites, Inc. (0775), TPI International, LLC (9537), TPI Turkey, LLC (2552), TPI APAC, LLC (8038), TPI APAC II, Inc. (3515), TPI Turkey II, LLC (2551), TPI Turkey Izbas, LLC (0185), TPI Composites Services, LLC (4547), TPI Mexico, LLC (0745), TPI Mexico II, LLC (8269), TPI Mexico III, LLC (7315), TPI Mexico IV, LLC (1231), TPI Mexico V, LLC (5628), TPI Mexico VI, LLC (7260), Ponto Alto Holdings, LLC (0322), TPI Arizona, LLC (9641), TPI Iowa, LLC (2887), TPI Iowa II, LLC (4175), Composite Solutions, Inc. (1486), TPI Holdings Mexico, LLC (1936), and TPI Technology, Inc. (2727). The Debtors' mailing address is 9200 E. Pima Center Parkway, Suite 250, Scottsdale, AZ 85258.

*(III) Granting Adequate Protection to the Senior Secured Parties, (IV) Modifying The Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 37] (the "**Motion**").[2] In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT[3]

1. These Chapter 11 Cases are unique in a variety of ways. The most glaring of which is that the Debtors filed these cases with more than ***$50 million of cash on hand***. That is not a typo. Because of this reality, one would expect that any proposed DIP facility would include rather reasonable terms. But not here. The proposed DIP Facility is neither typical nor reasonable.

2. Essentially, in exchange for an initial interim DIP draw of merely $7.5 million, the Debtors effectively cede control of these Chapter 11 Cases to Oaktree on several business decisions that are core to the Debtors' proper exercise of their fiduciary duty. For example, Oaktree will use the DIP Facility to meddle in the Debtors' contract negotiations with their two largest customers, without whom the Debtors cannot continue to operate, by requiring that such negotiations and resulting contracts are to Oaktree's satisfaction.[4] Moreover, Oaktree will only allow the Debtors to file a chapter 11 plan that is approved by Oaktree, ***in its sole discretion***.

3. How does Oaktree maintain this control? Simple: Oaktree is not required to provide any further DIP funding beyond the initial $7.5 million interim DIP draw unless the Debtors meet certain Conditions Precedent (defined herein) that are subject to Oaktree's control and approval.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Interim DIP Order (defined herein), as applicable.

[3] Capitalized terms used in this Preliminary Statement but not otherwise defined herein have the meanings ascribed to them in this Objection.

[4] *See* Vesta's Limited Objection to Debtors' DIP Motion [Docket No. 143].

The Conditions Precedent include: (a) Oaktree's approval of the terms of any contracts with the Debtors' two largest customers; (b) Oaktree's approval of the terms of the Debtors' plan, in their sole discretion; (c) the Debtors maintaining minimum liquidity of $30 million at the time of the second DIP draw; and (d) the Debtors' compliance with Oaktree's lightning speed case milestones that require these Chapter 11 Cases to conclude in less than 100 days.

4. Of course, whether they provide the second DIP draw of $20 million or not, Oaktree wants all of the benefits (and then some) of a DIP lender who is providing full access to a DIP facility that actually provides reasonable assurances of administrative solvency, including section 506(c) waivers, section 552(b) waivers, marshaling waivers, an all-encompassing collateral package (including claims and causes of action against themselves and avoidance action proceeds), a litany of fees, final approval of roll-up loans, payment of professional fees, limited challenge rights for the Committee, and comprehensive releases, just to name a few.

5. The Committee understands why Oaktree might attempt to leverage a minimal investment of $7.5 million into an overly constricting DIP Facility. Oaktree is concerned about this Court overturning its virtually unprecedented *equity-for-secured debt swap* with the Debtors that was just executed in December 2023. Yes, that's not a typo either. This was not a swap of unsecured debt for secured debt. **This was a swap of preferred equity into almost $400 million of senior secured debt**, enabling Oaktree to leapfrog all of the Debtors' unsecured creditors who now sit behind those purportedly secured claims plus the DIP Facility in these Chapter 11 Cases.

