**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| TPI COMPOSITES, INC., *et al.*, | § | Case No. 25-34655 (CML) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS | § | |
| | § | |
| *Plaintiff,* | § | Adv. No. _____ |
| | § | |
| v. | § | |
| | § | |
| OAKTREE FUND ADMINISTRATION, LLC; OAKTREE POWER OPPORTUNITIES FUND V (DELAWARE) HOLDINGS, L.P.; OPPS TPIC HOLDINGS, LLC; OAKTREE PHOENIX INVESTMENT FUND, L.P; OPPS XB TPIC PT, L.P.; OPPS XI TPIC HOLDINGS, L.P.; OCM POWER V TPIC PT, L.P.; OPIF TPIC CTB, L.P. | § | |
| | § | |
| *Defendants.* | § | |

## ADVERSARY COMPLAINT

Plaintiff, the Official Committee of Unsecured Creditors (the "<u>Committee</u>") appointed in

the chapter 11 cases (the "<u>Chapter 11 Cases</u>") of TPI Composites, Inc. ("<u>TPI</u>") and its affiliated

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  TPI Texas, LLC (4000), TPI Composites, Inc. (0775), TPI International, LLC (9537), TPI Turkey, LLC (2552), TPI APAC, LLC (8038), TPI APAC II, Inc. (3515), TPI Turkey II, LLC (2551), TPI Turkey Izbas, LLC (0185), TPI Composites Services, LLC (4547), TPI Mexico, LLC (0745), TPI Mexico II, LLC (8269), TPI Mexico III, LLC (7315), TPI Mexico IV, LLC (1231), TPI Mexico V, LLC (5628), TPI Mexico VI, LLC (7260), Ponto Alto Holdings, LLC (0322), TPI Arizona, LLC (9641), TPI Iowa, LLC (2887), TPI Iowa II, LLC (4175), Composite Solutions, Inc. (1486), TPI Holdings Mexico, LLC (1936), and TPI Technology, Inc. (2727).  The Debtors' mailing address is 9200 E. Pima Center Parkway, Suite 250, Scottsdale, AZ 85258.

debtors-in-possession (together with TPI, the "Debtors") brings this action on behalf of the Debtors' estates against Defendants Oaktree Fund Administration, LLC, Oaktree Power Opportunities Fund V (Delaware) Holdings, L.P., Opps TPIC Holdings, LLC, Oaktree Phoenix Investment Fund, L.P., Opps Xb TPIC PT, L.P., Opps XI TPIC Holdings, L.P., OCM Power V TPIC PT, L.P., and OPIF TPIC CTB, L.P.[2]

## NATURE OF THE CASE[3]

1.      Oaktree—the Debtors' sole Preferred Equity holder—effectuated an uptier transaction to achieve a better position vis-a-vis unsecured creditors at a time when it knew the Debtors were insolvent or would soon become insolvent, without providing any additional funding (or other reasonably equivalent value) to the Debtors.

2.      Oaktree began, by its own choice, as a Preferred Equity holder.  Once it became clear the Debtors were not going to be able to meet their obligation to pay dividends to Oaktree (and in preparation for the Debtors' impending financial distress), Oaktree, due to its insider status, forced the Debtors to convert almost $400 million in Preferred Equity into first lien secured debt with alleged liens on substantially all of the Debtors' assets.  Without providing any additional funding to the Debtors, Oaktree intentionally leapfrogged over unsecured creditors, including Noteholders, to ensure it would be paid first in a likely and foreseeable in- or out-of-court restructuring process.

3.      Now, in the Chapter 11 Cases filed less than two years after Oaktree was gratuitously given priority over unsecured creditors, Oaktree intends to exchange its secured debt

---

[2]     Portions of this complaint contain information included in materials marked Confidential or Highly Confidential by the Debtors or Oaktree.  The Committee is thus filing this complaint under seal pursuant to paragraph 12 of the Agreed Protective Order (Bankr. Dkt. 270), which permits parties to "file Confidential or Highly Confidential Material under seal without the necessity of filing a separate motion under Local Rule 9037-1(g)."

[3]     Capitalized terms used but not defined in this section shall have the meanings ascribed herein.

to become once again the equity owner of the Debtors.  In the end, absent this Court's intervention, Oaktree will come full circle and own the Debtors either through a credit bid or plan process without spending a dime (other than partially funding debtor-in-possession financing ("DIP Financing") in the amount of $7.5 million), since it voluntarily purchased the Preferred Equity in 2021.

