IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § | Chapter 11 |
| TPI COMPOSITES, INC., *et al.*, | § § § | Case No. 25-34655 (CML) |
| Debtors.[1] | § § § § | (Jointly Administered) |

**EMERGENCY MOTION OF DEBTORS FOR
ENTRY OF ORDER (I) AUTHORIZING AND
APPROVING SETTLEMENT AND (II) GRANTING RELATED RELIEF**

> EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 9:00 AM THURSDAY, DECEMBER 18, 2025.
>
> IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

TPI Composites, Inc. and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: TPI Texas, LLC (4000), TPI Composites, Inc. (0775), TPI International, LLC (9537), TPI Turkey, LLC (2552), TPI APAC, LLC (8038), TPI APAC II, Inc. (3515), TPI Turkey II, LLC (2551), TPI Turkey Izbas, LLC (0185), TPI Composites Services, LLC (4547), TPI Mexico, LLC (0745), TPI Mexico II, LLC (8269), TPI Mexico III, LLC (7315), TPI Mexico IV, LLC (1231), TPI Mexico V, LLC (5628), TPI Mexico VI, LLC (7260), Ponto Alto Holdings, LLC (0322), TPI Arizona, LLC (9641), TPI Iowa, LLC (2887), TPI Iowa II, LLC (4175), Composite Solutions, Inc. (1486), TPI Holdings Mexico, LLC (1936), and TPI Technology, Inc. (2727). The Debtors' mailing address is 9200 E. Pima Center Parkway, Suite 250, Scottsdale, AZ 85258.

**Background**

1. On August 11, 2025, the Debtors each commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases. On August 21, 2025, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (Docket No. 113) (the "**Creditors' Committee**").

2. The Debtors' chapter 11 cases are being jointly administered for procedural purposes pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

3. Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of William E. Siwek in Support of Debtors' Chapter 11 Petitions and First Day Relief* (Docket No. 14) (the "**First Day Declaration**").

4. On October 1, 2025 and October 2, 2025, the Creditors' Committee filed several pleadings related to the prepetition transaction in which Oaktree Capital Management L.P. and certain of its affiliated funds and entities ("**Oaktree**" and, together with the Debtors and the Creditors' Committee, the "**Parties**" and each a "**Party**") exchanged Oaktree's then-existing $436 million of Preferred Equity[2] into a $393 million Senior Secured Term Loan, with the remaining

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Final DIP Order (as defined herein).

2

$43 million in accrued and unpaid dividends exchanged into common equity (the "**2023 Transaction**").[3]

5.  The Creditors' Committee's Pleadings asserted, among other things, that the 2023 Transaction constituted a fraudulent transfer and should be avoided, the Senior Secured Term Loan should be recharacterized as equity, and Oaktree's claims should be equitably subordinated. In addition, through the Creditors' Committee's Pleadings, the Creditors' Committee sought derivative standing to assert and settle estate claims on behalf of the Debtors for constructive fraudulent transfer, actual fraudulent transfer, and avoidance of the 2023 Transaction, and requested a temporary restraining order, preliminary injunction, and declaratory judgment seeking to prohibit Oaktree from credit bidding in any sale transactions or auction, if one were to be held.

6.  Also, on October 14, 2025, the Court conducted a hearing (the "**Final DIP Hearing**") to consider the relief requested under the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status and (III) Granting Adequate Protection to the Senior Secured Parties, (IV) Modifying Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (Docket No. 37). At the Final DIP Hearing, the Court directed the Debtors, Oaktree, and the Creditors' Committee to participate in mediation (the "**Mediation**").

---

[3] Specifically, the Creditors' Committee filed the (i) *Adversary Complaint*, (Adv. Pro. No. 25-03761, Docket No. 2) (the "**Complaint**"), (ii) *Emergency Motion of the Official Committee of Unsecured Creditors for a Temporary Restraining Order and Preliminary Injunction Against the Credit Bid of the Oaktree Entities* (Adv. Pro. No. 25-03761, Docket No. 3) (the "**Standing Motion**"), and (iii) *Emergency Motion of the Official Committee of Unsecured Creditors for Standing to Prosecute Claims on Behalf of the Debtors' Estates* (Docket No. 300) (collectively, the "**Creditors' Committee's Pleadings**").