6. As discussed in greater detail below, Oaktree and its proposed DIP Facility are rife with self-interest and, unless modified to address the serious issues raised in this Objection, will upend the purpose of chapter 11 by granting Oaktree excessive control over the Debtors and these cases generally. As such, the Committee objects to approval of the DIP Facility, as proposed.

- 3 -

## BACKGROUND

A. **General Background**

7. On August 11, 2025 (the "**Petition Date**"), the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**").

8. No trustee or examiner has been appointed in these Chapter 11 Cases. Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtors continue to operate their businesses as debtors in possession.

9. On August 21, 2025, the Office of the United States Trustee appointed the Committee pursuant to Bankruptcy Code § 1102(a). *See United States Trustee's Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 113]. The Committee is comprised of seven members: (i) U.S. Bank Trust Company, National Association, as Trustee for the 5.25% Convertible Senior Notes due 2028; (ii) Zoltek Corporation; (iii) Blue Cube Operations LLC; (iv) Newtech Industrial (Singapore); (v) Sunwell (Jiangsu) Carbon Fiber Composite Co. Ltd.; (vi) Zhejiang Zhenshi New Materials Co. Ltd.; and (vii) Westlake Epoxy Inc.

10. On August 25, 2025, the Committee selected Lowenstein Sandler LLP as its proposed counsel and on August 26, 2025, the Committee selected Munsch Hardt Kopf & Harr, P.C. as its proposed Texas counsel. On August 27, 2025, the Committee selected Berkeley Research Group, LLC as its proposed financial advisor.

11. The Debtors filed these Chapter 11 Cases to confirm a chapter 11 plan which the Debtors expect will result in the Senior Secured Parties becoming the new owners of the

reorganized company. *See Declaration of William E. Siwek in Support of Debtors' Chapter 11 Petitions and First Day Relief*, ¶ 15 [Docket No. 14] (the "**First Day Declaration**").

12. Additional information regarding the Debtors' prepetition capital structure and these Chapter 11 Cases is set forth in detail in the First Day Declaration.

### B. The 2023 "Uptier" Transaction and the Prepetition Secured Debt

13. On November 8, 2021, the Debtors issued $350 million of Series A Preferred Stock (the "**2021 Transaction**") to affiliated funds and entities of Oaktree Capital Management, L.P. (collectively, "**Oaktree**"), proceeds of which were used to pay off the company's then-existing senior credit facility. The 2021 Transaction also provided Oaktree with the option to redeem all or any portion of its preferred equity at any time after November 8, 2026. *See* First Day Declaration, ¶ 9.

14. After experiencing contractual challenges and other liquidity issues, in the third quarter of 2023, the Debtors entered into an equity-to-secured debt transaction with Oaktree pursuant to that certain Credit Agreement and Guaranty between the Debtors on the one hand and the Senior Secured Lenders and Oaktree on the other, whereby Oaktree exchanged $436 million of preferred equity into a $393 million Senior Secured Term Loan, with the remaining $43 million in dividends exchanged into common equity (the "**2023 Uptier Transaction**"). *See* First Day Declaration, ¶ 12.

15. The Debtors assert that the 2023 Uptier Transaction was projected to improve liquidity by approximately $190 million through the Senior Secured Term Loan, which extended the time during which the Debtors could make in kind interest payments and eliminated mandatory dividends previously owed to Oaktree on account of the preferred equity. *See* First Day Declaration,

¶ 12. The Debtors never recognized the full benefit of that purported $190 million liquidity improvement, having filed these Chapter 11 Cases before reaping all those benefits.

16. As of the Petition Date, the Debtors owed Oaktree $472 million in secured obligations under the Senior Secured Credit Agreement. *See* First Day Declaration, ¶ 32. ***Almost half a billion dollars that previously sat behind general unsecured creditors in the form of equity, now sits firmly ahead of them***.