## JURISDICTION AND VENUE

4.      This matter is brought pursuant to Rules 3007, 3012, and 7001 *et seq.* of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to seek relief in accordance with 11 U.S.C. §§ 105(a), 502, 544, 548, and 550 and 28 U.S.C. §§ 2201 and 2202.

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1331 because this is a civil proceeding arising in or relating to the Debtors' Chapter 11 Cases.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

6.      Venue is proper in this Court under 28 U.S.C. § 1409(a).

7.      The Committee has standing to pursue Counts One, Two, Eight, and Nine herein pursuant to 11 U.S.C. §§ 502(a) and 1109(b) and Bankruptcy Rule 3007.  The Committee separately filed a motion in the Chapter 11 Cases seeking standing to pursue Counts Three through Seven herein.

8.      Pursuant to Bankruptcy Rule 7008 and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas, the Committee consents to entry of final orders or a final judgment by this Court in this adversary proceeding.

## THE PARTIES

9.      Plaintiff is the Committee in these Chapter 11 Cases appointed by the Office of the United States Trustee pursuant to 11 U.S.C. § 1102(a)(1).

10.     The Committee is comprised of seven creditors holding unsecured claims against the Debtors.

11.     Defendant Oaktree Fund Administration, LLC is a limited liability company organized under the laws of the state of Delaware.

12.     Oaktree Fund Administration, LLC is the administrative agent with respect to the Uptier Transaction (defined in section C of "Background").

13.     Defendant Oaktree Power Opportunities Fund V (Delaware) Holdings, L.P. is a limited partnership organized under the laws of the state of Delaware.

14.     Defendant Opps TPIC Holdings, LLC is a limited liability company organized under the laws of the state of Delaware.

15.     Defendant Oaktree Phoenix Investment Fund, L.P. is a limited partnership organized under the laws of the Cayman Islands.

16.     Oaktree Power Opportunities Fund V (Delaware), L.P., Opps TPIC Holdings, LLC, and Oaktree Phoenix Investment Fund, L.P. (collectively, the "Lenders") are the "lenders" in connection with the 2023 Transaction.

17.     Oaktree Fund Administration, LLC and the Lenders are collectively referred to herein as "Oaktree."

18.     Defendant Opps Xb TPIC, PT, L.P. is a limited partnership organized under the laws of the state of Delaware.

19.     Defendant Opps XI TPIC Holdings, L.P. is a limited partnership organized under the laws of the state of Delaware.

20.     Defendant OCM Power V TPIC PT, L.P. is a limited partnership organized under the laws of the state of Delaware.

21.    Defendant OPIF TPIC CTB, L.P. is a limited partnership organized under the laws of the Cayman Islands.

22.    Oaktree, Opps Xb TPIC, PT, L.P., Opps XI TPIC Holdings, L.P., OCM Power V TPIC PT, L.P., and OPIF TPIC CTB, L.P. are collectively referred to herein as the "DIP Lenders."

## BACKGROUND

**A.    The Preferred Equity Purchase**

23.    In 2021, ██████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████████████████

██    ████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████

25.    On November 8, 2021, TPI entered into a Series A Preferred Stock Purchase Agreement (the "Preferred Equity Agreement") with Oaktree, whereby Oaktree purchased an aggregate of 350,000 shares of newly designated Series A Preferred Stock (the "Preferred Equity") for an aggregate purchase price of $350 million (the "Preferred Equity Purchase").

26.    At the time of the Preferred Equity Purchase, ██████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

██    ████████████████████████████████████████████
█████████████████████████████████████████████████████████
██████████████████████████████████

28.     The Preferred Equity Agreement provided that the company may "elect at [its] option to require Oaktree to purchase an additional $50.0 million of Series A Preferred Stock upon the same terms and conditions as the initial issuance of the Series A Preferred Stock during the two-year period following the Closing Date."

29.     The Preferred Equity Agreement further included the issuance of a warrant to purchase 4,666,667 shares of common stock at $0.01 per share (for a total of approximately $47,000), exercisable anytime over five years, adjusting for splits, dividends, or similar events.

30.     Oaktree fully exercised the warrant in August 2022.



32.     The dividend rate on the Preferred Equity was 11% annually, payable in cash or paid-in-kind for the first two years and compounded on a quarterly/cumulative basis.

33.     In connection with the Preferred Equity Purchase, ███████████████████ ██████████████████████



**B.     The Debtors' Financial Projections, Performance, and Solvency**

35.     According  to  Oaktree, █████████████████████████ ████████████████████████

36.     Beginning in 2022, TPI experienced an increase in costs for necessary materials coupled with challenges such as decreased demand and a projected sales decline.