7. On October 14, 2025, the Court entered the *Final Order (I) Authorizing Debtors and Debtors in Possession to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Senior Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (Docket No. 373) (the "**Final DIP Order**").

8. On October 29, 2025 and November 11, 2025, the Debtors, Oaktree, the Creditors' Committee, and certain affiliates of GE Vernova International, LLC ("**GEV**") and Vestas Wind Systems A/S ("**Vestas**", together with GEV, the "**Customers**") participated in the Mediation overseen by the Honorable Marvin Isgur.

9. On October 24, 2025, Oaktree moved to dismiss with prejudice the Creditors' Committee's adversary complaint in its entirety (Docket Nos. 25-27), and on October 28, 2025, the Debtors joined in Oaktree's motion to dismiss and moved to intervene in the adversary proceeding (Docket No. 29). On November 5, 2025, the Debtors and Oaktree objected to the Creditors' Committee's standing motion (Docket Nos. 415-426). Both the Standing Motion and Oaktree's motion to dismiss have been fully briefed.

10. On November 24, the Court entered the *Order Authorizing and Approving Stipulation (I) Regarding Certain Prepetition Collateral and (II) Extending Challenge Period for Official Committee of Unsecured Creditors Under Final Dip Order* (Docket No. 471) (the "**Disputed Collateral Stipulation**").

11. On November 24, 2025 and December 2, 2025, the Court conducted hearings regarding the Creditors' Committee's Pleadings, among other matters.

4

12. The Parties have engaged in extensive discovery and briefing in connection with litigation of the Creditors' Committee's Challenges[4] and, as a result, have utilized a significant amount of the Debtors' limited available cash. In an effort to end the costs associated with the continued prosecution of the Creditors' Committee's Challenges, during the Mediation, the Parties began engaging in meaningful discussions on the key terms of a global settlement to resolve the Creditors' Committee's Challenges, thereby allowing the Debtors and their estates to refocus their efforts and limited resources on pursuing a value-maximizing transaction and resolution of these chapter 11 cases. Central to these negotiations are certain claims held by Oaktree against the Debtors (collectively, the "**Oaktree Claims**").[5]

13. As a result of such negotiations, the Parties have agreed to a global settlement resolving the Creditors' Committee's Challenges and other matters on the terms and conditions set forth in <u>Exhibit 1</u> to the Proposed Order (as defined below) (the "**Settlement**").

### Jurisdiction

14. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[4] "**Creditors' Committee's Challenges**" means, collectively, the (i) Creditors' Committee Pleadings and (ii) all potential Challenges (as defined in the Final DIP Order and Disputed Collateral Stipulation) asserted or assertable as set forth in both the Creditors' Committee Pleadings and the Disputed Collateral Stipulation. The Challenge Period for all other Challenges has expired in accordance with the terms of the DIP Order and agreements of the Parties.

[5] The Oaktree Claims means (i) claims held by the Prepetition Administration Agent or Senior Secured Lenders on account of, arising under, or relating to the Senior Secured Term Loans and the Senior Secured Credit Agreement and (ii) all claims held by the DIP Lenders or the DIP Agent on account of, arising under, or relating to the DIP Credit Agreement, the DIP Facility, or the Final DIP Order, including claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Documents, which, for the avoidance of doubt, shall include all "DIP Obligations" (each, as such terms are defined in the Final DIP Order).

**Relief Requested**

15. By this Motion, pursuant to sections 363 and 105 of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors request entry of an order (i) authorizing and approving the Settlement among the Parties and (ii) granting related relief. A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit A** (the "**Proposed Order**").