### C. The Proposed DIP Financing

17. Through the Motion, the Debtors seek approval of a $82.5 million DIP financing package (the "**DIP Facility**") to fund the Chapter 11 Cases. As proposed, the DIP Facility consists of (i) (a) $7.5 million of new money loan, which was approved under the Interim DIP Order (the "**DIP Tranche 1**"), and (b) $20 million of new money loans upon entry of the Final Order (the "**DIP Tranche 2**"), and (ii) up to a $55 million roll-up of the Senior Secured Term Loan (the "**Roll-Up Loans**"). The Debtors also seek authority to use approximately $50 million of Cash Collateral. *See* Motion, ¶ 3.

18. The Motion further seeks to secure the DIP Facility with sweeping, automatically perfected, first-priority liens on substantially all the Debtors' assets (the "**DIP Liens**"),[5] which attach to, among other things, all the Debtors' unencumbered assets, including Avoidance Action

---

[5] As adequate protection to the Senior Secured Parties, the Debtors propose, among other things: (i) priority Adequate Protection Liens, subject only to the DIP Liens, Prepetition Permitted Prior Liens, and the Carve-Out; (ii) properly perfected, valid, and enforceable replacement liens; and (iii) allowed superpriority administrative expense claims. The adequate protection liens would attach to the Avoidance Action Proceeds and commercial tort claims and all other unencumbered assets (as well as any related insurance proceeds, including potential claims against Oaktree). There is also currently no requirement in the Final Order limiting adequate protection to instances where there is a *demonstrable* Diminution in Value of the Prepetition Lenders' collateral. *See* Interim DIP Order, ¶ 15.

Proceeds,[6] commercial tort claims, and even causes of action against Oaktree themselves. Moreover, the Motion seeks superpriority administrative expense status for the DIP Liens, subject only to the Carve-Out. *See* Motion, ¶ 51.

19. The obligation of Oaktree to make the DIP Tranche 2 loans is subject to certain oppressive conditions precedent (collectively, the "**Conditions Precedent**") set forth in Section 6.02 of the DIP Credit Agreement, including, among others:

- The Debtors must comply with the following milestones set forth in Section 8.21 of the DIP Credit Agreement (the "**Milestones**"):

    - <u>Entry of Final Order</u>. By the date that is no later than forty (40) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order;

    - <u>Disclosure Statement Order</u>. By the date that is no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall have entered a Disclosure Statement Order;

    - <u>Acceptable Plan</u>. By the date that is no later than one hundred (100) days after the Petition Date, the Borrower shall have obtained an entry of an order confirming an Acceptable Plan (i.e., a plan solely acceptable to Oaktree); and

    - <u>Acceptable Plan Effective Date</u>. By the date that is no later than one hundred and twenty (120) days after the Petition Date, the effective date of the Acceptable Plan shall have occurred.

- The Debtors are required to enter into binding agreements with their key customers, GEV and Vestas (the "**Customer Agreements**"), each in a form and substance satisfactory to the DIP Lenders (Oaktree).

20. The Debtors also propose to pay the DIP Lenders and the DIP Agent above-market interest and fees, including: (i) an interest rate of 9% per annum plus the Term SOFR rate with respect to SOFR Loans and 8% per annum plus the Base Rate with respect to Bate Rate Loans; (ii)

---

[6] "Avoidance Action Proceeds" shall have the same meaning ascribed to the term Avoidance Proceeds in the Interim DIP Order.

an upfront commitment fee in an amount equal to $825,000 paid in kind upon the funding of DIP Tranche 1 and DIP Tranche 2 (the "**Commitment Fee**"); and (iii) an exit fee in an amount equal to $825,000, upon the funding of DIP Tranche 1 and DIP Tranche 2, payable upon the earliest of (a) the Maturity Date, (b) the date on which the DIP Obligations are paid in part or in full, or the Commitments are terminated in part or in full (the "**Exit Fee**").  *See* Motion, p. 11.