37.     TPI's 2022 SEC filings acknowledge that the company had "incurred substantial losses over the past three years" and previewed that it would not have sufficient cash flow from operations to pay the accruing dividends owed to the Preferred Equity holders.

38.     TPI reported in its 10-K for 2022, issued in February 2023, that the Debtors began considering alternatives to pay their debts as they came due, including selling assets, restructuring debt, or obtaining additional debt financing or equity capital.

39.     The Debtors financial condition continued to deteriorate in 2023 due to, in part, the rising costs of labor and materials because of inflation.

40.     In addition, the market demand for wind turbines declined between 2022 and 2023.

41.     In March 2023, TPI issued and sold an aggregate of $132.5 million principal amount of convertible senior unsecured notes due in 2028 in a private placement offering (the "Notes" and the holders thereof the "Noteholders").

42.     Within a few short months after the issuance of the Notes, the Debtors' second quarter 2023 earnings were well below market expectations.

43.     As a result, the Notes traded down at a significant discount (roughly 30% of par at the time).

44.     In addition, at or around the time of the Uptier Transaction, the Notes were trading at roughly 50% of par, implying an aggregate debt discount of approximately $66 million.

▮▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███   ███████████████████████████████████

███████████████████████████████████████████

███████

47.     The financial projections in the Business Plan were unreasonable given the information available to the Debtors at the time because: (i) management was unreasonably optimistic about the potential positive impact of environmental regulations on the Debtors' customer bargaining power;  (ii) management took an overly bullish view of recontracting and expanding production lines, gross margins per blade set, and projected utilization of the production lines; and (iii) management was too aggressive in its expectations for managing operating costs and reducing lost revenue due to warrantee servicing.

███   ███████████████████████████████████

███████████████████████████████████████████

████████████████

49.     The Debtors' historical financial performance has been characterized by flat to declining topline growth since 2021, minimal earnings before income, taxes, depreciation, and amortization ("EBITDA") margin, and negative cash flow from operating activities with cash flow sustained by financing activities.

50.     As of 2023, the Debtors' sales were highly concentrated with three customers accounting for almost 90% of the Debtors' revenues.

51.     In addition, in 2023, the Debtors were potentially liable for product warranty claims, and certain customer supply agreements were subject to early termination and volume reductions at the sole discretion of the customers.

52.     Furthermore, as of 2023, it was possible customers could assert liquidated damages against the Debtors associated with any project delays.

53.     Such high customer concentration left the Debtors exposed to material revenue and profitability downside either due to customer contract cancellations or other modifications, which could materially harm the financial condition of the Debtors' business.

54.     In February 2024, the Debtors publicly announced that, unless the company obtained sufficient capital, it would be forced to delay, reduce, or eliminate operations.

**C.     Negotiating the Uptier Transaction**

█     ████████████████████████████████████████████████

████████████████████████████████████████████████

56.     For example, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

57.     According to Oaktree's own documents, ████████████████████

████████████████████████████████████████████████

████████████████

58.     As a result, in 2023, ████████████████████████████

████████████████████████████████████████████████

████████████████████████

█     ████████████████████████████████████

60.     However, according to its own documents, ████████████████████

████████████████████████████████████████████████

████████████████████████████████

61.     As one potential option, the Debtors considered obtaining additional funding through the option in the Preferred Equity Agreement to require Oaktree to purchase an additional $50.0 million of preferred equity.

62.     However, ███████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████

        ██     ████████████████████████████████████████

64.     According to communications between TPI and Oaktree, ████████████ ████████████████████████████

65.     During negotiations between the parties, ████████████████ ███████████████████████████████████████████████ ██████████████████████

        ██     ████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████

67.     From September to November 2023, ██████████████████ ████████████████████████████████

68.     During the negotiations, ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

69.     Absent an agreement with Oaktree, ██████████████████████

████████████████████████████████████████████████████████████████

████████████████████████

        ███     ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

71.     Communications  among  Oaktree  representatives  also  show  that  ██████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████

72.     Before entering the Uptier Transaction, █████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████

73.     Moving Oaktree ahead of unsecured Noteholders in priority was one of Oaktree's
primary goals of the Uptier Transaction.