**Settlement**

16. The terms and conditions of the Settlement are attached as Exhibit 1 to the Proposed Order, and the principal terms are set forth below.[6] At the core of the Settlement is a recovery sharing mechanism between Oaktree and the holders of allowed general unsecured claims against the Debtors, pursuant to which Oaktree has agreed to turn over to the holders of allowed general unsecured claims a portion of Oaktree's cash distributions (when and if Oaktree receives such distributions) either (i) on account of the Oaktree Claims or (ii) on account of any reorganized instrument (including debt or equity) that Oaktree (or any affiliated assignee, transferee, participant or successor in respect of the Oaktree Claims or such reorganized instrument, as applicable) may receive on account of the Oaktree Claims (either or both constitute, an "**Oaktree Recovery**"). More specifically, Oaktree has agreed to share cash distributions in accordance with the percentages and thresholds set forth below.

| Oaktree Claim Distribution[7] | | % Sharing | | $ Recovery | |
|---|---|---|---|---|---|
| **Min** | **Max** | **Oaktree** | **GUC** | **Oaktree** | **GUC** |
| Upfront Cash | | | | n.a | $1.0 |
| $ - | $89.5 | 100% | 0% | $89.5 | - |
| $89.5 | $125 | 95% | 5% | $33.725 | $1.775 |

---

[6] The following summary of the Settlement is subject entirely to the express terms of the Settlement contained in **Exhibit 1** to the Proposed Order. If there are any inconsistencies between the summary herein and the Settlement, the Settlement shall control.

[7] All dollar amounts indicated are in millions of dollars.

| Oaktree Claim Distribution[7] | | % Sharing | | $ Recovery | |
|---|---|---|---|---|---|
| $125 | $290 | 90% | 10% | $148.5 | $16.5 |
| $290 | Unlimited | 100% | 0% | - | - |
| | | | | $271.125[8] | $19.275 |
| Less: Crediting of upfront cash | | | | | $(1.0) |
| **Net GUC Cash Recovery** | | | | | **$18.275** |

17.     To achieve such sharing of future cash distributions, the Settlement contemplates the establishment of a trust (the "**GUC Trust**")[9] in connection with a resolution of these chapter 11 cases, with $1 million in upfront cash being funded to pay for the costs of administering the GUC Trust and making distributions to the holders of allowed general unsecured claim if and when available. Once aggregate recoveries to the holders of allowed general unsecured claims exceed $18.275 million, such upfront cash will be credited against any final distributions to the GUC Trust in accordance with the recovery sharing mechanism set forth above.

18.     As set forth above, from any Oaktree Recovery, including on account of any reorganized instrument (including debt or equity) that Oaktree may receive on account of the Oaktree Claims, Oaktree shall retain (i) 100% of the first $89.5 million, (ii) 95% of amounts in excess of $89.5 million and up to $125 million, with the remainder allocated to holders of allowed general unsecured claims, (iii) 90% of amounts in excess of $125 million and up to $290 million, with the remainder allocated to holders of allowed general unsecured claims, and (iv) 100% of amounts in excess of $290 million.[10]

---

[8] Plus 100% of recoveries above $290 million.

[9] The Parties will agree to a reasonable periodic reporting mechanism between Oaktree and the GUC Trust to fairly monitor if and when Oaktree receives any Oaktree Recovery. The establishment of the GUC Trust, selection by the Creditors' Committee of the GUC Trust trustee, and details of any reporting requirements will be provided in separate and subsequent documentation.

[10] From a general unsecured creditor perspective, absent this Settlement and/or alternative resolution of the Oaktree Claims, general unsecured creditors would not stand to receive a recovery of any kind unless and until Oaktree

7

19. In addition, the Settlement incorporates the following key agreements and compromises by and among the Parties:

i. The Debtors will use reasonable efforts to satisfy the Customers' claims through non-cash consideration;

ii. The Debtors will use reasonable efforts to pay the claims of critical vendors that are forecasted to be paid through December 31, 2025 based on the Debtors' most recent financial projections;

iii. The Debtors will provide a waiver of preference actions under section 547 of the Bankruptcy Code against holders of allowed general unsecured claims arising from the provision of goods and services to any Debtor, effective upon approval of the Settlement;

iv. The Debtors will pay reasonable and documented fees and expenses of U.S. Bank Trust Company, National Association, as Trustee for the 5.25% Convertible Senior Notes due 2028 (the "**Indenture Trustee**") and its counsel incurred in connection with the Debtors and these chapter 11 cases on or before December 2, 2025, in an amount not to exceed $250,000;