21. The Motion also seeks approval of preemptive waivers of the Debtors' rights to: (i) surcharge the DIP Secured Parties' and Senior Secured Parties' (i.e., Oaktree's) collateral pursuant to Section 506(c) of the Bankruptcy Code; (ii) apply the "equities of the case" exception under Section 552(b) of the Bankruptcy Code; and (iii) seek the equitable remedy of marshaling. *See* Motion, pp. 20–21.

22. Lastly, the Motion proposes to give the Committee only sixty (60) days following its formation to assert a challenge against the Senior Secured Parties and a litany of their affiliates, officers, directors, representatives, and other related parties in connection with all matters related to the prepetition liens and the senior secured obligations, including the controversial 2023 Uptier Transaction.  To conduct this investigation, the Committee is afforded a budget of just $50,000. *See* Motion, ¶ 21.

23. After a hearing on August 13, 2025, the Court entered the *Interim Order (I) Authorizing Debtors and Debtors in Possession to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Senior Secured parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* [Docket No. 73] (the "**Interim DIP Order**").

24. Since the Committee's appointment, the Debtors and the Committee have attempted to resolve the Committee's objections to the form of the Final Order. The issues set forth in this Objection remain unresolved, but the Committee is committed to working with the Debtors and Oaktree prior to the hearing to try to resolve any outstanding issues.

## OBJECTION

25. Simply put, the flaws in the proposed DIP Facility are not just unfair to all unsecured creditors and in favor of Oaktree. If the Final Order is entered as currently contemplated, Oaktree would be given nearly exclusive control over these Chapter 11 Cases resulting from the DIP Facility's overreaching Conditions Precedent and expedited Milestones. In addition to this unwarranted control, the Debtors also seek substantive lender protections on a final basis including a marshaling waiver and waivers under sections 506(c) and 552(b) of the Bankruptcy Code, in exchange for only $7.5 million in guaranteed new money (the same amount of money that was approved on an interim basis).

26. Moreover, the proposed limitations on the Committee's Challenge Period, investigation budget, and use of DIP Facility proceeds further illustrate Oaktree's intent to control these Chapter 11 Cases and, if approved, will hamper the Committee's ability to exercise its fiduciary duties and conduct an adequate investigation. Accordingly, the proposed DIP Facility is neither fair nor equitable, and the DIP Lenders should not be afforded a "good faith" finding under section 364(e) of the Bankruptcy Code.

27. For these reasons, and as set forth in greater detail below, the proposed DIP Facility would result in precisely the type of perversion of the bankruptcy process that the law finds offensive. Therefore, the Motion should be denied unless the proposed Final Order is amended consistent with the objections raised herein.

### A. The Conditions Precedent and Milestones Inappropriately Give Oaktree Control of the Chapter 11 Cases.

28. The onerous Conditions Precedent to the DIP Tranche 2 draw under the DIP Credit Agreement grant Oaktree carte blanche approval rights on case-defining issues and the unfettered ability to withhold the lion's share of the DIP Loans if these issues are not addressed and resolved to their liking. Of particular concern are the Conditions Precedent that allow Oaktree to withhold making the DIP Tranche 2 loans unless the Debtors: (i) enter into binding go-forward agreements with both GEV and Vestas, in each case to the satisfaction of Oaktree; (ii) deliver to Oaktree an Acceptable Plan; (iii) comply with Oaktree's case milestones; and (iv) maintain minimum liquidity of $30 million (more than the entire DIP Facility). By allowing Oaktree to withhold access to $20 million of DIP funding subject to the Debtors' compliance with these Conditions Precedent, approval of the DIP Facility will instantly cede total control of these cases to Oaktree.