74.     On August 28, 2023, ██████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

11

████████████████████████████████████████████████████████
█████████████████

75.    According to Oaktree's own documents, ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████

76.    The Debtors and Oaktree knew, and openly discussed the fact, that ████████

████████████████████████████████████████

██    ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████

78.    Upon information and belief, ███████████████████████████████████

█████████████████████████████████████████████████████

79.    Following entry into the Uptier Transaction, █████████████████████████

██████████████████████████████████████

**D.     The Uptier Transaction**

80.    In 2023, TPI entered into a credit agreement and other documentation with Oaktree (the "Uptier Agreement"), exchanging all outstanding Preferred Equity and $43 million of accrued and unpaid dividends for a $393 million senior secured term loan and 3,899,903 shares of common stock (the "Uptier Transaction").

81.    Pursuant to the Uptier Agreement, Oaktree Power Opportunities Fund V (Delaware) Holdings, L.P. converted $147,375,000 in Preferred Equity to secured debt.

82.     Pursuant to the Uptier Agreement, Opps TPIC Holdings, LLC converted $238,747,500 in Preferred Equity to secured debt.

83.     Pursuant to the Uptier Agreement, Oaktree Phoenix Investment Fund, L.P. converted $6,877,500 in Preferred Equity to secured debt.

███   ████████████████████████████████████████████████

██████████

███   ████████████████████████████████████████████████

████████████████████████████

86.     ████████████  Oaktree swapped its 11% dividends in the Preferred Equity Agreement for interest at a rate of 11% under the Uptier Agreement.

87.     ████████████████████████████████████████████████

████████████  the Uptier Agreement permitted TPI to keep just $40,000,000 on hand from its closing date through September 30, 2024, at which time TPI was again required to keep $50,000,000 on hand.

███   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

███   ████████████████████████████████████████████████

███████████████████████████████████████████

90.     ████████████████████████████████████████████████

████████████████████████████  the Uptier Agreement mandated that TPI would not incur indebtedness above its amount of commitments as of the closing date.

91. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ and the Uptier Agreement ██████ mandated

that TPI would not commit to any single capital expenditure project in excess of $10,000,000 and

that the total capital expenditures would not exceed $30,000,000 in any twelve-month period.

92. ██████████████████████████████████████████

████████████████████████████ under the Uptier Agreement, it was an event of

default to institute a bankruptcy proceeding.

93. The Uptier Agreement does not provide a schedule for payments of principal

amounts.

94. Under the Uptier Agreement, all amounts owed under the Uptier Transaction are

due on the maturity date of March 31, 2027.

**E.    The Chapter 11 Cases**

95. On August 11, 2025 (the "Petition Date"), the Debtors commenced the Chapter 11

Cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this

Court.

96. On August 21, 2025, the Office of the United States Trustee appointed the

Committee.

97. The Debtors assert $472 million is the secured outstanding amount owed to Oaktree

pursuant to the Uptier Agreement as of the Petition Date (the "Oaktree Claim").

98. Prior to the Petition Date, ██████████████████████████████

████████████████████████████████████████████████



101.    On August 12, 2025, the Debtors filed the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status and (III) Granting Adequate Protection to the Senior Secured Parties, (IV) Modifying Automatic Stay, (V) Scheduling Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion").

102.    Pursuant to the DIP Motion, the Debtors sought approval to, *inter alia*, enter an agreement (the "DIP Agreement") with the DIP Lenders to obtain postpetition secured financing from the DIP Lenders on an interim basis of $7.5 million and $27.5 million on final basis.

103.    On August 13, 2025, this Court entered an interim order approving the DIP Motion on an interim basis (the "Interim DIP Order").

104.    The DIP Lenders have only funded $7.5 million to the Debtors pursuant to the DIP Agreement and Interim DIP Order.

105.    The DIP Lenders have not provided the additional $20 million in financing to the Debtors under the DIP Agreement.

106.    Conditions precedent to funding the additional $20 million in financing to the Debtors under the DIP Agreement include (i) Oaktree's approval of the terms of any contracts with

the Debtors' two largest customers; and (ii) Oaktree's approval of the terms of the Debtors' plan in the Chapter 11 Cases, in their sole discretion.

107.    The DIP Agreement and Interim DIP Order provide that any action (A) objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of the senior secured obligations or the prepetition liens, or (B) otherwise asserting or prosecuting any so-called "lender liability" claims, action for preferences, fraudulent transfers or conveyances, other avoidance power claims, or any other claims, counterclaims or causes of action, objections, contests, or defenses of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable law, or otherwise must be brought, if by the Committee, by 60 calendar days from the filing of the notice of formation of the Committee, which is October 20, 2025 (the "Committee Challenge Period").