v. The Debtors will pay reasonable and documented fees and expenses of the advisors to the Creditors' Committee incurred on or before December 2, 2025, subject to such accrued amounts being consistent with weekly reporting provided as of the date hereof;

vi. Neither the Debtors' estates nor any other party in interest will be liable for fees or expenses incurred by advisors to the Creditors' Committee on or after December 3, 2025 in excess of $1.25 million;

vii. The Creditors' Committee will support, and will not take any action that would interfere with or fail to take any action where such failure would interfere with, the implementation of a plan or sale consistent with the Settlement, and will otherwise support the prompt and orderly conclusion of these chapter 11 cases in accordance with the Settlement; and

viii. Each Party agrees to grant the mutual releases to the other Parties contained in the Settlement, which releases will become effective upon the Court's entry of the Proposed Order, and effective upon the entry of such order, the Complaint, Standing Motion and Creditors' Committee's Challenges shall be shall be deemed withdrawn with prejudice and the Challenge Period shall expire for the Creditors' Committee for all purposes and the Stipulations shall be binding on and with respect to the Creditors' Committee in accordance with the terms of the Final DIP Order.

---

recovered payment in full on account of any amounts outstanding under the (i) DIP Facility and (ii) the Oaktree Claims, in an amount totaling approximately $479.3 million.

20. For the reasons described herein, the Debtors believe that entry into the Settlement is in the best interests of the Debtors, their estates, and all parties in interest.

## Relief Requested Should Be Granted

### A. Entry Into Settlement Is a Sound Exercise of Debtors' Business Judgment

21. Section 363(b) of the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing. The Fifth Circuit recognizes that a debtor may use property of the estate outside the ordinary course of business under section 363 of the Bankruptcy Code if there is a good business reason for doing so. *See, e.g.*, *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) (quoting *In re Cont'l Air Lines, Inc.*, 780 F.3d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.")); *In re ASARCO LLC*, 441 B.R. 813, 830 (Bankr. S.D. Tex. 2010); *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005).

22. The Debtors believe that the Settlement represents a valid exercise of the Debtors' business judgment and is a fair and reasonable compromise that is in the best interest of the Debtors, their estates, and their creditors. The Settlement resolves significant litigation involving the Parties and eliminates the need for continued, costly, and time-consuming litigation regarding the Creditors' Committee's Challenges. In addition, the Settlement secures the support of the Creditors' Committee for either a consensual reorganization or a sale, thereby providing clarity and stability for the Debtors' chapter 11 cases and avoiding the uncertainty and unnecessary costs associated with continued protracted litigation that has the potential to frustrate the Debtors' efforts to advance these chapter 11 cases.

23. Accordingly, the Debtors request that the Court enter the Proposed Order and authorize and approve the Settlement.

### B. Settlement Satisfies Bankruptcy Rule 9019 and Should Be Approved

24. Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Age Refin. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately, approval of a compromise is within the sound discretion of the bankruptcy court. *See U.S. v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297-98 (5th Cir. 1984). Settlements are considered a "normal part of the process of reorganization" and "a desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated and costly." *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted) (decided under the Bankruptcy Act).

25. The Fifth Circuit sets forth a three-factor balancing test under which bankruptcy courts are to analyze proposed settlements. *Id.* The factors courts consider are "(1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise." *See Age Refin. Inc.*, 801 F.3d at 540 (internal citations omitted).

26. Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors courts should focus on when considering whether to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider

the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540 (citations omitted); *Foster Mortg. Corp.*, 68 F.3d at 918.

27. Generally, the role of the bankruptcy court is not to decide the issues in dispute when evaluating a settlement. *See Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993). Instead, the court should determine whether the settlement as a whole is fair and equitable. *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

28. Furthermore, a proposed settlement "need not result in the best possible outcome for the debtor, but must not 'fall beneath the lowest point in the range of reasonableness.'" *In re Idearc Inc.*, 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009) (quoting *Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991)). The process of evaluating proposed settlements, then, "is the need to compare the terms of the compromise with the likely rewards of litigation." *TMT Trailer Ferry, Inc.*, 390 U.S. at 425.