29. As a result, the DIP Facility and DIP Credit Agreement must be modified to remove these overly restrictive and self-serving Conditions Precedent. Additionally, the Final Order must state that, to the extent Oaktree does not make the DIP Tranche 2 draw, neither the DIP Secured Parties nor the Senior Secured Parties shall be entitled to a marshaling waiver, the waiver under section 506(c) of the Bankruptcy Code, or the waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code.

30. The proposed Milestones are also a key aspect of Oaktree's plan to control these Chapter 11 Cases for their own benefit. Specifically, the Milestones require: (i) entry of a Final Order no later than 40 days after the Petition Date (September 20, 2025); (ii) entry of a Disclosure Statement Order (as defined in the DIP Credit Agreement) no later than 45 days after the Petition Date (September 25, 2025); (iii) entry of an order confirming an Acceptable Plan no later than 100

days after the Petition Date (November 19, 2025); and (iv) the occurrence of the effective date of an Acceptable Plan no later than 120 days after the Petition Date (December 9, 2025).

31. Moreover, the Oaktree-designed Milestones do not provide sufficient time for the Committee to undertake the necessary review and analysis of a variety of prepetition transactions, many of which implicate Oaktree, including the 2023 Uptier Transaction. The Milestones also place undue pressure on the Debtors to, among other things, negotiate key Customer Agreements, which will be mission critical for any successful chapter 11 plan and go forward company.  As such, the Committee submits that the Milestones set forth in (ii)–(iv) above should each be extended by *at least* thirty (30) days in light of the Debtors' ongoing negotiations with their key customers, and the Committee's nascent investigation into the 2021 Transaction, 2023 Uptier Transaction, and purported liens held by the Senior Secured Parties.

### B. The Investigation Period, Investigation Budget, and Limitations on the Committee's Use of DIP Financing Proceeds and Collateral Are Unreasonable and Prejudicial to Unsecured Creditors.

32. The proposed Final Order also includes several provisions that constrain the Committee's ability to fulfill its fiduciary duties to investigate and prosecute potential Challenges for the benefit of the Debtors' estates.  The Investigation Period is unreasonably short in light of, *inter alia*, the procedural hurdles that the Committee must navigate before initiating any Challenge. Critically, the Committee must first: (i) complete its investigation; (ii) provide notice to the Debtors; (iii) allow the Debtors time to respond and to initiate an action; and (iv) if the Debtors decline, seek and obtain an order granting the Committee standing—all before the 60-day Challenge Period expires.

33. In addition, Oaktree attempts to further hamstring the Committee by providing an unreasonably low investigation budget of $50,000, which budget is to be used to investigate all potential claims against Oaktree, including claims related to the 2023 Uptier Transaction. If the Committee's budget to investigate this controversial and, to the Committee's knowledge, unprecedented pre-bankruptcy transaction, is limited to $50,000, it will be tantamount to a *de facto* release of Oaktree. The Court should not countenance these efforts.

34. If that were not enough, Oaktree proposes other broad sweeping limitations on the Committee's professional fees more generally. Specifically, the proposed Final Order provides that the Committee cannot use DIP proceeds or Cash Collateral to object to standard chapter 11 documents including, but not limited to, the Motion, any disclosure statement, or any plan of reorganization or liquidation filed in these Chapter 11 Cases. *See* Interim DIP Order, ¶ 21. Such limitations would turn any creditors' committee's mandate on its head and must be removed. *See In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (finding cap on fees unacceptably limited the right of debtor's counsel to payment for bringing actions against the DIP lenders, creating an economic incentive to avoid bringing such actions in disregard of its fiduciary duties toward the estate); *see also In re Channel Master Holdings, Inc.*, No. 03-13004, 2004 Bankr. LEXIS 576, at *8–9 (Bankr. D. Del. Apr. 26, 2004).