108.    On September 24, 2025, the Debtors filed the *Emergency Motion of Debtors for Entry of Orders (I) Approving (A) Bid Procedures for Sale of Debtors' Assets, (B) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (C) Assumption and Assignment Procedures, (II) Scheduling Auction for and Hearing to Approve Sale of Debtors' Assets, (III)(A) Approving Sale of Debtors' Assets and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "Bid Procedures Motion").

109.    On September 30, 2025, the Court entered an order granting the Bid Procedures Motion (the "Bid Procedures Order").

110.    Pursuant to the Bid Procedures Order, the bid deadline is October 22, 2025.

111.    Pursuant to the Bid Procedures Order, Defendant Oaktree Fund Administration, LLC, as the administrative agent for the Lenders in connection with the Uptier Agreement, and the DIP Lenders under the DIP Agreement, shall have the right to credit bid on behalf of both the

Lenders and DIP Lenders all obligations under the Uptier Agreement and DIP Agreement, subject to the Committee Challenge Period in the DIP Agreement and Interim DIP Order.

**COUNT ONE**
**RECHARACTERIZATION OF SECURED CLAIM AS EQUITY INTEREST**
(*Against Oaktree*)

112.     The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

113.     Section 502(b) of the Bankruptcy Code provides, *inter alia*, that the Court shall not allow a claim that is unenforceable against the debtor under any applicable law.

114.     Section 105(a) of the Bankruptcy Code provides that the Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

115.     Pursuant to Section 105(a) of the Bankruptcy Code, bankruptcy courts possess the inherent power to recharacterize a purported debt instrument as equity where the parties intended that the instrument function as equity.

116.     The Oaktree Claim, while asserted as debt owed by the Debtors to Oaktree, began as, and continues to be, an equity contribution and should be recharacterized as an equity interest.

117.     Prior to the Uptier Transaction, Oaktree held Preferred Equity in the Debtors.

118.     Following the Uptier Transaction, Oaktree held common stock of the Debtors, along with alleged secured debt.

119.     The Debtors were thinly and/or inadequately capitalized at the time of the Uptier Transaction.

120.     As internal communications establish, Oaktree was intimately aware of the Debtors' dire financial situation prior to entry into the Uptier Transaction, based on, among other reasons, their seat on the board of directors.

121.    The intent of the Uptier Transaction was to improve the priority of the Oaktree Claim such that Oaktree was senior to unsecured creditors, including Noteholders.

122.    At the conclusion of the Chapter 11 Cases, Oaktree intends for its allegedly secured debt to be converted back into equity interests through a chapter 11 plan or a credit bid.

███ ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

124.    ██████████ the Uptier Agreement swapped the 11% dividend in the Preferred Equity Agreement for an 11% interest rate.

125.    ████████████████████████████████████████████████████

██████████ the Uptier Agreement permitted TPI to keep just $40,000,000 on hand from its closing date through September 30, 2024, at which time TPI was again required to keep $50,000,000 on hand.

███ ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

███ ████████████████████████████████████████████████████

███████████████████████████████████████████████

███ ████████████████████████████████████████████████████

██████████████████████ the Uptier Agreement mandated that TPI would not incur indebtedness above its amount of commitments as of the closing date.

███ ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

 the Uptier Agreement ▮▮▮ mandated that TPI would not commit to any single capital expenditure project in excess of $10,000,000 and that the total capital expenditures would not exceed $30,000,000 in any twelve-month period.

130.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ under the Uptier Agreement, it was an event of default to institute a bankruptcy proceeding.

131.   The Uptier Agreement does not provide for a schedule of payments of principal. Instead, all principal amounts owed under the Uptier Agreement must be paid by the maturity date of March 31, 2027.

## COUNT TWO
## EQUITABLE SUBORDINATION
### (*Against Oaktree*)

132.   The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

133.   Pursuant to Section 510(c) of the Bankruptcy Code, the Court may, "(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order than any lien securing such a subordinated claim be transferred to the estate."

134.   Pursuant to Section 502(b)(1) of the Bankruptcy Code, the Court should disallow any claim to the extent that "such claim is unenforceable against the debtor or property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."

135.     Pursuant to its general powers of equity codified in Section 105(a) of the Bankruptcy Code, the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.

136.     Equitable subordination is appropriate for the claims of creditors who engaged in inequitable conduct that either resulted in injury to the other creditors of a debtor or conferred an unfair advantage on such creditor, so long as subordination of those claims is not inconsistent with the provisions of the Bankruptcy Code.  Similarly, courts have held that equitable disallowance of claims may be appropriate in certain circumstances.