29. The Settlement satisfies these standards and is fair, equitable, and in the best interest of the Debtors' estates. First, the Debtors believe that continued litigation of the Creditors' Committee's Challenges would not yield any incremental value for the estates and, instead, would further deplete the Debtors' limited resources through additional fees and expenses associated therewith. Accordingly, the immediate resolution of the Creditors' Committee's Challenges on the proposed terms embodied in the Settlement and the stop to the incurrence of litigation expenses benefits the Debtors' estates and their creditors. Second, the Settlement is the product of extensive, good-faith, and arm's-length negotiations among the Parties, including through Mediation.

30. Finally, all factors bearing on the wisdom of the compromise—including the paramount interest of the Debtors' creditors—weigh in favor of approval of the Settlement. The Settlement provides the opportunity for potentially meaningful recoveries to unsecured creditors that may not otherwise be available while avoiding the significant costs, risks, and attendant delays associated with continued litigation of the Creditors' Committee's Challenges. Moreover, by resolving these issues, the Settlement brings much-needed stability to the Debtors' chapter 11 cases. This stability is particularly critical as the Debtors pursue a dual-track process involving both a potential plan of reorganization and a sale of their assets to one or more buyers. By eliminating the uncertainty surrounding the Creditors' Committee's Challenges, the Settlement facilitates a more orderly and efficient sale process, maximizes value for unsecured creditors, and provides a clear path forward for the successful resolution of these chapter 11 cases. Finally, the mutual release of claims among the Parties is reasonable and appropriate under the circumstances as it brings finality to the Creditors' Committee's Challenges and serves to implement the Settlement once approved by this Court. Considering the range of reasonable outcomes, the resolution afforded by the Settlement certainly exceeds the lowest point in the range of reasonableness.

31. Accordingly, the Debtors submit that the Settlement satisfies Bankruptcy Rule 9019 and should be authorized and approved.

### Emergency Consideration is Requested/Waiver of Bankruptcy Rule 6004(h)

32. The Debtors seek relief on an emergency basis. It is critical that the Settlement be authorized and approved no later than December 18, 2025 to ensure that the Debtors can proceed with the sale and plan process without the overhang of ongoing litigation regarding the Creditors' Committee's Challenges. For the same reason, the Debtors hereby request relief from Bankruptcy Rule 6004(h), which provides that an "order authorizing the use . . . of

property . . . is stayed until expiration of 10 days after entry of the order, unless the Court orders otherwise." Absent the relief on an emergency basis, the Debtors' ability to conduct a successful auction (scheduled for December 12, 2025), pursue a value-maximizing plan, or enter into a sale transaction will be significantly impaired. Any delay in approval would risk undermining stakeholder confidence, introduce uncertainty into the sale process, and potentially diminish recoveries for the Debtors' estates and all stakeholders. Accordingly, the Debtors believe that emergency consideration of the Motion is necessary and appropriate.

## Reservation of Rights

33. Except as otherwise expressly provided in the Settlement, nothing contained herein is intended to be or shall be deemed, as applicable, as (i) an implication or admission as to the validity of any claim against the Debtors or any other party, including Oaktree and the Creditors' Committee, (ii) a waiver or limitation of the Debtors' or any other party in interest's rights to dispute the amount of, basis for, or validity of, any claim, (iii) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) a waiver of the obligation of any party in interest to file a proof of claim, (v) an agreement or obligation to pay any claims, or (vi) a waiver of any claims or causes of action that may exist against any creditor or interest holder. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be, and should not be construed as, an admission as to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## Notice

34. Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  December 10, 2025
       Houston, Texas

                                                                    */s/  Gabriel A. Morgan*
WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Gabriel.Morgan@weil.com
          Clifford.Carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Lauren Tauro (admitted *pro hac vice*)
Ryan C. Rolston (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Matt.Barr@weil.com
          Lauren.Tauro@weil.com
          Ryan.Rolston@weil.com

*Attorneys for Debtors
and Debtors in Possession*

**Certificate of Service**

I hereby certify that on December 10, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                                                                 */s/  Gabriel A. Morgan*
                                                                                 Gabriel A. Morgan