35. To remedy the issues outlined above, the Committee proposes that the Final Order: (i) extend the Investigation Period to at least 120 days after the Committee's appointment; (ii) increase the Committee's investigation budget to $250,000, without prejudice to the Committee seeking further increases to facilitate the Committee's exercise of its fiduciary duties; (iii) provide that the investigation budget does not apply to the Committee's investigation of the 2023 Uptier Transaction; (iv) provide that proceeds of the DIP Facility, DIP Collateral, and Prepetition Collateral

may be used by the Committee in the furtherance of their statutory duties, including, for example, to object to the disclosure statement or chapter 11 plan; and (iv) grant the Committee automatic standing to assert challenges in the Chapter 11 Cases.[7] Furthermore, a provision should be added to the Final Order providing that any successful challenge could result in the Roll-Up Loans being unrolled on a dollar for dollar basis as well as the Court's ability to fashion any other appropriate remedy.

### C. The Court Should Not Permit the Improper Waivers of Marshaling, Surcharge Rights under Bankruptcy Code § 506(c), and Rights Under Bankruptcy Code § 552(b) Related to the "Equities of the Case."

36. The proposed waivers of section 506(c) surcharge, marshaling,[8] and section 552(b) "equities of the case" rights, albeit a typical request by a DIP lender, is an unprecedented ask where here, the Debtors seek approval of these valuable protections in exchange for the mere $7.5 million that was already authorized pursuant to the Interim DIP Order. Meanwhile, the Debtors and DIP Lenders insist on approval of these waivers on a final basis despite the very realistic possibility that the $20 million DIP Tranche 2 is never authorized to be drawn, which is inappropriate and prejudicial to unsecured creditors. As proposed, the Final Order would further insulate Oaktree from having to "pay the freight" of the Chapter 11 Cases.

37. To make matters worse, the Committee has yet to receive assurance that there will be sufficient availability under the DIP Facility to pay all administrative claims against the Debtors'

---

[7] At a minimum, the Challenge Period should be tolled in the event that the Committee files a motion seeking standing to assert a challenge until such motion is determined by the Court, as is customary in other DIP orders.

[8] To the extent the Court grants the Debtors' request to encumber the Excluded Collateral (defined herein), Oaktree, at a minimum, should be required to exhaust all other collateral before seeking satisfaction of all claims from unencumbered assets (including, if allowed by the Court, the Avoidance Action Proceeds), the value of which would otherwise be available for the benefit of unsecured creditors.

estates, including post-petition trade claims, section 503(b)(9) claims, critical vendor claims, and professional fees, among other things. In fact, to the contrary, the Debtors have encountered further liquidity constraints as one of their financiers that is party to a supply chain financing agreement ceased purchasing any of the Debtors' receivables until certain conditions are met.[9] Any reasonable assurance is further contravened by the possibility that Oaktree is not satisfied with the terms of Customer Agreements with GEV and Vestas or any chapter 11 plan proposed by the Debtors.

38. At its core, Oaktree is requesting substantial lender protections while maintaining complete control over whether the Debtors can access the vast majority of the DIP Facility. Or said another way, Oaktree is requesting protections that are typically reserved for a *final* DIP order, but is not providing any certainty that the Debtors will receive a penny more than the $7.5 million that was already approved on an *interim* basis. As such, the litany of lender protections that are typically granted with a final DIP order, like a 506(c) waiver, 552(b) waiver, and marshaling waiver, should not be granted at this time.

D. **The DIP Facility Inappropriately Grants Superpriority Claims and Liens on Unencumbered Assets, Including Avoidance Action Proceeds, Commercial Tort Claims and Other Potential Claims Against Oaktree.**

39. It is inappropriate to encumber the Avoidance Action Proceeds, commercial tort claims and other claims against Oaktree before the Committee has had the opportunity to conduct a thorough investigation. Thus, the scope of the collateral package must be narrowed to exclude: (i) Avoidance Action Proceeds or property recovered from Avoidance Actions; (ii) commercial tort

---

[9] *See* Debtors' Supplement to Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Continue Financing Receivables Under Supply Chain Financing Agreements and (II) Granting Related Relief, ¶ 3 [Docket No. 142].

claims and other claims and causes of action against Oaktree and any proceeds or property recovered therefrom including those associated with the 2023 Uptier Transaction; (iii) claims against the Debtors' equity holders, and current and former directors and officers and other insiders, and the Debtors' director and officer insurance policies and proceeds thereof; and (iv) any other unencumbered assets (collectively, the "**Excluded Collateral**").