137.     Oaktree engaged in wrongful conduct that injured the Debtors, their creditors, and others.

138.     Oaktree, in its capacity as an insider, engaged in, and benefitted from, inequitable conduct by consummating the Uptier Transaction, which resulted in Oaktree converting its Preferred Equity into a secured loan and obtaining a lien on the Debtors' assets without providing reasonably equivalent value, which conferred an unfair benefit upon Oaktree.

139.     Knowing the Debtors were insolvent and could not pay all obligations as they arose, Oaktree required the Debtors to favor Oaktree over other creditors by converting their Preferred Equity position to a secured claimant position for little or no value.

140.     In consummating the Uptier Transaction with the Debtors, Oaktree intended, knew, or was reckless with regard to the fact that the Debtors were insolvent, or would become insolvent, as a result of and/or shortly after the Uptier Transaction and further restructuring would be required.

141.     The intent of the Uptier Transaction was to put Oaktree in a position senior to general unsecured creditors in the event of a bankruptcy or other restructuring process.

142.    Oaktree's inequitable conduct injured the Debtors and their estates and creditors, while conferring an unfair advantage on Oaktree.

143.    As a result of the Uptier Transaction, potential recoveries to unsecured creditors will be materially less than they would be if the Uptier Transaction had not been consummated.

144.    Equitable subordination or disallowance of the Oaktree Claim is not inconsistent with the provisions of the Bankruptcy Code and related case law.

145.    Principles of equitable subordination or, alternatively, equitable disallowance, require that the Oaktree Claim be equitably subordinated to all other allowed general unsecured claims against the Debtors or disallowed, and such equitable subordination or disallowance is consistent with the provisions and purposes of the Bankruptcy Code.

146.    The Court should equitably subordinate the Oaktree Claim against the Debtors to all allowed general unsecured claims against the Debtors or disallow such claims under Section 510(c) of the Bankruptcy Code and applicable law.

**COUNT THREE**
**CONSTRUCTIVE FRAUDULENT TRANSFER UNDER**
**11 U.S.C. § 544 AND DUFTA § 1304**
**(*Against Oaktree*)**

147.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

148.    Pursuant to Delaware Uniform Fraudulent Transfer Act ("DUFTA") Section 1304, a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were reasonably small

21

in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

149.    The Uptier Transaction was consummated within four years of the Petition Date.

150.    The Uptier Transaction constituted an obligation incurred by the Debtors.

151.    Oaktree did not provide any additional funding to the Debtors in exchange for obtaining a lien on substantially all assets of the Debtors.

152.    The Debtors did not receive reasonably equivalent value in exchange for granting Oaktree liens on substantially all of their assets.

153.    At the time of the Uptier Transaction, the Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they came due.

154.    The granting of new liens therefore constitutes a fraudulent transfer under DUFTA, which should be avoided.

155.    Wherefore, the Uptier Transaction is avoidable pursuant to Section 1304 of the DUFTA.

**<u>COUNT FOUR</u>**
**CONSTRUCTIVE FRAUDULENT TRANSFER UNDER**
**11 U.S.C. § 548(a)(1)(B)**
***(Against Oaktree)***

156.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

157.    Pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, a transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred within two years before the date of the filing of the petition, may be avoided if the debtor voluntarily or

involuntarily (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

158.    The Uptier Transaction constituted an obligation incurred by the Debtors.

159.    The Uptier Transaction was consummated within two years of the Petition Date.

160.    Oaktree did not provide any additional funding to the Debtors in exchange for being given a lien on substantially all assets of the Debtors.

161.    The Debtors did not receive reasonably equivalent value in exchange for granting Oaktree liens on substantially all of their assets.

162.    At the time of the Uptier Transaction, the Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they came due.

163.    Wherefore, the Uptier Transaction is avoidable pursuant to Section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT FIVE
## AVOIDANCE OF ACTUAL FRAUDULENT TRANSFER
## UNDER 11 U.S.C. § 544 AND DUFTA § 1304
### *(Against Oaktree)*

164.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

165.    Pursuant to DUFTA Section 1304, an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the obligation was incurred if the debtor incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor.

166.     In determining actual intent under DUFTA Section 1304, consideration is given to the following factors, among others: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

167.     The Uptier Transaction was consummated within four years of the Petition Date.

168.     The Uptier Transaction constituted an obligation incurred by the Debtors.

169.     The Debtors entered into the Uptier Transaction, under which Oaktree swapped its Preferred Equity for secured debt, ███████████████████████████████████████ ████████ and with the intent to hinder, delay, or defraud its creditors by putting Oaktree ahead of unsecured creditors.