40.  Specifically, granting liens on the Avoidance Action Proceeds is unacceptable as it contravenes the intended purpose of avoidance actions and robs the estates and unsecured creditors of an important source of value.  Indeed, the Fifth Circuit recognizes that avoidance actions and their proceeds are intended to safeguard equitable distribution to creditors.  *See, e.g.*, *Cullen Ctr. Bank & Trust v. Hensley (In re Criswell)*, 102 F.3d 1411, 1414 (5th Cir. 1997) (holding that "Congress enacted [avoidance powers to] . . . facilitate[e] the prime bankruptcy policy of equality of distribution among creditors of the debtor.").  The primary purpose of such a restriction is to reserve avoidance powers and their proceeds for unsecured creditors.  *See Gaudet v. Babin (In re Zelda)*, 103 F.3d 1195, 1203 (5th Cir. 1997) ("A trustee's avoidance powers are intended to benefit the debtor's creditors, as such powers facilitate a trustee's recovery of as much property as possible for distribution to the [unsecured] creditors."); *McFarland v. Leyh (In re Tex. Gen. Petrol Corp.)*, 52 F.3d 1330, 1335–36 (5th Cir. 1995) (emphasis added) ("The proceeds recovered in avoidance actions ***should not benefit the reorganized debtor***; rather, the proceeds should benefit the unsecured creditors.").

41.  In addition, as the Committee's lien review has just begun, the Committee has not determined whether the Senior Secured Parties' collateral includes any commercial tort claims, which must be specifically identified in the applicable security agreements and financing statements, and whether there are any other unencumbered prepetition assets.  *See* UCC § 9-

108(e)(1) (alteration in original) ("A description only by type of collateral defined in [the Uniform Commercial Code] is an insufficient description of . . . a commercial tort claim."). A related provision of the UCC prohibits the attachment of a security interest in after-acquired commercial tort claims. *See* UCC § 9-204(b)(2) ("A security interest does not attach under a term constituting an after-acquired property clause to . . . a commercial tort claim"). As such, it is possible that the commercial tort claims are unencumbered assets that should remain for the benefit of unsecured creditors.

42. The Final Order should also not be a mechanism for Oaktree to obtain DIP Liens on causes of action against itself. But Oaktree is proposing exactly that. If this were permitted (and it should not be), Oaktree—in exchange for potentially lending only $7.5 million—will control and thereby could pocket-veto potential claims against itself in connection with, among other conduct, the 2023 Uptier Transaction. This brazen overreach must be stricken from the Final Order, otherwise the Committee's challenge rights will be rendered illusory.

43. Accordingly, the Final Order should specifically carve out the Excluded Collateral from the DIP Collateral and Adequate Protection collateral.

**E. Other Aspects of the DIP Facility and Final Order Should Not Be Approved.**

44. In addition to the foregoing, this Court should not approve the Motion on a final basis until the following issues are resolved:

    i. **Diminution in Value:** The Debtors assert that the Senior Secured Parties are entitled adequate protection in their interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any diminution in value of the Prepetition Collateral. Any adequate protection must be restricted such that the Senior Secured Parties are not entitled to any adequate protection for a diminution in value related to "the priming of their respective interests in the Prepetition Collateral (including Cash Collateral)." Further, the Final Order should provide that adequate protection is granted only to the extent of any