170.     Due to its position as an insider, Oaktree was intimately aware of the Debtors' financial situation prior to entry into the Uptier Transaction, ██████████████████████████ ██████████████████████████████████████████.

171.    Knowing the Debtors were insolvent and could not pay all of their obligations as they arose, the Debtors favored Oaktree over unsecured creditors by converting their Preferred Equity position to a secured claimant position for little to no value in the Uptier Transaction.

172.    Prior to the Uptier Transaction, Oaktree was the holder of Preferred Equity in TPI.

173.    Prior to the Uptier Transaction, Oaktree was an insider of the Debtors.

174.    The obligation incurred by the Debtors in the Uptier Transaction was owed to an insider of the Debtors.

175.    The Debtors retained possession and control of all of their assets after the Uptier Transaction.

176.    Upon information and belief, ████████████████████████████████████ ████████████████████████████████████████

177.    Pursuant to the Uptier Transaction, the Debtors granted liens on substantially all their assets.

178.    The value of consideration received by the Debtors in the Uptier Transaction was not reasonably equivalent to the amount of the obligation incurred.

179.    The Debtors were insolvent or became insolvent shortly after the obligations under the Uptier Transaction were incurred.

180.    The granting of new liens therefore constitutes a fraudulent transfer under DUFTA, which should be avoided.

181.    Wherefore, the Uptier Transaction is avoidable pursuant to Section 1304 of the DUFTA.

## COUNT SIX
### ACTUAL FRAUDULENT TRANSFER UNDER 11 U.S.C. § 548(a)(1)(A)
### (*Against Oaktree*)

182.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

183.    Pursuant to 11 U.S.C. § 548(a)(1)(A), an obligation incurred by a debtor that was made or incurred on or within two years before the date of the filing of the petition may be avoided if the debtor voluntarily or involuntarily made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

184.    The Uptier Transaction constituted an obligation incurred by the Debtors.

185.    The Uptier Transaction was consummated within two years of the Petition Date.

186.    The Debtors entered into the Uptier Transaction, under which Oaktree swapped its Preferred Equity for debt, ███████████████████████████████ with the intent to hinder, delay, or defraud its creditors by putting Oaktree ahead of other creditors.

187.    Courts determine whether a party has intent to hinder, delay, or defraud creditors by analyzing certain "badges of fraud," including:  (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.

188.    Pursuant to the Uptier Transaction, the Debtors granted liens on substantially all of their assets in favor of Oaktree.

189.     The value of consideration received by the Debtors in the Uptier Transaction was not reasonably equivalent to the amount of the obligation incurred.

190.     Prior to the Uptier Transaction, Oaktree was an insider of the Debtors.

191.     The obligation incurred by the Debtors in the Uptier Transaction was owed to an insider of the Debtors.

192.     Oaktree was intimately aware of the Debtors' financial situation prior to entry into the Uptier Transaction, ███████████████████████████████████████████████
███████████████████████

193.     At the time of the Uptier Transaction, the Debtors were insolvent, inadequately capitalized, or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

194.     Knowing the Debtors were insolvent and could not pay all of their obligations as they arose, the Debtors favored Oaktree over other creditors by converting their Preferred Equity position to a secured claimant position for little to no value in the Uptier Transaction.

195.     The intent of the Uptier Transaction was to put Oaktree in a position senior to unsecured creditors.

196.     To put Oaktree in a position senior to unsecured creditors, the Debtors exchanged Oaktree's Preferred Equity into secured debt without requiring Oaktree to provide any additional funding to the Debtors.

197.     The Debtors retained possession and control of all of their assets after the Uptier Transaction.

198.     The granting of new liens therefore constitutes a fraudulent transfer, which should be avoided.

199.     Wherefore, the Uptier Transaction is avoidable pursuant to Section 548(a)(1)(A) of the Bankruptcy Code.

### COUNT SEVEN
### AVOIDANCE AND RECOVERY OF THE UPTIER TRANSACTION
### UNDER 11 U.S.C. § 550
### (*Against Oaktree*)

200.     The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

201.     The Uptier Transaction was an actual and/or constructive fraudulent transfer under the Bankruptcy Code and applicable state law.

202.     Oaktree was the initial transferee of the Uptier Transaction and/or the person for whose benefit the obligations were incurred in the Uptier Transaction.