      *demonstrable* diminution in the value of the Senior Secured Parties' collateral (the "**Diminution in Value**"). *See* Interim DIP Order, ¶ K.

ii. **Authorization of the DIP Financing and the DIP Documents:** The Debtors seek authorization on a final basis to execute, and borrow money pursuant to, the DIP Documents. This provision should require the Debtors to provide the Committee with (1) copies of any non-material amendments to any Approved Budget or the DIP Documents within two business days following execution or approval, as applicable, and (2) if any material amendments to the DIP Documents are contemplated, notice of such amendment(s) at least five business days prior to such amendment required to be occurring, and provide the Committee with the opportunity to object and be heard by the Court in the event such objection is not resolved. *See* Interim DIP Order, ¶ 2.

iii. **Releases:** The DIP Facility requires the Debtors to provide broad releases on a final basis to the DIP Secured Parties and each of their Representatives, including releases of any claims or causes of action that the Debtors may have against them, in their capacities as DIP Secured Parties and Representatives of the same. Any releases of the DIP Secured Parties and their Representatives should be effective only after (a) the Challenge Period has expired without a challenge, or (b) any timely Challenge has been fully adjudicated and resolved in favor of the lenders. Furthermore, no releases should be granted in the Final Order in favor of any insider or former or current director or officer of the Debtors. Absent such modifications, the Motion should not be granted on a final basis. *See* Interim DIP Order, ¶ 33.

iv. **Credit Bidding:** The DIP Secured Parties' and Senior Secured Parties' ability to credit bid should be subject to the Committee's challenge rights and limited to the extent of allowed, non-contingent, and non-disputed claims. Additionally, any credit bid based on unencumbered assets should be paid for with cash. *See* Interim DIP Order, ¶ 34.

## RESERVATION OF RIGHTS

As negotiations remain ongoing, the Committee reserves all of its rights to supplement or amend this Objection at or prior to the Final Hearing. The Committee also reserves all of its rights with respect to any filing by the Debtors, the Senior Secured Parties, or the DIP Secured Parties prior to the Final Hearing. Nothing contained in, or omitted from this Objection constitutes an admission or stipulation by the Committee, any member of the Committee, or any other party with

respect to any alleged claims against the Debtors, the Senior Secured Parties, DIP Secured Parties, or any other parties as applicable, including but not limited to the amount, validity, enforceability of any alleged claims against the Debtors, the extent, validity, priority, or perfection of any alleged liens and security interests in the Debtors' assets, or any money damage causes of action.

## CONCLUSION

For the foregoing reasons, the Committee respectfully requests that the Court (i) deny final approval of the Motion unless and until the issues raised herein are adequately addressed in any Final Order, and (ii) grant such other and further relief as is just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated: September 5, 2025

**MUNSCH HARDT KOPF & HARR, P.C.**

*/s/ Brenda L. Funk*
John D. Cornwell
Texas Bar No. 24050450
Brenda L. Funk
Texas Bar No. 24012664
700 Milam St., Suite 800
Houston, Texas 77002
Phone: (713) 222-1470
Fax: (713) 222-1475
E-mail: jcornwell@munsch.com
E-mail: bfunk@munsch.com

-and-

LOWENSTEIN SANDLER LLP
Jeffrey L. Cohen (admitted *pro hac vice*)
David M. Posner (admitted *pro hac vice*)
Eric Chafetz (admitted *pro hac vice*)
Erica G. Mannix (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Phone: (212) 262-6700
Fax: (212) 262-7402
E-Mail: jcohen@lowenstein.com
E-mail: dposner@lowenstein.com
E-mail: echafetz@lowenstein.com
E-mail: emannix@lowenstein.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 5th day of September, 2025, she caused a true and correct copy of the foregoing Notice of Appearance to be served electronically on those parties requesting electronic service through the Court's ECF system.

>*/s/ Brenda L. Funk*
>Brenda L. Funk
>Texas Bar No. 24012664