203.     Pursuant to 11 U.S.C. § 550, the Committee is entitled to avoid the liens granted in the Uptier Transaction.

### COUNT EIGHT
### DECLARATORY JUDGMENT – MAXIMUM AMOUNT OF OAKTREE
### CLAIM FOR PURPOSES OF CREDIT BIDDING
### (*Against Oaktree*)

204.     The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

205.     The Oaktree Claim cannot be used to credit bid because it is not a secured claim.

206.     Oaktree has no right to credit bid any portion of the Oaktree Claim.

207.     Upon information and belief, Oaktree asserts the right to credit bid $472 million based on the Oaktree Claim.

208.     Accordingly, a justiciable controversy exists with respect to whether Oaktree can credit bid the Oaktree Claim.

209.    Pursuant to 28 U.S.C. §§ 2201 and 2202 and Bankruptcy Rule 7001, the Court should enter a declaratory judgment fixing the allowable amount of the Oaktree Claim for the purposes of a credit bid at $0.

## COUNT NINE
## DECLARATORY JUDGMENT – MAXIMUM AMOUNT OF DIP FINANCING CLAIM FOR PURPOSES OF CREDIT BIDDING
### (*Against All Defendants*)

210.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

211.    The DIP Lenders have funded only $7.5 million to the Debtors in connection with the DIP Agreement.

212.    The DIP Lenders only have a right to credit bid the $7.5 million of new money actually loaned to the Debtors under the DIP Agreement.

213.    Upon information and belief, the DIP Lenders may assert the right to credit bid the entire amount of its obligations pursuant to the DIP Agreement.

214.    While permitted to "roll up" funds under the terms of the Interim DIP Order, such "roll up" was premised on the fact that the Oaktree Claim was, in fact, secured.

215.    Once the Oaktree Claim is determined to not constitute a secured claim, the roll-up should be unwound and, therefore, the DIP Lenders should not be permitted to credit bid any such amounts.

216.    Upon information and belief, Oaktree asserts the right to credit bid $472 million based on the Oaktree Claim, a portion of which was subject to the "roll up".

217.    Accordingly, a justiciable controversy exists with respect to the amount the DIP Lenders can credit bid in connection with the DIP Agreement.

218.    Pursuant to 28 U.S.C. §§ 2201 and 2202 and Bankruptcy Rule 7001, the Court should enter a declaratory judgment fixing the allowable amount of the DIP Lender's claim in connection with the DIP Agreement at $7.5 million.

### PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, the Committee requests that the Court enter a judgment for relief as follows:

(a)    recharacterizing the Oaktree Claim from secured debt to equity;

(b)    equitably subordinating and/or disallowing the Oaktree Claim;

(c)    finding the Uptier Transaction was an actual and/or constructive fraudulent transfer;

(d)    avoiding the Uptier Transaction;

(e)    declaring Oaktree is not permitted to credit bid on account of the Oaktree Claim;

(f)    finding the DIP Lenders are only permitted to credit bid $7.5 million on account of the DIP Financing; and

(g)    granting such further and other relief as is just and equitable.

Dated: October 1, 2025

   _/s/ John D. Cornwell_

MUNSCH HARDT KOPF & HARR, P.C.
John D. Cornwell (24050450)
Brenda L. Funk (24012664)
700 Milam St., Suite 800
Houston, Texas 77002
Phone: (713) 222-1470
Fax: (713) 222-1475
E-Mail: jcornwell@munsch.com
E-Mail: bfunk@munsch.com

-and-

LOWENSTEIN SANDLER LLP
Jeffrey L. Cohen *(admitted pro hac vice)*
Eric Chafetz *(admitted pro hac vice)*
David M. Posner *(admitted pro hac*)
Erica Mannix *(admitted pro hac vice)*
1251 Avenue of the Americas
New York, New York 10020
Phone: (212) 262-6700
Fax: (212) 262-7402
E-Mail: jcohen@lowenstein.com
E-Mail: echafetz@lowenstein.com
E-Mail: dposner@lowenstein.com
E-Mail: emannix@lowenstein.com

-and-

LOWENSTEIN SANDLER LLP
Michael A. Kaplan *(admitted pro hac vice)*
Colleen M. Restel (SDTX Fed. No. 3867989)
One Lowenstein Drive
Roseland, New Jersey 07068
Phone: (973) 597-2500
Fax: (973) 597-2400
E-Mail: mkaplan@lowenstein.com
E-Mail: crestel@lowenstein.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*