**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| **In re:** | § | **Chapter 11** |
|  | § |  |
| **TPI COMPOSITES, INC.,** *et al.*, | § | **Case No. 25-34655 (CML)** |
|  | § |  |
| **Debtors.**[1] | § | **(Jointly Administered)** |
|  | § |  |
|  | § |  |

**MEMORANDUM OF LAW
IN SUPPORT OF (I) FINAL APPROVAL OF
DISCLOSURE STATEMENT AND (II) CONFIRMATION OF
AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
TPI COMPOSITES, INC. AND CERTAIN OF ITS AFFILIATED DEBTORS**

| | |
|---|---|
| **WEIL, GOTSHAL & MANGES LLP** | **WEIL, GOTSHAL & MANGES LLP** |
| Gabriel A. Morgan (24125891) | Matt Barr (admitted *pro hac vice*) |
| Clifford W. Carlson (24090024) | Lauren Tauro (admitted *pro hac vice*) |
| Emma Wheeler (24145695) | 767 Fifth Avenue |
| 700 Louisiana Street, Suite 3700 | New York, New York 10153 |
| Houston, Texas 77002 | Telephone:  (212) 310-8000 |
| Telephone:  (713) 546-5000 | Facsimile:  (212) 310-8007 |
| Facsimile:  (713) 224-9511 | |

*Attorneys for Debtors
and Debtors in Possession*

Dated:  June 29, 2026
       Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  TPI Texas, LLC (4000), TPI Composites, Inc. (0775), TPI International, LLC (9537), TPI Turkey, LLC (2552), TPI APAC, LLC (8038), TPI APAC II, Inc. (3515), TPI Turkey II, LLC (2551), TPI Turkey Izbas, LLC (0185), TPI Composites Services, LLC (4547), TPI Mexico, LLC (0745), TPI Mexico II, LLC (8269), TPI Mexico III, LLC (7315), TPI Mexico IV, LLC (1231), TPI Mexico V, LLC (5628), TPI Mexico VI, LLC (7260), Ponto Alto Holdings, LLC (0322), TPI Arizona, LLC (9641), TPI Iowa, LLC (2887), TPI Iowa II, LLC (4175), Composite Solutions, Inc. (1486), TPI Holdings Mexico, LLC (1936), and TPI Technology, Inc. (2727).  The Debtors' mailing address is 9200 E. Pima Center Parkway, Suite 250, Scottsdale, AZ 85258.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................1

**I.**  Supporting Declarations....................................................................................................4

**II.**  General Background of Chapter 11 Cases and Plan ..........................................................5

    A.  ECP Sale Transaction ...........................................................................................5

    B.  Unsecured Claims Settlement................................................................................8

    C.  Oaktree Settlement Agreement .............................................................................9

    D.  Plan and Disclosure Statement............................................................................10

**III.**  Plan Solicitation and Tabulation.....................................................................................12

    A.  Solicitation ...........................................................................................................12

    B.  Tabulation ............................................................................................................15

ARGUMENT ...............................................................................................................................19

**I.**  DISCLOSURE STATEMENT SHOULD BE APPROVED ON FINAL BASIS.............20

    A.  Parties in Interest Received Sufficient Notice of Combined Hearing and
        Objection Deadline ...............................................................................................20

    B.  Disclosure Statement Contains Adequate Information and Should Be
        Approved...............................................................................................................21

    C.  Solicitation of Votes Complied with Bankruptcy Code, Bankruptcy Rules,
        and Disclosure Statement Order ...........................................................................25

**II.**  PLAN SETTLEMENTS, RELEASES, EXCULPATION, AND INJUNCTION
    PROVISIONS ARE APPROPRIATE AND SHOULD BE APPROVED.......................26

    A.  RemainCo Releases Are Appropriate and Should Be Approved...........................27

    B.  Third-Party Releases Are Consensual, Appropriate, Comply with
        Applicable Law, and Should Be Approved ..........................................................32

    C.  Exculpation Provision Should Be Approved ........................................................38

    D.  Injunction Provisions Are Appropriate and Should Be Approved ........................40

**III.**  PLAN SATISFIES BANKRUPTCY CODE'S REQUIREMENTS FOR
    CONFIRMATION AND SHOULD BE APPROVED....................................................42

    A.  Section 1129(a)(1):  Plan Complies with Applicable Provisions of
        Bankruptcy Code .................................................................................................43

    B.  Section 1129(a)(2):  RemainCo Debtors Have Complied with Bankruptcy
        Code .....................................................................................................................46

    C.  Section 1129(a)(3): Plan Has Been Proposed in Good Faith and Not by Any
        Means Forbidden by Law ....................................................................................48

D.     Section 1129(a)(4):  Plan Provides that Professional Fees and Expenses Are Subject to Court Approval ..................................................................................49

E.     Section 1129(a)(5):  RemainCo Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders ......................................50

F.     Section 1129(a)(6):  Plan Does Not Contain Any Rate Changes ..........................51

G.     Section 1129(a)(7):  Plan Satisfies Best Interests Test .........................................51

H.     Section 1129(a)(8):  Plan Has Been Accepted by Impaired Voting Class ............52

I.     Section 1129(a)(9):  Plan Provides for Payment in Full of All Allowed Priority Claims ..................................................................................................53

J.     Section 1129(a)(10):  At Least One Class of Impaired Claims Has Accepted Plan ...................................................................................................54

K.     Section 1129(a)(11):  Plan Is Feasible ...............................................................54

L.     Section 1129(a)(12):  All Statutory Fees Have Been or Will Be Paid..................56

M.     Sections 1129(a)(13)–(16) and 1129(e):  Inapplicable Provisions ........................57

N.     Section 1129(b):  Plan Satisfies "Cram Down" Requirements for Non-Accepting Classes ................................................................................................57

O.     Section 1129(c):  Plan Is Only Plan on File...........................................................60

P.     Section 1129(d):  Principal Purpose of Plan Is Not Avoidance of Taxes ..............60

Q.     Request for Waiver of Bankruptcy Rules 3020(e) and 6004(h) ...........................60

IV.     COURT SHOULD OVERRULE UNRESOLVED U.S. TRUSTEE OBJECTION AND CONFIRM PLAN .........................................................................61

A.     Third-Party Releases, Including Opt-Out Feature, Are Consensual and Consistent with Precedent in District..................................................................62

RESERVATION OF RIGHTS ..............................................................................................66

CONCLUSION.......................................................................................................................66

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ameriforge Grp., Inc.*,
   No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017) (Docket No. 142) .............................34

*Applewood Chair Co. v. Three Rivers Plan. & Dev. Dist. (In re Applewood Chair Co.)*,
   203 F.3d 914 (5th Cir. 2000) ................................................................................................33

*In re Armstrong World Indus., Inc.*,
   348 B.R. 111 (D. Del. 2006)..................................................................................................58

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999)...............................................................................................................51

*Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*,
   584 F.3d 229 (5th Cir. 2009) ................................................................................................39

*Baron v. Sherman (In re Ondova Ltd. Co.)*,
   914 F.3d 990 (5th Cir. 2019) ................................................................................................39

*Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*,
   783 F.3d 266 (5th Cir. 2015) ................................................................................................22

*In re Bigler, LP*,
   442 B.R. 537 (Bankr. S.D. Tex. 2010) .............................................................................27, 32

*In re Block Shim Dev. Co.-Irving*,
   939 F.2d 289 (5th Cir. 1991) ...........................................................................................48, 51

*In re Briscoe Enters., Ltd., II*,
   994 F.2d 1160 (5th Cir. 1993) ..............................................................................................42

*Cadle Co. v. Mims (In re Moore)*,
   608 F.3d 253 (5th Cir. 2010) ................................................................................................29

*In re Chapel Gate Apartments, Ltd.*,
   64 B.R. 569 (Bankr. N.D. Tex. 1986)...................................................................................49

*Cole v. Nabors Corp. Servs., Inc. (In re CJ Holding Co.)*,
   597 B.R. 597 (S.D. Tex. 2019) .............................................................................................65

*In re Core Sci., Inc.*,
   No. 22-90341 (CML) (Bankr. S.D. Tex. Jan. 16, 2024) (Docket No. 1749)..........................64

*In re Couture Hotel Corp.*,
    536 B.R. 712 (Bankr. N.D. Tex. 2015)......................................................................48

*In re Cutera, Inc.*,
    No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 16, 2025) (Docket No. 251).......................33, 64

*In re Cypresswood Land Partners, I*,
    409 B.R. 396 (Bankr. S.D. Tex. 2009) .....................................................................42

*In re Derosa-Grund*,
    567 B.R. 773 (Bankr. S.D. Tex. 2017) .................................................................28, 29

*In re DocuData Sols., L.C.*,
    No. 25-90023 (CML) (Bankr. S.D. Tex. June 23, 2025) (Docket No. 834)......................40, 64

*Dodson v. Huff (In re Smyth)*,
    207 F.3d 758 (5th Cir. 2000) ..................................................................................39

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992)........................................................................59

*In re DRF Logistics, LLC*,
    No. 24-90447 (CML) (Bankr. S.D. Tex. Nov. 25, 2024) (Docket No. 530) .....................40, 64

*In re Eagle Bus Mfg., Inc.*,
    134 B.R. 584 (Bankr. S.D. Tex. 1991) .....................................................................44

*Elec. Reliability Council of Tex. v. May (In re Tex. Com. Energy)*,
    607 F.3d 153 (5th Cir. 2010) ..................................................................................66

*In re Energy & Expl. Partners, Inc.*,
    No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 21, 2016) (Docket No. 730) ...........................33

*In re Energy Partners, Ltd.*,
    No. 09-32957, 2009 WL 2898876 (Bankr. S.D. Tex. Aug. 3, 2009) ....................................61

*Epstein v. Container Store Grp., Inc. (In re Container Store Grp., Inc.)*,
    676 B.R. 356 (S.D. Tex. 2026) ...................................................................... *passim*

*In re Everstream Sols. LLC*,
    No. 25-90144 (CML) (Bankr. S.D. Tex. Nov. 11, 2025) (Docket No. 594) ...........................64

*In re Ferretti*,
    128 B.R. 16 (Bankr. D.N.H. 1991).............................................................................23

*In re Finlay Enters., Inc.*,
    No. 09-14873 (JMP), 2010 WL 6580628 (Bankr. S.D.N.Y. June 29, 2010) .........................55

iv

*FOM P.R. S.E. v. Dr. Barnes Eyecenter Inc.*,
255 F. App'x 909 (5th Cir. 2007) ...............................................................................32

*In re Foster Mortg. Corp.*,
68 F.3d 914 (5th Cir. 1995) ......................................................................................29

*In re Gen. Homes Corp.*,
134 B.R. 853 (Bankr. S.D. Tex. 1991) .....................................................................28

*In re GenOn Energy, Inc.*,
No. 17-33695 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017) (Docket No. 1250) ...........33

*In re GOL Linhas Aéreas Inteligentes S.A.*,
No. 24-10118 (MG) (Bankr. S.D.N.Y. May 22, 2025) (Docket No. 1658) ............64

*In re Harborwalk, LP*,
Nos. 10-80043, 10-80044, 10-80045, 2010 WL 5116620 (Bankr. S.D. Tex.
Oct. 25, 2010) ...........................................................................................................47

*Harrington v. Purdue Pharma, L.P.*,
603 U.S. 204 (2024) ........................................................................................ *passim*

*In re Heritage Org.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007) ...............................................................28, 44

*In re Highland Cap. Mgmt., L.P.*,
132 F.4th 353 (5th Cir. 2025) ..............................................................................41, 42

*Highland Cap. Mgmt., L.P. v. NexPoint Advisors, L.P.*,
No. 24-10534 (5th Cir. 2025) (Docket No. 110) ......................................................41

*Hilal v. Williams (In re Hilal)*,
534 F.3d 498 (5th Cir. 2008) ....................................................................................39

*Hinojosa Eng'g, Inc. v. Lopez (In re Treyson Dev., Inc.)*,
No. 14-70256 (EVR), 2016 WL 1604347 (Bankr. S.D. Tex. Apr. 19, 2016) .........33

*In re Idearc Inc.*,
423 B.R. 138 (Bankr. N.D. Tex. 2009).........................................................43, 55, 61

*In re J. Reg. Co.*,
407 B.R. 520 (Bankr. S.D.N.Y. 2009)......................................................................55

*In re J T Thorpe Co.*,
308 B.R. 782 (Bankr. S.D. Tex. 2003) .................................................................42, 47

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987),
    *aff'd sub nom.*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ...................54, 59

*In re Keisler*,
    No. 08-34321 (RS), 2009 WL 1851413 (Bankr. E.D. Tenn. June 29, 2009) ..........................23

*In re Lakeside Glob. II, Ltd.*,
    116 B.R. 499 (Bankr. S.D. Tex. 1989) ......................................................................54

*In re Lernout & Hauspie Speech Prods., N.V.*,
    301 B.R. 651 (Bankr. D. Del. 2003), *aff'd*, 308 B.R. 672 (D. Del. 2004)...............................58

*In re Luminar Techs., Inc.*,
    No. 25-90807 (CML) (Bankr. S.D. Tex. Apr. 3, 2026) (Docket No. 589)..............................35

*Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,
    150 F.3d 503 (5th Cir. 1998)  ................................................................23, 47, 48, 49

*In re Mirant Corp.*,
    348 B.R. 725 (Bankr. N.D. Tex. 2006), *aff'd sub nom.*, *Objecting Class 3
    Claimholders v. New Mirant Entities*, No. 4:06-CV-744-A (JHM), 2006 WL
    3780884 (N.D. Tex. Dec. 26, 2006) ................................................................................28

*In re MLN US Holdco LLC*,
    No. 25-90090 (CML) (Bankr. S.D. Tex. Apr. 17, 2025) (Docket No. 263)............................64

*In re Mobileum, Inc.*,
    No. 24-90414 (CML) (Bankr. S.D. Tex. Sept. 11, 2024), (Docket No. 194).........................64

*In re Moody Nat'l SHS Hous. H, LLC*,
    No. 10-30172 (MI), 2010 WL 5116872 (Bankr. S.D. Tex. June 30, 2010) ......................32, 47

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950)...................................................................................................20

*NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap.
    Mgmt., L.P.)*,
    48 F.4th 419 (5th Cir. 2022), *pet. for cert. denied*, No. 22-631 (U.S. July 2,
    2024) ................................................................................................38, 39, 41, 42

*In re Nine Energy Serv., Inc.*,
    No. 26-90295 (CML) (Bankr. S.D. Tex. Mar. 4, 2026) (Docket No. 189) ..................... *passim*

*Otto v. Tex. Tamale Co. (In re Tex. Tamale Co.)*,
    219 B.R. 732 (Bankr. S.D. Tex. 1998) ................................................................20

*Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners* (*In re Tex. Rangers Baseball Partners*),
521 B.R. 134 (Bankr. N.D. Tex. 2014)..................................................................22

*Phx. Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*,
995 F.2d 1274 (5th Cir. 1991) ..........................................................................43

*In re Pine Gate Renewables, LLC*,
No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 19, 2026) (Docket No. 1483) .................. *passim*

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
761 F.2d 1374 (9th Cir. 1985) ..........................................................................54

*In re PosiGen, PBC*,
No. 25-90787 (CML) (Bankr. S.D. Tex. Feb. 24, 2026) (Docket No. 613) ................... *passim*

*In re Premiere Network Servs., Inc.*,
333 B.R. 130 (Bankr. N.D. Tex. 2005)................................................................44

*Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968).......................................................................................28

*Republic Supply Co. v. Shoaf*,
815 F.2d 1046 (5th Cir. 1987) .....................................................................32, 33

*Rivercity v. Herpel (In re Jackson Brewing Co.)*,
624 F.2d 599 (5th Cir. 1980) ...........................................................................28

*In re Robertshaw US Holding Corp.*,
662 B.R. 300 (Bankr. S.D. Tex. 2024) ....................................................34, 62, 63

*In re Roqumore*,
393 B.R. 474 (Bankr. S.D. Tex. 2008) ................................................................29

*In re Sentry Operating Co. of Tex., Inc.*,
264 B.R. 850 (Bankr. S.D. Tex. 2001) ...........................................................43, 58

*Sequa Corp. v. Christopher (In re Christopher)*,
28 F.3d 512 (5th Cir. 1994) .............................................................................20

*In re Star Ambulance Serv., LLC*,
540 B.R. 251 (Bankr. S.D. Tex. 2015) ...............................................................47

*In re Sun Country Dev., Inc.*,
764 F.2d 406 (5th Cir. 1985) ...........................................................................48

*In re T-H New Orleans Ltd. P'ship*,
  116 F.3d 790 (5th Cir. 1997) ...................................................................48, 54

*Tex. Extrusion Corp. v. Lockheed Corp.* (*In re Tex. Extrusion Corp.*),
  844 F.2d 1142 (5th Cir. 1988) ...............................................................23, 24, 51

*In re TPI Composites, Inc.*,
  No. 25-34655 (CML) (Bankr. S.D. Tex. May 21, 2026) (Docket No. 929)......................35, 64

*United States v. Energy Res. Co.*,
  495 U.S. 545 (1990)...........................................................................54

*In re Vill. at Camp Bowie I, L.P.*,
  710 F.3d 239 (5th Cir. 2013) ...................................................................48

*Walters v. Hunt (In re Hunt)*,
  146 B.R. 178 (Bankr. N.D. Tex. 1992)...........................................................21

*In re Wellpath Holdings, Inc.*,
  No. 24-90533 (ARP) (Bankr. S.D. Tex. May 1, 2025) (Docket No. 2596)......................40, 64

*Williams v. Placid Oil Co. (In re Placid Oil Co.)*,
  753 F.3d 151 (5th Cir. 2014) ...................................................................20

*In re Wool Growers Cent. Storage Co.*,
  371 B.R. 768 (Bankr. N.D. Tex. 2007)...........................................................32

**Statutes**

11 U.S.C. § 109(d) ...............................................................................47

11 U.S.C. § 1123(a) ..............................................................................44

11 U.S.C. § 1123(b)(3)(A)........................................................................27

11 U.S.C. § 1123(b)(6) ...........................................................................32

11 U.S.C. § 1125(a)(1)............................................................................22

11 U.S.C. § 1125(d) ..............................................................................23

11 U.S.C. § 1125(e) ..............................................................................26

11 U.S.C. § 1126(c) ..............................................................................52

11 U.S.C. § 1129(a)(1)............................................................................43

11 U.S.C. § 1129(a)(2)............................................................................46

11 U.S.C. § 1129(a)(3)........................................................................................................48

11 U.S.C. § 1129(a)(4)........................................................................................................49

11 U.S.C. § 1129(a)(5)........................................................................................................50

11 U.S.C. § 1129(a)(6)........................................................................................................51

11 U.S.C. § 1129(a)(7)........................................................................................................51

11 U.S.C. § 1129(a)(8)........................................................................................................52

11 U.S.C. § 1129(a)(9)........................................................................................................53

11 U.S.C. § 1129(a)(10)......................................................................................................54

11 U.S.C. § 1129(a)(12)......................................................................................................56

## Other Authorities

Fed. R. Bankr. P. 3020(e) ..................................................................................................60

Fed. R. Bankr. P. 3020(e), Adv. Comm. Notes, 1999 Amend.........................................60

Fed. R. Bankr. P. 6004(h), Adv. Comm. Notes, 1999 Amend. .......................................61

H.R. REP. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963..................................24

H.R. Rep. No. 95-595, First Session (1977) ....................................................................43

H.R. REP. No. 595, 95th Cong., 1st Sess. 408–09 (1977)...............................................23

S. Rep. No. 95-989 (1978)................................................................................................43

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5907) ...................23

TPI Composites, Inc. ("**Parent**"), TPI Texas, LLC, TPI International, LLC, TPI Turkey, LLC, TPI APAC, LLC, TPI APAC II, Inc., TPI Turkey II, LLC, TPI Turkey Izbas, LLC, TPI Composites Services, LLC, TPI Mexico, LLC, TPI Mexico II, LLC, TPI Mexico III, LLC, TPI Mexico IV, LLC, Ponto Alto Holdings, LLC, TPI Arizona, LLC, TPI Iowa, LLC, TPI Iowa II, LLC, Composite Solutions, Inc., TPI Holdings Mexico, LLC, and TPI Technology, Inc. (collectively, the "**RemainCo Debtors**") submit this memorandum of law (the "**Memorandum**") in support of their request for entry of an order (i) approving, on a final basis, the *Disclosure Statement for Amended Joint Chapter 11 Plan of Liquidation of TPI Composites, Inc. and Certain of Its Affiliated Debtors*, dated May 22, 2026 (Docket No. 932) (as may be amended, supplemented, or otherwise modified from time to time, the "**Disclosure Statement**") and (ii) confirming the *Amended Joint Chapter 11 Plan of Liquidation of TPI Composites, Inc. and Certain of Its Affiliated Debtors*, dated May 22, 2026 (Docket No. 931) (as may be amended, supplemented, or otherwise modified from time to time, the "**Plan**").[2]

## PRELIMINARY STATEMENT

1.      The RemainCo Debtors are seeking confirmation of the Plan, which represents the culmination of months of significant, good-faith efforts and negotiations and has the support of the RemainCo Debtors' major stakeholders, including the Creditors' Committee, the Senior Secured Lenders, and the DIP Lenders (each, as defined below).

2.      As further described herein, Parent and certain of its subsidiaries, including the RemainCo Debtors, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), filed these chapter 11 cases (the "**Chapter 11 Cases**") on

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

August 11, 2025 (the "**Petition Date**"), with the goal of maximizing the going-concern value of the Debtors' Estates for all stakeholders.  Prior to and following the filing of these Chapter 11 Cases, the Debtors engaged in extensive negotiations with the Senior Secured Lenders and the Customers (as defined below) regarding the terms of a potential reorganization of the Debtors' business and renewal of the Customers' short-term supply agreements.  After weeks without resolution or agreement on the terms of a consensual reorganization and in the face of significant liquidity constraints, in September 2025, the Debtors commenced a comprehensive sale and marketing process for substantially all of the Debtors' assets in an effort to preserve and maximize value while still continuing to pursue a potential reorganization transaction.

3.      Following an extensive marketing and sale process and months of arm's-length negotiations, on March 6, 2026, Parent and certain of its Debtor and non-Debtor subsidiaries, each as a seller party, and ECP Blade Holdings LLC[3] (the "**Buyer**") entered into the ECP Purchase Agreement (as defined below).  The ECP Purchase Agreement provides for the sale of (i) equity interests of non-Debtors TPI Composites, S. de R.L. de C.V., TPI Blade Services LATAM S.A. de C.V., and TPI Blade Services Europe S.L.U., which are non-U.S. subsidiaries of Debtors TPI Mexico, LLC, TPI Mexico II, LLC, TPI Turkey Izbas, LLC, TPI Composites Services, LLC, and non-Debtor TPI Holdings Switzerland GmbH, as applicable, (ii) certain assets of non-Debtor TPI Composites Denmark ApS, the indirect foreign subsidiary of Debtor TPI International, LLC, and (iii) substantially all of the assets related to the Debtors' business in the United States and Mexico, other than the equity of TPI MX V & VI (as defined below) and related assets to be sold pursuant to the Vestas Sale Transactions (as defined below).  On March 16, 2026,

---

[3] ECP Blade Holdings LLC subsequently changed its name to TPI Composites Holdings, LLC.  Accordingly, references herein to the Buyer are to TPI Composites Holdings, LLC (formerly known as ECP Blade Holdings LLC).

the Court entered an order approving the ECP Sale Transaction (as defined below) pursuant to the terms of the ECP Purchase Agreement.  Having obtained Court approval of the ECP Sale Transaction, the RemainCo Debtors now seek confirmation of the Plan.  The Plan, which is the end result of the hard work of the RemainCo Debtors and their advisors, contemplates the distribution of proceeds from the ECP Sale Transaction (the "**ECP Sale Proceeds**"), the liquidation of any remaining assets of the RemainCo Debtors, and the wind-down of the RemainCo Debtors and their Estates in a cost-efficient manner after the Plan Effective Date.

4.     For the reasons set forth herein and in the Supporting Declarations (as defined below), the Disclosure Statement satisfies the requirements of sections 1125 and 1126 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and any other applicable laws or regulations, including the *Procedures for Complex Cases in the Southern District of Texas* (the "**Complex Case Rules**").  Furthermore, the Plan satisfies the requirements for confirmation under section 1129 of the Bankruptcy Code and achieves the objectives of chapter 11. Accordingly, the Disclosure Statement should be approved on a final basis, and the Plan should be confirmed.  A proposed order approving the Disclosure Statement on a final basis and confirming the Plan has been filed contemporaneously herewith (the "**Proposed Confirmation Order**").

5.     The only formal objection the RemainCo Debtors received to confirmation of the Plan is the *United States Trustee's Objection to Confirmation of the Amended Joint Chapter 11 Plan of Liquidation of TPI Composites, Inc. and Certain of Its Affiliated Debtors* (Docket No. 985) (the "**U.S. Trustee Objection**").  The U.S. Trustee Objection objects on the basis that (i) the Plan contains non-consensual third-party releases that are impermissible under *Purdue*, (ii) the Plan's proposed opt-out provisions in the Notice of Non-Voting Status (as defined

below) are ineffective to confer affirmative consent to the Third-Party Releases (as defined below), and (iii) the Plan should expressly state that it does not release claims asserted by governmental entities acting under their police and regulatory authority.[4]  The RemainCo Debtors submit that the Third-Party Releases, which afforded non-voting parties an opportunity to opt out, are consensual within well-established Fifth Circuit precedent and the U.S. Trustee Objection should be overruled.

## BACKGROUND

### I.      SUPPORTING DECLARATIONS

6.      Contemporaneously with the filing of this Memorandum, the RemainCo Debtors also filed the following documents in support of confirmation of the Plan and final approval of the Disclosure Statement:

- o     *Certificate of Publication*, filed on June 4, 2026 (Docket No. 955) (the "**Publication Affidavit**");

- o     *Affidavit of Service of Solicitation Materials*, filed on June 24, 2026 (Docket No. 986) (the "**Solicitation Affidavit**");

- o     *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding the Solicitation and Tabulation of Ballots Cast on the Amended Joint Chapter 11 Plan of Liquidation of TPI Composites, Inc. and Certain of Its Affiliated Debtors*, filed contemporaneously herewith (the "**Tabulation Declaration**");

- o     *Declaration of Neal P. Goldman in Support of Confirmation of Amended Joint Chapter 11 Plan of Liquidation of TPI Composites, Inc. and Certain of Its Affiliated Debtors* (the "**Goldman Declaration**"), filed contemporaneously herewith;

- o     *Declaration of Brian Cejka in Support of Liquidation Analysis with Respect to Confirmation of Amended Joint Chapter 11 Plan of Liquidation of TPI Composites, Inc. and Certain of Its Affiliated Debtors*

---

[4] Prior to filing the U.S. Trustee Objection, the RemainCo Debtors reached an agreement with the U.S. Trustee on language in the Proposed Confirmation Order to resolve the portion of the U.S. Trustee Objection in clause (iii).  Such language is included in paragraph 20 of the Proposed Confirmation Order.

(the "**Liquidation Analysis Declaration**"), filed contemporaneously herewith; and

o    *Declaration of Brian Cejka in Support of Final Approval of Disclosure Statement and Confirmation of Amended Joint Chapter 11 Plan of Liquidation of TPI Composites, Inc. and Certain of Its Affiliated Debtors* (the "**Cejka Declaration**" and collectively with the above declarations and affidavits, the "**Supporting Declarations**").

7.     The Supporting Declarations and any testimony and other declarations that may be adduced or submitted at, or in connection with, the Combined Hearing (as defined below) are herein incorporated in full.

## II.    GENERAL BACKGROUND OF CHAPTER 11 CASES AND PLAN

8.     On the Petition Date, the Debtors each commenced with the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.  On August 21, 2025, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Creditors' Committee**") (Docket No. 113).

9.     These Chapter 11 Cases are being jointly administered for procedural purposes pursuant to Rule 1015(b) of the Bankruptcy Rules and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

A.    ECP Sale Transaction

10.    In early 2025, the Debtors, together with their legal and financial advisors and under the guidance of a transaction committee of Parent's board of directors (the "**Transaction Committee**"), engaged with key stakeholders in the hope of reaching a

5

consensus around a restructuring transaction that would right-size the Debtors' capital structure, reduce operational costs, and improve profitability. Such stakeholders included the Debtors' anticipated go-forward Original Equipment Manufacturer customers – GE Vernova International, LLC ("**GE Vernova**") and Vestas Wind Systems A/S ("**Vestas**" and, together with GE Vernova, the "**Customers**") – as well as the Senior Secured Lenders. After considering out-of-court alternatives to implement a restructuring of their balance sheet, the Debtors commenced these Chapter 11 Cases to avail themselves of the protections afforded by the Bankruptcy Code.

11.     Following the commencement of these Chapter 11 Cases, the Debtors continued to experience cash constraints due to accelerated payment terms from suppliers and the resulting production delays and stoppages, as well as the capital-intensive nature of their business. With diminishing time to pursue a restructuring, the Debtors decided to initiate a parallel marketing and sale process to generate the greatest level of interest in, and highest or otherwise best value for, the Debtors' assets and maximize recoveries for all stakeholders. On September 30, 2025, the Court entered an order (Docket No. 288) (the "**Bidding Procedures Order**") authorizing and approving, among other things, (i) orderly and value-maximizing bidding procedures for the sale of the Debtors' assets, in whole or in part, including equity interests of non-Debtor foreign subsidiaries owned by certain Debtors (collectively, the "**Assets**"), (ii) assumption and assignment procedures for the Debtors' executory contracts and unexpired leases, and (iii) an auction for the sale of the Assets and a hearing to consider approval of one or more proposed sale transactions.

12.     Promptly after entry of the Bidding Procedures Order, the Debtors, with the assistance of their advisors (including their investment banker, Jefferies LLC), began marketing the Assets to potential purchasers and interested parties, working diligently to solicit interest in one or more potential sale transactions. As a result of the sale and marketing efforts, in

February 2026 the Debtors received a bid from ECP V, LLC ("**ECP**") for (i) the equity interests of TPI Blade Services Europe S.L.U., TPI Composites, S. de R.L. de C.V., and TPI Blade Services LATAM S.A. de C.V., (ii) certain of the assets of non-Debtor TPI Composites Denmark ApS, and (iii) substantially all of the Assets related to the Debtors' business in the United States and Mexico, other than the equity of TPI MX V & VI (as defined below) and related assets to be sold pursuant to the Vestas Sale Transactions (as defined below) ((i), (ii), and (iii) collectively, the "**Remaining Assets**").

13.     Following weeks of arm's-length negotiations, on March 6, 2026, Parent, TPI Technology, Inc., TPI Mexico, LLC, TPI Mexico II, LLC, TPI Mexico III, LLC, TPI Arizona, LLC, TPI Iowa, LLC, TPI Composites Services, LLC, TPI Turkey Izbas, LLC, TPI Holdings Switzerland GmbH, TPI Composites Denmark ApS, each as a seller party, and the Buyer executed that certain *Stock and Asset Purchase Agreement* (as may be amended, modified, or supplemented, the "**ECP Purchase Agreement**" and, together with all ancillary documents attached thereto or referenced therein, the "**Sale Transaction Documents**") for the sale of the Remaining Assets (such transaction, the "**ECP Sale Transaction**").   Pursuant to the final form of the Sale Transaction Documents, the Buyer will acquire the Remaining Assets for an aggregate purchase price of $20 million (subject to certain purchase price adjustments), plus the assumption of certain liabilities.  Following the hearing held on March 16, 2026, the Court entered an order authorizing and approving the sale to the Buyer of the Remaining Assets, free and clear of all liens, claims,

and encumbrances (other than the liabilities assumed and liens permitted in the ECP Purchase Agreement), pursuant to the Sale Transaction Documents (Docket No. 778).[5]

B.      Unsecured Claims Settlement

14.     In October 2025, the Creditors' Committee filed several pleadings in these Chapter 11 Cases asserting, among other things, that (i) the transaction in which Oaktree Capital Management L.P. and certain of its affiliated funds and entities ("**Oaktree**") exchanged its then-existing $436 million of preferred equity into the Senior Secured Term Loan, with $43 million in accrued and unpaid dividends exchanged into common equity (the "**2023 Transaction**") constituted a fraudulent transfer and should be avoided, (ii) the Senior Secured Term Loan should be recharacterized as equity, and (iii) the Senior Secured Term Loan Claims should be equitably subordinated.  In addition, the Creditors' Committee sought derivative standing to assert and settle, on behalf of the Debtors' estates, claims belonging to the Debtors' estates for constructive fraudulent transfer, actual fraudulent transfer, and avoidance of the 2023 Transaction and requested a temporary restraining order and preliminary injunction seeking to prohibit the Senior Secured Lenders from credit bidding in the Debtors' sale process or at the Auction, if one were to be held.

15.     In an effort to resolve the Creditors' Committee's concerns, the Debtors engaged in numerous discussions with the Creditors' Committee, the DIP Lenders, and the Senior

---

[5] Pursuant to various purchase agreements, the Debtors sold to affiliates of Vestas (i) substantially all of the assets of non-Debtor TPI Composites India Private Limited ("**TPI India**"), certain assets of non-Debtor TPI Global SSC India Private Limited, and certain Assets of Parent and certain other Debtors, in each case, exclusively related to the business operations of TPI India, and (ii) (a) all of the equity in TPI Mexico V, LLC and TPI Mexico VI, LLC (together, "**TPI MX V & VI**"), as reorganized through the implementation of the TPI MX V & VI Plan (as defined herein) and (b) certain assets of Parent, certain Debtors, and certain non-Debtors primarily related to the manufacturing of wind turbine blades in Matamoros, Mexico (collectively, the "**Vestas Sale Transactions**").

The Vestas Sale Transactions were approved as part of the *Second Amended Joint Chapter 11 Plan of TPI MX V, LLC and TPI Mexico VI, LLC* (Docket No. 929) (the "**TPI MX V & VI Plan**"), which the Court confirmed on May 21, 2026 (Docket No. 929) and went effective on June 15, 2026 as detailed in the *Notice of Occurrence of Plan Effective Date for Second Amended Joint Chapter 11 Plan of TPI Mexico V, LLC and TPI Mexico VI, LLC* (Docket No. 980).

Secured Lenders, including attending mediation with the Creditors' Committee, the Customers, the Senior Secured Lenders, and the DIP Lenders. These discussions culminated in the execution of a global settlement term sheet (the "**Unsecured Claims Settlement**") among the Debtors, the Creditors' Committee, the Senior Secured Lenders, and the DIP Lenders, the terms of which were approved by the Court on December 10, 2025 (Docket No. 553) (the "**Settlement Order**").

16.     The Unsecured Claims Settlement provides that, among other things, (i) each party to the Unsecured Claims Settlement granted each other party a mutual release in connection with the claims and causes of action being litigated between such parties, (ii) the Debtors agreed to waive preference actions under section 547 of the Bankruptcy Code against holders of Allowed General Unsecured Claims arising from the provision of goods and services to any Debtor, (iii) the Debtors agreed to use reasonable efforts to pay the claims of critical vendors that are forecasted to be paid through December 31, 2025 based on the Debtors' most recent financial projections, (iv) the Senior Secured Lenders agreed to a recovery-sharing mechanism where, at certain levels of recovery to the Senior Secured Lenders, the Senior Secured Lenders would share a portion of the cash distributions they received with holders of Allowed General Unsecured Claims, and (v) the Creditors' Committee agreed to support the implementation of a plan or sale consistent with the terms of the Unsecured Claims Settlement.

C.     Oaktree Settlement Agreement

17.     On March 1, 2026, the Debtors received a *Notice of Default under the DIP Credit Agreement and Reservation of Rights* from Oaktree, as administrative agent for the DIP Lenders, advising the Debtors that they were in default of certain covenants in the DIP Credit Agreement. Under the DIP Credit Agreement, the DIP Lenders' consent was also required to consummate the Vestas Sale Transactions and ECP Sale Transaction.

9

18.     On March 16, 2026, the Debtors, Oaktree (as DIP Agent and Prepetition Administrative Agent), GE Vernova, GE Renewables North America, LLC ("**GERNA**"), and Vestas entered into that certain *Oaktree Consent Term Sheet* (Docket No. 765) (as may be amended, supplemented, or otherwise modified from time to time, the "**Oaktree Consent Term Sheet**" and the settlement in connection therewith, the "**Oaktree Settlement**"), pursuant to which Oaktree agreed to consent to the Debtors' proposed sale transactions and waive the defaults arising under the DIP Credit Agreement.  In connection with the Oaktree Consent Term Sheet, each of the parties thereto agreed, among other things, to support the Debtors' sale transactions, including the ECP Sale Transaction, and any related chapter 11 plans, and the Debtors agreed to provide appropriate releases to Oaktree and its affiliates in any such chapter 11 plan.

D.     Plan and Disclosure Statement

19.     On May 22, 2026, the RemainCo Debtors filed the Plan and the Disclosure Statement.  The Plan provides for the distribution of ECP Sale Proceeds from the ECP Sale Transaction, the liquidation of any remaining assets of the RemainCo Debtors, and the wind-down of the RemainCo Debtors and their Estates in a cost-efficient manner after the Plan Effective Date. Actions contemplated by the Plan include, among other things, the cancellation of Existing Equity Interests and the establishment of the WindDown Co, which is overseen by the WindDown Agent, to carry out and implement all provisions of the Plan.  Other than any restrictions expressly imposed by the Plan, TPI MX V & VI Plan, or the Confirmation Order, WindDown Co will be authorized to, among other things, (i) make distributions on account of any Allowed Claims (other than Allowed General Unsecured Claims), (ii) except to the extent Claims have already been Allowed, control and effectuate the Claims reconciliation process with respect to all Claims (other than Allowed General Unsecured Claims), (iii) reserve ECP Sale Proceeds, in consultation with the Prepetition Administrative Agent, for the payment of certain Allowed Claims (excluding

10

Allowed General Unsecured Claims), and (iv) direct and control the wind down, liquidation, sale, or abandonment of the RemainCo Debtors' remaining assets and Estates.

20.     The GUC Trust, which is overseen by the GUC Trustee, was established on the effective date of the TPI MX V & VI Plan to, among other things, reconcile General Unsecured Claims and make distributions to holders of Allowed General Unsecured Claims in accordance with the terms of the Plan and the GUC Trust Agreement.  Upon the Plan Effective Date, the GUC Trust will be similarly authorized with respect to the General Unsecured Claims under the Plan. Distributions to holders of Allowed General Unsecured Claims will be funded by any rights to distributions that the Senior Secured Lenders as holders of Senior Secured Term Loan Claims in Class 3 turn over to the GUC Trust pursuant to the Unsecured Claims Settlement, including any such rights arising as a result of an amount equal to 1% of the purchase price (exclusive of taxes, tariffs, and other fees) actually paid by GERNA to ECP or its Affiliates for wind turbine blades manufactured using, or otherwise attributable to, the assets acquired by ECP pursuant to the ECP Purchase Agreement pursuant to an agreement between GERNA and Oaktree.

21.     The Plan provides for payment in full of Allowed Other Priority Claims and Allowed Other Secured Claims in compliance with the Bankruptcy Code.[6]  Additionally, the Plan provides for the following treatment of other Claims and Interests:

o     Holders of Allowed Senior Secured Term Loan Claims (Class 3) will receive, subject to the terms of the Unsecured Claims Settlement, their Pro Rata Share of the (i) Excess Sale Proceeds, (ii) any remaining GUC Reserve Funding Amount or WindDown Reserve after the completion of the Claims reconciliation process and the wind down of the GUC Trust, the WindDown Co, and the estates of the Affiliated Debtors, as applicable, and (iii) the Surplus Senior Claims Recovery Pool Cash until holders of Allowed Senior Secured Term Loan Claims receive an amount equal to the Allowed amount of their Allowed Senior Secured Term Loan Claims;

---

[6] The treatment described herein is a summary and is qualified in its entirety by reference to the full text of the Plan.

o   Holders of Allowed General Unsecured Claims (Class 4) will receive, subject to the terms of the Unsecured Claims Settlement, their Pro Rata Share of the GUC Trust Interests along with holders of beneficial interests in the GUC Trust granted in connection with TPI MX V & VI Plan;

o   Holders of Allowed Intercompany Interests (Class 5) will not receive distributions under the Plan and their Interests will be adjusted, reinstated, set off, settled, contributed, cancelled, released, discharged, or otherwise addressed, to the extent reasonably determined to be appropriate by the RemainCo Debtors or the WindDown Co, as applicable; *provided*, that no Plan distributions will be made to holders of Intercompany Interests on account of such Intercompany Interests under the Plan unless all Allowed Claims against such RemainCo Debtor have been satisfied in full or as otherwise satisfied and released in accordance with the Bankruptcy Code and the Plan; and

o   Holders of Existing Equity Interests (Class 6) will neither receive nor retain any property of the Parent's Estate or direct interest in property of the Parent's Estate on account of such Existing Equity Interests; *provided*, that in the event that all Allowed Claims have been satisfied in full or as otherwise satisfied and released in accordance with the Bankruptcy Code and the Plan, each holder of an Existing Equity Interest as of the Plan Effective Date may receive its share of any remaining assets of the Parent consistent with such holder's rights of payment under applicable law or contract, as applicable, existing immediately prior to the Petition Date. A single share of Parent Common Stock will be issued on the Plan Effective Date to the WindDown Agent to hold in trust as custodian for the benefit of the holders of Existing Equity Interests for purposes of effectuating the Plan.

## III.   PLAN SOLICITATION AND TABULATION

### A.   <u>Solicitation</u>

22.   On May 7, 2026, the RemainCo Debtors filed the *Motion of TPI Composites, Inc. and Certain of Its Affiliated Debtors for Entry of Order (I) Conditionally Approving Disclosure Statement, (II) Establishing Solicitation, Voting, and Related Procedures, (III) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan, (IV) Establishing Notice and Objection Procedures for Confirmation of Plan, and (V) Granting Related Relief* (Docket No. 893) (the "**Disclosure Statement Motion**"), pursuant to which the RemainCo Debtors sought a combined hearing on final approval of the

Disclosure Statement and confirmation of the Plan.  On May 21, 2026, the Court entered an order conditionally approving the Disclosure Statement and approving the solicitation and voting procedures set forth in the Disclosure Statement Motion (Docket No. 927) (the "**Disclosure Statement Order**").

23.     The Disclosure Statement Order, among other things, (i) scheduled the hearing to consider final approval of the Disclosure Statement and confirmation of the Plan for July 1, 2026   at   1:00 p.m.   (Central   Time)   (the "**Combined   Hearing**"),   (ii) established June 24, 2026 at 4:00 p.m. (Central Time) as the deadline to (a) vote to accept or reject the Plan (the "**Voting Deadline**"), (b) opt out of or opt in to the Third-Party Releases, as applicable, and (c) object to the adequacy of the Disclosure Statement or confirmation of the Plan (the "**Objection Deadline**"), (iii) approved the solicitation, balloting, tabulation, and related activities undertaken by the RemainCo Debtors in connection with the Plan (collectively, the "**Solicitation and Voting Procedures**"), the form of ballots with voting instructions (the "**Ballots**"), and certain other notices, and (iv) approved the form and manner of notice of the Combined Hearing (the "**Combined Hearing Notice**").

24.     On May 27, 2026, the RemainCo Debtors commenced solicitation of votes on the Plan by causing their claims, noticing, and solicitation agent, Kroll Restructuring Administration LLC ("**Kroll**"), to distribute by e-mail or first-class mail copies of the Plan, the Disclosure Statement (with all exhibits, including the Plan), a copy of the Solicitation and Voting Procedures, the Combined Hearing Notice, and the applicable Ballot (collectively, the "**Solicitation Package**") to each creditor entitled to vote on the Plan.  *See* Solicitation Aff. ¶¶ 1–2.  As discussed below, Class 3 (Senior Secured Term Loan Claims) and Class 4 (General Unsecured Claims) were the only Classes entitled to vote on the Plan (together,

13

the "**Voting Classes**").  Class 3 (Senior Secured Term Loan Claims) voted to accept the Plan, and Class 4 (General Unsecured Claims) voted to accept the Plan at certain RemainCo Debtors and to reject the Plan at others, as further detailed in the chart herein.  Tabulation Decl. Ex. A.

25.     In lieu of transmitting a Solicitation Package, the RemainCo Debtors mailed holders of Claims in Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) a notice of non-voting status (the "**Notice of Non-Voting Status for Classes 1 and 2**") and a Combined Hearing Notice.  The Notice of Non-Voting Status for Classes 1 and 2 provided (i) notice of the Court's conditional approval of the Disclosure Statement, (ii) notice of the filing of the Plan and Disclosure Statement, (iii) notice of the holder's non-voting status, and (iv) information about how to obtain copies of the Disclosure Statement and Plan.  The Notice of Non-Voting Status for Classes 1 and 2 also included a form to complete and return if the party elected to opt out of the Third-Party Releases (the "**Release Opt-Out Form**").  The Release Opt-Out Form contained the full text of the third-party release provision, as set forth in Article 10.6(b) of the Plan (the "**Third-Party Releases**"), and advised such holders that they would be deemed to be bound by the Third-Party Releases unless they timely and properly opted out of such releases, in accordance with Rule 40 of the Complex Case Rules and consistent with the Disclosure Statement Order.

26.     The RemainCo Debtors also provided a notice of non-voting status (the "**Notice of Non-Voting Status for Class 6**" and, together with the Notice of Non-Voting Status for Classes 1 and 2, the "**Notices of Non-Voting Status**"), along with a Combined Hearing Notice, to known, registered holders of Parent's common stock, whose positions in the Existing Equity Interests are registered in their own names directly on the books and records of the applicable transfer agent or the RemainCo Debtors (the "**Known Equity Holders**"), and bank, broker, and financial institution nominees that hold Parent's common stock "in street name" on

behalf of beneficial holders, whose positions in the Existing Equity Interests are held through the Depository Trust Company or similar securities depository (the "**Equity Nominees**"), in each case, in Class 6 (Existing Equity Interests).

27.     On May 26, 2026, the RemainCo Debtors filed the Combined Hearing Notice (Docket No. 937).  On May 27, 2026, Kroll served (i) the Combined Hearing Notice on all holders of Claims, Known Equity Holders, and Equity Nominees and (ii) the Notices of Non-Voting Status, on holders of Claims in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), and the Known Equity Holders and Equity Nominees in Class 6 (Existing Equity Interests).  *See* Solicitation Aff. ¶¶ 1–2; Solicitation and Voting Procedures § E.6.  A shortened version of the Combined Hearing Notice was also published in the national edition of *USA Today* on June 1, 2026.  *See* Publication Aff. ¶ 2.  The Plan and Disclosure Statement were also made available at no cost on Kroll's website at https://restructuring.ra.kroll.com/TPIComposites.

28.     In accordance with the Disclosure Statement Order, on June 17, 2026, the RemainCo Debtors filed the *Notice of Filing of Plan Supplement for Amended Joint Chapter 11 Plan of Liquidation of TPI Composites, Inc. and Certain of Its Affiliated Debtors* (the "**Plan Supplement**") (Docket No. 982), which included substantially final forms of (a) the GUC Trust Agreement, (b) the Schedule of Retained Causes of Action, (c) the Schedule of Assumed Contracts, and (d) the identities of the GUC Trustee and the WindDown Agent.

B.     Tabulation

29.     After the Voting Deadline, and following a complete review by Kroll of all Ballots received, Kroll finalized the tabulation of the Ballots.  Tabulation Decl. ¶ 12.  As detailed herein and in the Tabulation Declaration, at least one Impaired Class, Class 3 (Senior Secured Term Loan Claims), voted to accept the Plan at each of the twenty RemainCo Debtors, and the Plan accordingly satisfies section 1129(a)(10) of the Bankruptcy Code and should be confirmed

as to each RemainCo Debtor.  With respect to Class 4 (General Unsecured Claims), (i) Class 4 at five RemainCo Debtors voted to accept the Plan, (ii) Class 4 at six RemainCo Debtors voted to reject the Plan, (iii) at six RemainCo Debtors, no holder of a Class 4 Claim cast a Ballot, and such Class is presumed to have accepted the Plan pursuant to Section E, paragraph 8 of the Solicitation and Voting Procedures, and (iv) at three RemainCo Debtors, no holder of a Class 4 Claim was entitled to vote, and such Class is eliminated for voting purposes pursuant to Article 3.5 of the Plan and Section E, paragraph 8 of the Solicitation and Voting Procedures.  Votes were received and counted on a debtor-by-debtor basis, and a chart of the voting results by RemainCo Debtor is included in the Tabulation Declaration at Exhibit A and set forth below:

| Debtor | Class | Number Accepting (%) | Number Rejecting (%) | Amount Accepting (%) | Amount Rejecting (%) | Voting Result |
|---|---|---|---|---|---|---|
| Composite Solutions, Inc. | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | — | — | — | — | Presumed to accept (Section E, paragraph 8 of the Solicitation and Voting Procedures) |
| Ponto Alto Holdings, LLC | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | — | — | — | — | Eliminated for voting purposes (Art. 3.5 of the Plan) |
| TPI APAC II, Inc. | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | 1 (50.00%) | 1 (50.00%) | $1.00 (0.00%) | $1,033,134.23 (100.00%) | Reject |
| TPI APAC, LLC | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General | 1 (100.00%) | 0 (0.00%) | $167,403.00 (100.00%) | $0.00 (0.00%) | Accept |

| Debtor | Class | Number Accepting (%) | Number Rejecting (%) | Amount Accepting (%) | Amount Rejecting (%) | Voting Result |
|---|---|---|---|---|---|---|
| | Unsecured Claims) | | | | | |
| TPI Arizona, LLC | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | — | — | — | — | Presumed to accept (Section E, paragraph 8 of the Solicitation and Voting Procedures) |
| TPI Composites Services, LLC | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | 3 (75.00%) | 1 (25.00%) | $127,770.27 (88.73%) | $16,225.00 (11.27%) | Accept |
| TPI Composites, Inc. | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | 29 (93.55%) | 2 (6.45%) | $222,117,767.87 (61.61%) | $138,389,195.29 (38.39%) | Reject |
| TPI Holdings Mexico, LLC | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | — | — | — | — | Eliminated for voting purposes (Art. 3.5 of the Plan) |
| TPI International, LLC | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | 1 (50.00%) | 1 (50.00%) | $1,107,567.00 (5.92%) | $17,587,321.05 (94.08%) | Reject |
| TPI Iowa II, LLC | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | — | — | — | — | Presumed to accept (Section E, paragraph 8 of the Solicitation |

17

| Debtor | Class | Number Accepting (%) | Number Rejecting (%) | Amount Accepting (%) | Amount Rejecting (%) | Voting Result |
|---|---|---|---|---|---|---|
| | | | | | | and Voting Procedures) |
| **TPI Iowa, LLC** | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | 6 (100.00%) | 0 (0.00%) | $4,477,854.16 (100.00%) | $0.00 (0.00%) | Accept |
| **TPI Mexico II, LLC** | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | — | — | — | — | Presumed to accept (Section E, paragraph 8 of the Solicitation and Voting Procedures) |
| **TPI Mexico III, LLC** | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | 6 (85.71%) | 1 (14.29%) | $36,103,922.72 (99.85%) | $55,204.20 (0.15%) | Accept |
| **TPI Mexico IV, LLC** | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | — | — | — | — | Presumed to accept (Section E, paragraph 8 of the Solicitation and Voting Procedures) |
| **TPI Mexico, LLC** | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | 11 (91.67%) | 1 (8.33%) | $75,459,726.76 (99.72%) | $210,600.00 (0.28%) | Accept |
| **TPI Technology, Inc.** | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | — | — | — | — | Presumed to accept (Section E, paragraph 8 of |

| Debtor | Class | Number Accepting (%) | Number Rejecting (%) | Amount Accepting (%) | Amount Rejecting (%) | Voting Result |
|---|---|---|---|---|---|---|
| | | | | | | the Solicitation and Voting Procedures) |
| TPI Texas, LLC | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | — | — | — | — | Eliminated for voting purposes (Art. 3.5 of the Plan) |
| TPI Turkey II, LLC | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | 3 (75.00%) | 1 (25.00%) | $76,635.00 (21.51%) | $279,676.53 (78.49%) | Reject |
| TPI Turkey Izbas, LLC | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | 1 (50.00%) | 1 (50.00%) | $50,000.00 (15.17%) | $279,676.53 (84.83%) | Reject |
| TPI Turkey, LLC | Class 3 (Senior Secured Term Loan Claims) | 3 (100.00%) | 0 (0.00%) | $456,839,237.05 (100.00%) | $0.00 (0.00%) | Accept |
| | Class 4 (General Unsecured Claims) | 0 (0.00%) | 1 (100.00%) | $0.00 (0.00%) | $279,676.53 (100.00%) | Reject |

## ARGUMENT

30.     This argument is divided into four sections. *Section I* demonstrates the satisfaction of each requirement for final approval of the Disclosure Statement under section 1125(a) of the Bankruptcy Code. *Section II* addresses satisfaction of the applicable requirements for the settlement, release, exculpation, and injunction provisions contained in the Plan pursuant to Bankruptcy Rule 9019, section 1123 of the Bankruptcy Code, and applicable Fifth Circuit law. *Section III* demonstrates the satisfaction of each of the requirements for confirmation of the Plan

under section 1129 of the Bankruptcy Code. *Section IV* responds to the issues raised in the U.S. Trustee Objection.

## I.   DISCLOSURE STATEMENT SHOULD BE APPROVED ON FINAL BASIS

31.   For the reasons set forth below, the Disclosure Statement satisfies the applicable requirements of section 1125 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules and should be approved on a final basis as containing adequate information.

A.   Parties in Interest Received Sufficient Notice of Combined Hearing and Objection Deadline

32.   Bankruptcy Rule 3017(a) authorizes the Court to fix a time for filing objections to the adequacy of a disclosure statement, and Bankruptcy Rule 3020(b)(1) authorizes the Court to fix a time for filing objections to confirmation of a chapter 11 plan. Bankruptcy Rules 2002(b), 2002(d), and 3017(a) generally provide that parties in interest should receive not less than 28 days' notice by mail of the time fixed for filing objections to approval of a disclosure statement and confirmation of a plan.

33.   Further, the Fifth Circuit has adopted the general rule that "[d]ue process requires that notice be 'reasonably calculated, under all the circumstances, to inform interested parties of the pendency' of a proceeding." *Williams v. Placid Oil Co. (In re Placid Oil Co.)*, 753 F.3d 151, 154 (5th Cir. 2014) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). When evaluating the sufficiency of notice, courts in this Circuit consider whether "(1) the notice apprised the claimant of the pendency of the action, and (2) [whether] it was sufficiently timely to permit the claimant to present his objections." *Sequa Corp. v. Christopher (In re Christopher)*, 28 F.3d 512, 518 (5th Cir. 1994) (citations omitted); *Otto v. Tex. Tamale Co. (In re Tex. Tamale Co.)*, 219 B.R. 732, 739–40 (Bankr. S.D. Tex. 1998) (citations omitted).

20

Indeed, "[w]hether a particular method of notice is reasonably calculated to reach interested parties depends upon the particular circumstances of each case." *Walters v. Hunt (In re Hunt)*, 146 B.R. 178, 182 (Bankr. N.D. Tex. 1992).

34.     On May 7, 2026, the RemainCo Debtors filed the Disclosure Statement Motion seeking the relief requested in the Disclosure Statement Order, including to establish the Plan Objection Deadline and set the Combined Hearing.  *See* Disclosure Statement Motion ¶ 5. The RemainCo Debtors submitted to the Court that conditional approval of the Disclosure Statement was warranted and appropriate in these Chapter 11 Cases because it would enable the RemainCo Debtors to commence solicitation, facilitate the expeditious confirmation and consummation of the Plan, ensure that the RemainCo Debtors have sufficient liquidity to prosecute the Plan, and ensure the orderly reconciliation of claims.  *See id.* at ¶ 15.

35.     On May 26, 2026, the RemainCo Debtors filed the Combined Hearing Notice, and on May 27, 2026, Kroll served the Combined Hearing Notice, with the dates for the Plan Objection Deadline and Combined Hearing and caused the Combined Hearing Notice to be published in the national edition of *USA Today* on June 1, 2026.  *See* Publication Aff. Ex. A; *see* Solicitation Aff. ¶ 2.  Parties in interest, therefore, received at least 28 days' notice of the Objection Deadline and 35 days' notice of the Combined Hearing.

36.     Accordingly, the RemainCo Debtors submit that all parties in interest had sufficient notice of the Objection Deadline and the Combined Hearing as required by the Bankruptcy Rules and precedent in this Circuit, and no party has been prejudiced by this schedule.

B.     <u>Disclosure Statement Contains Adequate Information and Should Be Approved</u>

37.     As set forth in the Solicitation Affidavit and in accordance with section 1126 of the Bankruptcy Code, the RemainCo Debtors solicited votes to accept or reject the Plan from holders of Claims in Class 3 (Senior Secured Term Loan Claims) and Class 4 (General

Unsecured Claims), the only Classes of Impaired Claims entitled to vote on the Plan.  To approve a solicitation of votes to accept or reject a plan, the Court must determine that such solicitation complied with sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.

38.    On May 21, 2026, the Court entered the Disclosure Statement Order, conditionally approving the Disclosure Statement as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code.  In accordance with section 1125(b), the RemainCo Debtors did not solicit votes on the Plan until after the Disclosure Statement Order was entered.

39.    Under section 1125 of the Bankruptcy Code, a plan proponent must provide voting creditors with "adequate information" regarding a debtor's proposed plan.[7]  A debtor's disclosure statement must provide sufficient information to permit an informed judgment by creditors entitled to vote on the plan.  *See, e.g., Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 271 (5th Cir. 2015) ("The proponent of a reorganization plan . . . must provide a court-approved disclosure statement that contains 'adequate information' about the assets, liabilities, and financial affairs of the debtor sufficient to enable creditors to make an 'informed judgment' about the plan."); *Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners (In re Tex. Rangers Baseball Partners)*, 521 B.R. 134, 176 (Bankr. N.D. Tex. 2014) ("Section 1125 of the Bankruptcy Code entitles creditors to 'adequate information' so they can make an informed decision on whether to accept or reject a chapter 11 plan.").  The essential

---

[7] "**[A]dequate information**" is defined in the Bankruptcy Code as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1).

requirement of a disclosure statement is that it "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Keisler*, No. 08-34321 (RS), 2009 WL 1851413, at *4 (Bankr. E.D. Tenn. June 29, 2009) (quoting *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991)).

40.      Whether a disclosure statement contains adequate information "is not governed by any otherwise applicable nonbankruptcy law, rule, or regulation."  11 U.S.C. § 1125(d).  Instead, bankruptcy courts have broad discretion to determine the adequacy of the information contained in a disclosure statement. *See, e.g., Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) (noting that the determination of what is adequate information is "largely within the discretion of the bankruptcy court").

41.      Congress granted bankruptcy courts wide discretion in determining the adequacy of a disclosure statement, taking into account the various facts and circumstances that accompany chapter 11 cases. *See* H.R. REP. No. 595, 95th Cong., 1st Sess. 408–09 (1977); *see also Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 518 (5th Cir. 1998) ("[W]ith respect to a particular disclosure statement, '[b]oth the kind and form of information are left essentially to the judicial discretion of the court'" (quoting S. Rep. No. 95-989, at 121 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5907)).  Accordingly, the determination of whether a disclosure statement contains adequate information is made on a case-by-case basis, focusing on the unique facts and circumstances of each case. *See In re Tex. Extrusion Corp.*, 844 F.2d at 1157 ("The determination of what is adequate information is subjective and made on a case by case basis.").

42.      Whether a disclosure statement contains adequate information is intended by Congress to be a flexible, fact-specific inquiry left within the discretion of the Court:

23

> Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis.  Courts will take a practical approach as to what is necessary under the circumstances of each case, such as the cost of preparation of the statements, the need for relative speed in solicitation and confirmation, and, of course, the need for investor protection.  There will be a balancing of interests in each case.

H.R. REP. 95-595, at 409 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6365; *see generally In re Tex. Extrusion Corp.*, 844 F.2d at 1157.

43.     The Disclosure Statement is extensive and comprehensive.  The Disclosure Statement provides various types of information, including the following:

- o      a summary of the Plan, including the classification and treatment of Claims and Interests and an estimate of recoveries to holders of Claims in each Class, *see* Disclosure Statement, Art. II;

- o      an overview of the Debtors' operations, *see id.* at Art. III.B;

- o      the RemainCo Debtors' corporate and capital structures, *see id.* at Arts. III.C–D;

- o      significant events leading to commencement of these Chapter 11 Cases, *see id.* at Art. IV;

- o      key events during these Chapter 11 Cases, *see id*. at Art. V;

- o      certain risk factors to be considered, *see id*. at Art. VII;

- o      tax consequences of the Plan, *see id.* at Art. VIII;

- o      requirements for confirmation of the Plan, *see id.* at Art. X;

- o      alternatives to confirmation and consummation of the Plan, *see id.* at Art. XI; and

- o      a liquidation analysis setting forth the estimated return that holders of Claims and Interests would receive in a hypothetical chapter 7 liquidation, *see id.* at Ex. B.

44.     For the reasons set forth above, the Disclosure Statement, which was conditionally approved pursuant to the Disclosure Statement Order, satisfies the requirements of section 1125(a) of the Bankruptcy Code and should be approved on a final basis.

24

C.      Solicitation of Votes Complied with Bankruptcy Code, Bankruptcy Rules, and Disclosure Statement Order

45.     As approved in the Disclosure Statement Order, the Solicitation Packages and Solicitation and Voting Procedures comply with the Bankruptcy Code and Bankruptcy Rules. *See* Disclosure Statement Order ¶¶ 5, 8.

46.     Bankruptcy Rule 3017(d) sets forth the materials that must be provided to holders of claims and equity interests for the purpose of soliciting their votes and providing adequate notice of the hearing on confirmation of a plan. Bankruptcy Rule 3018(c) provides for the necessary form of acceptances and rejections of a plan.

47.     In accordance with these rules and the Disclosure Statement Order, only holders of Claims in the Voting Classes were sent Ballots. These holders also received a copy of the Disclosure Statement, the Disclosure Statement Order (including the Solicitation and Voting Procedures attached thereto as Schedule 1), and the Combined Hearing Notice. The Ballot conformed to Official Form No. 314, as modified to address the facts of these Chapter 11 Cases and to be appropriate for the Voting Classes. These modifications included bold and capitalized language disclosing the Third-Party Releases and, with respect to the Ballot sent to holders of Claims in Class 4 (General Unsecured Claims), the procedures for opting in to such releases. The forms of Ballot were approved by the Court in the Disclosure Statement Order, and no party has objected to the sufficiency of the Ballots.[8] Accordingly, the RemainCo Debtors have satisfied Bankruptcy Rules 3017(d), 3018(c), and 9009.

_____

[8] The Ballot initially distributed to holders of Claims in Class 4 (General Unsecured Claims) contained an inadvertent error in the description of the optional opt-in release election. To correct the error, on June 11, 2026, Kroll served a notice on affected holders with the correct opt-in release election language. *See* Solicitation Aff. ¶¶ 5–6. Additionally, on June 12, 2026, the RemainCo Debtors filed the *Notice for Holders of Claims in Class 4 (General Unsecured Claims)* (Docket No. 973), disclosing the clarification on the docket.

48.     As set forth in the Tabulation Declaration, Kroll used standard tabulation procedures in tabulating the votes received from the Voting Classes.  Kroll carefully reviewed all Ballots received by the Voting Deadline in accordance with the procedures described in the Disclosure Statement Order, the Solicitation and Voting Procedures, and the instructions set forth in the Ballots.  *See* Tabulation Decl. ¶ 13.  The RemainCo Debtors submit that the Court should approve the tabulation of votes confirming that, with respect to Class 3 (Senior Secured Term Loan Claims), and with respect to Class 4 (General Unsecured Claims) at the eleven RemainCo Debtors identified in the chart set forth in paragraph 29, the requisite majorities in amount and number of eligible claimants voted to accept the Plan pursuant to section 1126(c) of the Bankruptcy Code.

49.     Pursuant to section 1125(e) of the Bankruptcy Code, "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.  11 U.S.C. § 1125(e).

50.     The RemainCo Debtors engaged in an arm's length, good faith negotiation with the Senior Secured Lenders and all parties, including Kroll and the Exculpated Parties, and took appropriate actions in connection with the solicitation of votes to accept or reject the Plan. Therefore, the RemainCo Debtors submit that the Court should grant these parties the protections provided under section 1125(e) of the Bankruptcy Code.

## II.     PLAN SETTLEMENTS, RELEASES, EXCULPATION, AND INJUNCTION PROVISIONS ARE APPROPRIATE AND SHOULD BE APPROVED

51.     The Plan provides for the releases of certain Claims and Causes of Action, including the RemainCo Releases (as defined below) and Third-Party Releases, in favor of the

Released Parties.[9]  The RemainCo Releases and Third-Party Releases are integral components of the Plan, were negotiated as part of the Unsecured Claims Settlement and the Oaktree Settlement, are appropriate and necessary under the circumstances, are consistent with the Bankruptcy Code, comply with applicable case law and precedent in the Fifth Circuit, and, for the reasons set forth below, should be approved.

A.      RemainCo Releases Are Appropriate and Should Be Approved

52.      Article 10.6(a) of the Plan provides for the release of any and all Claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the RemainCo Debtors, their Estates, the GUC Trust, or the WindDown Co (as applicable)) against the Released Parties based on or relating to, or in a manner arising from, in whole or in part, the RemainCo Debtors, their Estates, these Chapter 11 Cases, and a broad range of related transactions and documents (as set forth in more detail and defined in the Plan, the "**RemainCo Releases**").  In addition, the Plan incorporates various settlements of claims, including the Unsecured Creditors' Settlement (as separately approved by the Settlement Order) and the Oaktree Consent Term Sheet.

53.      Under section 1123(b)(3)(A) of the Bankruptcy Code, a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A).  Accordingly, a debtor may release causes of action as consideration for concessions made by its stakeholders pursuant to a chapter 11 plan.  *See, e.g.*, *In re Bigler*, *LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (finding that plan release provision

---

[9] "**Released Parties**" means, collectively, and in each case solely in their capacity as such (a) the RemainCo Debtors, (b) the Senior Secured Lenders, (c) the Prepetition Administrative Agent, (d) the DIP Agent, (e) the DIP Lenders, (f) the GUC Trust and GUC Trustee, (g) the WindDown Co and WindDown Agent, and (h) the Related Parties of each Person in clauses (a) through (g); *provided*, *however*, that each Person that timely and properly opts out of, or fails to opt into, as applicable, the releases set forth in Article 10.6(b) of the Plan will not be a Released Party; *provided*, *further*, that, other than with respect to the parties expressly identified as Released Parties, holders of Existing Equity Interests shall not be deemed Released Parties in such capacity.

"constitutes an acceptable settlement under § 1123(b)(3) because the [d]ebtors and the [e]state are releasing claims that are property of the [e]state in consideration for funding of the Plan . . . ."); *In re Heritage Org.*, 375 B.R. 230, 308 (Bankr. N.D. Tex. 2007) ("[T]he plain language of § 1123(b)(3) provides for the inclusion in a plan of a settlement of claims belonging to the debtor or to the estate . . . .") (emphasis omitted); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991) ("To the extent that . . . the plan purports to release any causes of action against the [creditor] which the [d]ebtor could assert, such provision is authorized by § 1123(b)(3)(A) . . . ."). In considering the appropriateness of a release of claims by a debtor, courts consider whether the release is (i) "fair and equitable" and (ii) "in the best interest of the estate." *See Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citing *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see In re Derosa-Grund*, 567 B.R. 773, 784-85 (Bankr. S.D. Tex. 2017); *see also In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006), *aff'd sub nom.*, *Objecting Class 3 Claimholders v. New Mirant Entities*, No. 4:06-CV-744-A (JHM), 2006 WL 3780884 (N.D. Tex. Dec. 26, 2006); *In re Heritage Org.*, 375 B.R. at 259.

54.     Courts generally determine whether a release is "fair and equitable" and "in the best interests of the estate" by reference to the following so-called "*Foster Mortgage*" factors:

- o   the probability of success of litigation, with due consideration for the uncertainty in fact and law;

- o   the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection;

- o   the paramount interest of the creditors and a proper deference to their respective views;

- o   the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and

     o     all other factors bearing on the wisdom of the compromise.

*Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (citing *In re Foster Mortg. Corp.*, 68 F.3d 914, 917–18 (5th Cir. 1995)); *see also Derosa-Grund*, 567 B.R. at 784–85; *In re Roqumore*, 393 B.R. 474, 479–80 (Bankr. S.D. Tex. 2008).

55.     The RemainCo Releases meet the foregoing standard and should be approved. *First*, the RemainCo Debtors do not believe there exist claims or causes of action against the Released Parties that are likely to provide a net benefit to the Estates. *See* Goldman Decl. ¶ 12. As detailed in the Goldman Declaration, in May 2025, the Transaction Committee formed a special investigation subcommittee (the "**Investigation Subcommittee**"), composed of Neal P. Goldman and Timothy Pohl. The Investigation Subcommittee approved the RemainCo Releases following a thorough investigation. *See* Goldman Decl. ¶¶ 10–12. Specifically, the Investigation Subcommittee considered, among other things, potential claims and causes of action that the Debtors may hold, including against directors, managers, officers, or any insiders, as well as third parties (the "**Investigation**"). *See* Goldman Decl. ¶ 10. Ultimately, based on the Investigation, the Investigation Subcommittee concluded that release of any potential claim or cause of action held by the Debtors was reasonable and appropriate in the context of a chapter 11 plan. *See* Goldman Decl. ¶ 12.

56.     *Second*, the RemainCo Releases were a material inducement for the Released Parties, including the Senior Secured Lenders and the Creditors' Committee, to support these Chapter 11 Cases, the ECP Sale Transaction, and the Plan and reflect a reasonable balance of the risk and expense of potential litigation, against the potential benefits provided to the RemainCo Debtors by the Released Parties. *See* Goldman Decl. ¶¶ 12, 14. The Plan and the RemainCo Releases reflect global resolution between the RemainCo Debtors and their stakeholders, including pursuant to the Unsecured Claims Settlement and Oaktree Settlement,

29

which resolved substantial impediments to the RemainCo Debtors' entry into the ECP Purchase Agreement and consummation of the ECP Sale Transaction and the Plan and avoided the need for costly and protracted litigation against the Senior Secured Lenders that would otherwise interfere with the efficient wind-down of the Estates following the closing of the ECP Sale Transaction. *See id.*

57. *Third*, the RemainCo Releases constitute an integral aspect of the RemainCo Debtors' arm's-length negotiations and restructuring transactions with their key stakeholders, including the Senior Secured Lenders, the DIP Lenders, and the Creditors' Committee, including the Plan, ECP Sale Transaction, Unsecured Claims Settlement, and Oaktree Settlement, and are being granted in exchange for the benefits provided to the Debtors leading up to and throughout these Chapter 11 Cases. *See* Goldman Decl. ¶ 13. As explained in greater detail in the Goldman Declaration, the Released Parties have made significant contributions to these Chapter 11 Cases, including (i) in the case of the Senior Secured Lenders, engaging constructively with the Debtors regarding potential restructuring transactions before and after the Petition Date, consenting to the Debtors' use of cash collateral throughout these Chapter 11 Cases, participating in the Unsecured Claims Settlement, consenting to the ECP Sale Transaction per the Oaktree Consent Term Sheet, agreeing to support the Plan, and agreeing to fund the WindDown Reserve and pay Administrative Expense Claims on the Plan Effective Date from the ECP Sale Proceeds, which constitute collateral securing the Senior Secured Term Loan Claims, (ii) in the case of the DIP Lenders, which are affiliates of the Senior Secured Lenders, providing an initial tranche of new money at the outset of these Chapter 11 Cases, pursuant to the DIP Credit Agreement and DIP Orders, allowing the Debtors to minimize disruption to their business operations while transitioning into chapter 11, and (iii) in the case of the Creditors' Committee, and in accordance

with the Unsecured Claims Settlement, agreeing to support the implementation of a plan or sale consistent with such Unsecured Claims Settlement. *Id.* at ¶¶ 15–17. Without the RemainCo Releases, the RemainCo Debtors and their Estates would not have been able to secure the benefits provided by the transactions contemplated by the Plan. *Id.* at ¶ 14.

58. *Fourth*, in consideration of the RemainCo Releases, certain of the RemainCo Debtors' Related Parties that are Released Parties, including the RemainCo Debtors' directors, officers, and advisors, have provided, and continue to provide, other integral support to the RemainCo Debtors during these Chapter 11 Cases. *See* Goldman Decl. ¶ 18. In particular, the RemainCo Debtors' directors, officers, and executive management team were instrumental throughout these Chapter 11 Cases, including in (i) navigating the sale process and negotiating and entering into the ECP Purchase Agreement in an effort to maximize the value of the RemainCo Debtors' Estates, (ii) managing intense demands associated with these Chapter 11 Cases, while maintaining their regular duties, (iii) stabilizing and continuing the RemainCo Debtors' operations during the course of these Chapter 11 Cases, and (iv) ensuring the preservation of the RemainCo Debtors' business and, by extension, the value of the Estates. *Id.* Likewise, the Transaction Committee and TPI Board provided critical guidance throughout the process, engaging with the Debtors' management and advisors regarding the ECP Sale Transaction and the Plan and taking part in numerous discussions and question-and-answer sessions regarding related issues. *Id.*

59. Accordingly, the RemainCo Releases are fair, equitable, in the best interest of the Estates, are consistent with prevailing Fifth Circuit law, and should be approved by the Court.

B.      <u>Third-Party Releases Are Consensual, Appropriate, Comply with Applicable Law, and Should Be Approved</u>

60.      In addition to the RemainCo Releases, <u>Article 10.6(b)</u> of the Plan provides for certain consensual Third-Party Releases. Section 1123(b)(6) of the Bankruptcy Code provides that a chapter 11 plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(6). Under Fifth Circuit law, a plan may include releases of third parties if such releases are provided by parties that consented to such releases and received consideration in exchange therefor. *See Bigler*, 442 B.R. at 549; *see Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987) (acknowledging that Bankruptcy Code does not prohibit a non-debtor release "when it has been accepted and confirmed as an integral part of a plan of reorganization"); *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007) ("Most courts allow consensual nondebtor releases to be included in a plan." (citations omitted)). If these requirements are satisfied, a release should be approved when it is "an essential means of implementing [a] [p]lan pursuant to Section 1123(a)(5) of the Bankruptcy Code[.]" *In re Moody Nat'l SHS Hous. H, LLC*, No. 10-30172 (MI), 2010 WL 5116872, at *5 (Bankr. S.D. Tex. June 30, 2010) (approving consensual nondebtor release).

61.      Employing that standard, Fifth Circuit courts routinely allow third-party releases in chapter 11 plans when the third-party releases are (i) consensual, (ii) specific in language, (iii) integral to the plan, (iv) a condition of a settlement, and (v) given for consideration, so long as such releases do not otherwise violate provisions of the Bankruptcy Code. *See, e.g.*, *Wool Growers*, 371 B.R. at 776 ("Consensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate section 524(e).") (citations omitted); *see also FOM P.R. S.E. v. Dr. Barnes Eyecenter Inc.*, 255 F. App'x 909, 912 (5th Cir. 2007) (enforcing a non-debtor release where "the release of claims was

32

an integral part of the bankruptcy order . . . [and] was not simply boilerplate language that was inserted into the [reorganization plan], but rather a necessary part of the [reorganization plan] itself"); *Applewood Chair Co. v. Three Rivers Plan. & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914, 920 (5th Cir. 2000) (declining to uphold a general release that did not contain a specific discharge of indebtedness of a third party); *Shoaf*, 815 F.2d at 1050 (upholding a third-party release that was specifically provided for in confirmed plan); *Hinojosa Eng'g, Inc. v. Lopez (In re Treyson Dev., Inc.)*, No. 14-70256 (EVR), 2016 WL 1604347, at *16 (Bankr. S.D. Tex. Apr. 19, 2016) (noting that "[t]he Fifth Circuit require[s] that the language in the plan must be specific as to the parties involved and the claim(s) released in order to be sufficient") (citations omitted). The United States District Court for the Southern District of Texas (the "**District Court**") has continued to view consensual third-party releases as permissible and consistent with Fifth Circuit law, including as recently as February of this year. *See Epstein v. Container Store Grp., Inc. (In re Container Store Grp., Inc.)*, 676 B.R. 356, 388 (S.D. Tex. 2026) ("**Container Store**").

62.     In determining whether a third-party release is consensual, courts in the Fifth Circuit have focused on two things—notice and an opportunity to object—*i.e.*, whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look over it, [and] the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given." Conf. Hr'g Tr. at 47:7–11, *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 21, 2016) (Docket No. 730) (approving third-party releases as consensual, over objection, in light of sufficient notice and opportunity to object); *see also* Conf. Hr'g Tr. 91:15–92:5, *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 16, 2025) (Docket No. 251) (analyzing the facts and circumstances surrounding opt-out third-party releases before determining such releases were appropriate); *In re*

33

*GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017) (Docket No. 1250) (approving third-party releases as consensual over objections from parties in interest, including U.S. Trustee); *In re Ameriforge Grp., Inc.*, No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017) (Docket No. 142) (confirming chapter 11 plan over objection because certain impaired creditors were deemed to have consented to third-party release provisions unless they opted out).

63.     Moreover, as the Court recently confirmed, nothing in the Supreme Court's recent decision in *Purdue* has modified the law in this jurisdiction, which provides that opt-out features are an appropriate mechanism to obtain consensual third-party releases. *Harrington v. Purdue Pharma, L.P.*, 603 U.S. 204 (2024) ("***Purdue***"); *see In re Pine Gate Renewables, LLC*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 19, 2026) ("***Pine Gate***") (Docket No. 1483) (approving opt out releases); *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (holding that the use of opt-out mechanisms in plans of reorganization are an appropriate method to obtain consensual third-party releases and explaining that "[h]undreds of chapter 11 cases have been confirmed in this District with consensual third-party releases with an opt-out.  And, again, *Purdue* did not change the law in this Circuit."); *see In re Container Store Grp., Inc.*, 676 B.R. at 382 ("A bankruptcy court's authority to enter consensual third-party releases is a matter of federal law.  And, as discussed, 'what constitutes consent, including opt-out features and deemed consent for not opting out, has long been settled in this [d]istrict.'") (alteration in original) (citations omitted).

64.     The parameters around when an opt-out is appropriate are the subject of several recent decisions in this district, including the District Court's recent opinion in *Container Store*.  *See Container Store*, 676 B.R. at 388 ("For these reasons, consistent with its longstanding precedent, the court holds that the failure to opt-out constitutes consent to a third-party release

under the appropriate circumstances."). The District Court in *Container Store* held that the debtors' "third-party releases [were] consensual, with the exception of claimants in Class 5 and Class 8, who received no recovery under the Plan and were deemed to reject it." *See Container Store*, 676 B.R. at 390–91. The Court has since followed the guidance in *Container Store*, confirming chapter 11 plans with opt-out provisions in *Nine Energy*, *Pine Gate*, and *PosiGen* and finding that, with the exception of classes that were not receiving any recovery, opt-outs are enforceable. *See In re Nine Energy Serv., Inc.*, No. 26-90295 (CML) (Bankr. S.D. Tex. Mar. 4, 2026) (Docket No. 189); *In re PosiGen, PBC*, No. 25-90787 (CML) (Bankr. S.D. Tex. Feb. 24, 2026) (Docket No. 613); *In re Pine Gate Renewables, LLC*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 19, 2026) (Docket No. 1483); *In re TPI Composites, Inc.*, No. 25-34655 (CML) (Bankr. S.D. Tex. May 21, 2026) (Docket No. 929) (approving the TPI MX V & VI Plan, which included the same third-party releases as the RemainCo Plan). Recently in *Luminar*, the Court confirmed a chapter 11 plan with opt-out third party releases for general unsecured creditors that were only expected to receive a *de minimis* recovery. *See In re Luminar Techs., Inc.*, No. 25-90807 (CML) (Bankr. S.D. Tex. Apr. 3, 2026) (Docket No. 589).

65. Furthermore, the Complex Case Rules permit consensual third-party releases with an opt-out. Specifically, the Complex Case Rules provide:

> If a proposed plan seeks consensual pre- or post-petition releases with respect to claims that creditors may hold against non-debtor parties, then a ballot must be sent to creditors entitled to vote on the proposed plan and notices must be sent to non-voting creditors and parties-in-interest. The ballot and the notice must inform the creditors of such releases and provide a box to check to indicate assent or opposition to such consensual releases together with a method for returning the ballot or notice.

Complex Case Rules ¶ 40.

35

66. Here, the Third-Party Releases satisfy the Fifth Circuit's standard for approval of third-party releases under the Bankruptcy Code, the Court's longstanding application of such, and the Complex Case Rules and should be approved.

67. *First*, the Third-Party Releases are fully consensual. As set forth above and in compliance with the Disclosure Statement Order, parties in interest were provided extensive notice of these Chapter 11 Cases, the Plan, the proposed release provisions, and the deadline to object to confirmation of the Plan. The Combined Hearing Notice, the Notice of Non-Voting Status for Classes 1 and 2, and the Ballots expressly included in bold font the terms of the Third-Party Releases, as set forth in <u>Article 10.6(b)</u> of the Plan. Additionally, the Notice of Non-Voting Status for Classes 1 and 2 sets forth the procedures for opting out of such Third-Party Releases and attached the appropriate form in compliance with Rule 40 of the Complex Case Rules,[10] and the Ballot for Class 4 (General Unsecured Claims) sets forth the procedures for opting in to the Third-Party Releases and attached the appropriate form in compliance with Rule 40 of the Complex Case Rules. The Combined Hearing Notice advised careful review and consideration of the terms of the Third-Party Releases, along with the other release, exculpation, and injunction provisions set forth in the Plan. The release, exculpation, and injunction provisions, including the Third-Party Releases, were also emphasized with bold font in the Plan and the Disclosure Statement.

68. *Second*, the Third-Party Releases are sufficiently specific to put the Releasing Parties on notice of the claims being released. The Third-Party Releases describe the nature and type of claims being released, the restructuring of any Claim or Interest before or during

---

[10] Specifically, the Notice of Non-Voting Status for Classes 1 and 2 included a box to check to indicate opposition to the Third-Party Releases in accordance with Rule 40 of the Complex Case Rules.

these Chapter 11 Cases, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, and implementation of the Plan, the solicitation of votes with respect to the Plan, and any other related act or omission.

69.     *Third*, the Third-Party Releases are an integral part of the Plan and were a condition to finalizing the ECP Sale Transaction and reaching resolutions with the Creditors' Committee, the Senior Secured Lenders, and the DIP Lenders.  The Third-Party Releases were critical in reaching consensus to support the Plan.  *See* Goldman Decl. ¶ 22.  As such, the Third-Party Releases were a core negotiation point and appropriately offer certain protections to parties that constructively participated in, and consented to, the ECP Sale Transaction and the Plan.

70.     *Fourth*, the Third-Party Releases are given for consideration.  The Released Parties have played an extensive and integral role in the ECP Sale Transaction and Plan negotiation process and are providing mutual releases.  All parties in interest benefit from the Plan and the contributions of the Released Parties in furtherance thereof.  As described above, the Released Parties provided pre- and postpetition services to the Debtors, and such parties were instrumental throughout these Chapter 11 Cases and allowed the Debtors to maximize the value of their Estates. The Plan complies with the holding in *Container Store*, and the Court's holding in *Pine Gate*, by excluding Classes of creditors and equity holders who are deemed to reject and will receive no recovery from the definition of Releasing Parties.  *See* Plan, <u>Art. 1.115</u>.  In compliance with the Fifth Circuit and the Court's rulings, only Classes that would receive a recovery under the Plan will need to opt out to consent to the Third-Party Releases.  Holders of Claims in Class 4 (General Unsecured Claims), which is projected to receive a 0% recovery under the Plan, will only be

considered Releasing Parties if they submit an opt-in election, consistent with the *Container Store* decision.

71.     Based on the foregoing, the Third-Party Releases comply with the controlling Fifth Circuit standards, are appropriate and justified under the circumstances, and should therefore be approved.

C.     Exculpation Provision Should Be Approved

72.     The Plan provides for the exculpation of certain parties as set forth in Article 10.7 of the Plan (the "**Exculpation Provision**").  The Exculpation Provision protects the Exculpated Parties[11] from, among other things, Causes of Action arising out of or relating to the Debtors' wind-down, these Chapter 11 Cases, and the negotiations and agreements made in connection therewith.  Unlike the Third-Party Releases, the Exculpation Provision does not affect the liability of third parties *per se*, but rather sets a standard of care in hypothetical future litigation against an Exculpated Party for acts arising out of these Chapter 11 Cases, with a carve-out for actual fraud, willful misconduct, and gross negligence.  As such, the Exculpation Provision prevents future collateral attacks against a limited set of estate fiduciaries that have exercised their fiduciary duties to maximize value for the Debtors and the Estates.

73.     Courts in this Circuit permit exculpation of debtors for actions short of gross negligence committed during the course of bankruptcy and, although more carefully scrutinized, permit exculpation of non-debtor parties where a separate statutory basis for exculpation exists. *See NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 437 (5th Cir. 2022), *pet. for cert. denied*, No. 22-631 (U.S. July 2, 2024) ("***Highland I***")

---

[11] "**Exculpated Parties**" means each of the following in their capacity as such and, in each case, to the maximum extent permitted by law, (i) the RemainCo Debtors and their Estates, (ii) the Independent Directors, and (iii) the Creditors' Committee and each of its members.

("[Section] 524(e) does not permit absolve[ing] the [non-debtor] from any negligent conduct that occurred during the course of the bankruptcy absent another source of authority.") (citation omitted) (internal quotation marks omitted).  In this vein, section 1103(c) of the Bankruptcy Code is widely recognized as a separate statutory basis for exculpation for creditors' committees.  *See Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 253 (5th Cir. 2009) (approving the exculpation of a creditors' committee and its members because section 1103(c) of the Bankruptcy Code implies "qualified immunity for [committee members'] actions within the scope of their duties").

74.    In *Highland I*, the Fifth Circuit expressly adopted and applied precedent providing qualified immunity to bankruptcy trustees[12] to exculpate certain non-debtors acting within the scope of duties of a trustee.  *Highland I*, 48 F.4th at 436–37.  Based on the facts and circumstances before it, the Fifth Circuit determined in *Highland I* that (i) each of the three independent directors appointed as fiduciaries were properly exculpated by the Plan, and (ii) certain other non-debtor parties that were not acting in such a capacity could not be exculpated.  *Id.* at 437.  Citing section 1107(a) of the Bankruptcy Code, the court reasoned that "[l]ike a debtor-in-possession, the Independent Directors are entitled to all the rights and powers of a trustee" and were therefore entitled to exculpation.  *Id.*  Following *Highland I*, the Court has consistently approved plan exculpation provisions that applied to independent directors.  *See, e.g.*, *In re Pine Gate Renewables, LLC*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 19, 2026) (Docket No. 1483)

---

[12] *See, e.g.*, *Baron v. Sherman (In re Ondova Ltd. Co.)*, 914 F.3d 990, 993 (5th Cir. 2019) ("We thus hold that bankruptcy trustees in the Fifth Circuit are entitled to qualified immunity for personal harms caused by actions that, while not pursuant to a court order, fall within the scope of their official duties."); *Hilal v. Williams (In re Hilal)*, 534 F.3d 498, 501 (5th Cir. 2008) ("In this circuit, trustees cannot be subjected to personal liability for damages to the bankruptcy estate unless they are found to have acted with gross negligence.") (citation omitted); *Dodson v. Huff (In re Smyth)*, 207 F.3d 758, 762 (5th Cir. 2000) ("[W]e conclude that trustees should not be subjected to personal liability unless they are found to have acted with gross negligence.") (citation omitted).

(approving plan containing exculpation that applied to independent managers); *In re DocuData Sols., L.C.*, No. 25-90023 (CML) (Bankr. S.D. Tex. June 23, 2025) (Docket No. 834) (approving plan containing exculpation provision that applied to disinterested director); *In re Wellpath Holdings, Inc.*, No. 24-90533 (ARP) (Bankr. S.D. Tex. May 1, 2025) (Docket No. 2596) (approving plan containing exculpation provision that applied to independent directors); *In re DRF Logistics, LLC*, No. 24-90447 (CML) (Bankr. S.D. Tex. Nov. 25, 2024) (Docket No. 530) (same).

75.     Here, each of the Exculpated Parties participated in the RemainCo Debtors' Chapter 11 Cases in good faith. *See* Goldman Decl. ¶ 25. The Exculpation Provision will provide such parties with appropriate protections supported by express sources of authority within the Bankruptcy Code, including sections 524(e), 1103(c), and 1107(a) of the Bankruptcy Code. Furthermore, the Exculpation Provision represents a critical component of the overall settlement embodied by the Plan, is narrowly tailored to protect the Exculpated Parties from inappropriate litigation based on these Chapter 11 Cases and the Plan, and does not release any claim based on any act or omission that constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order. *See id.* Accordingly, the Exculpation Provision is appropriate and conforms to existing case precedent and should therefore be approved.

D.     Injunction Provisions Are Appropriate and Should Be Approved

76.     The Plan also provides for the injunction of certain actions as set forth in Article 10.5 of the Plan (the "**Injunction Provisions**"). The Injunction Provisions are appropriate because they comply with the Bankruptcy Code and are necessary to implement and enforce the Plan. In accordance with the District Court's ruling in *Container Store* and consistent with the Court's ruling in *Pine Gate*, the Gatekeeper Provision (as defined below) in the Injunction Provisions applies only to claims against the Exculpated Parties.

40

77.     As is common in chapter 11 plans in large chapter 11 cases, the Injunction Provisions permanently enjoin any party in interest from commencing or continuing in any manner any claim that was released or exculpated under the Plan.  The Injunction Provisions also include a "gatekeeper" provision to implement the Plan's exculpation provisions, which provides that, before any claim or Cause of Action is brought against an Exculpated Party, the Court must (i) determine, after notice and a hearing, that such claim or Cause of Action is colorable and has not been exculpated under the Plan and (ii) specifically authorize such person or entity to bring such claim or Cause of Action (the "**Gatekeeper Provision**").  As discussed in more detail below, the Gatekeeper Provision is consistent with the ones authorized by the Fifth Circuit in *Highland I* and in *In re Highland Cap. Mgmt., L.P.*, 132 F.4th 353 (5th Cir. 2025) ("***Highland II***")[13] and, more recently, by the Court in other cases.  *See, e.g., In re Nine Energy Serv., Inc.*, No. 26-90295 (CML) (Bankr. S.D. Tex. Mar. 4, 2026) (Docket No. 189); *In re PosiGen, PBC*, No. 25-90787 (CML) (Bankr. S.D. Tex. Feb. 24, 2026) (Docket No. 613); *In re Pine Gate Renewables, LLC*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 19, 2026) (Docket No. 1483).

78.     In *Highland I*, the Fifth Circuit approved a gatekeeper provision related to claims that were being exculpated under the plan,[14] and in *Highland II*, the Fifth Circuit clarified that the scope of a gatekeeper provision may not extend beyond claims subject to the plan's

---

[13] On May 29, 2025, the Supreme Court issued an order providing that the Fifth Circuit's *Highland II* decision was stayed pending further order of the Supreme Court.  *See Highland Cap. Mgmt., L.P. v. NexPoint Advisors, L.P.*, No. 24-10534 (5th Cir. 2025) (Docket No. 110).  On June 9, 2025, the Supreme Court issued an order denying Highland Capital Management's application for a stay.  *See id.* at Docket No. 115.

[14] *See Highland I*, 48 F.4th at 439 ("In sum, the Plan violates § 524(e) but only insofar as it exculpates and enjoins certain non-debtors . . . We otherwise affirm the inclusion of the injunction and the gatekeeper provisions in the Plan.").

injunction (there, the exculpated claims).[15]  Subsequent cases in this Circuit have limited the gatekeeper provision solely to exculpated parties.  *See, e.g., In re Nine Energy Serv., Inc.*, No. 26-90295 (CML) (Bankr. S.D. Tex. Mar. 4, 2026) (Docket No. 189); *In re PosiGen, PBC*, No. 25-90787 (CML) (Bankr. S.D. Tex. Feb. 24, 2026) (Docket No. 613); *In re Pine Gate Renewables, LLC*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 19, 2026) (Docket No. 1483).  Thus, because the Gatekeeper Provision is narrowly tailored to apply only to claims or Causes of Action against Exculpated Parties, it is consistent with Fifth Circuit precedent set forth in *Highland I* and *Highland II*.

79.     The Injunction Provisions, including the Gatekeeper Provision, are an integral component of the Plan, appropriate and necessary under the circumstances, consistent with the Bankruptcy Code, narrowly tailored, and compliant with applicable case law and precedent in the Fifth Circuit and, for the reasons set forth above, should be approved.

### III.     PLAN SATISFIES BANKRUPTCY CODE'S REQUIREMENTS FOR CONFIRMATION AND SHOULD BE APPROVED

80.     To achieve confirmation of the Plan, the RemainCo Debtors must demonstrate that the Plan satisfies section 1129 of the Bankruptcy Code by a preponderance of the evidence.  *See In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown."); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr.

---

[15] *See Highland II*, 132 F.4th at 362 ("The clear weight of Supreme Court and Fifth Circuit precedent dictates our holding: that a proper reading of *Highland I* requires that the definition of 'Protected Parties' used in the Plan's Gatekeeper Clause be narrowed coextensively with the definition of 'Exculpated Parties' used in the Exculpation Provision.").

S.D. Tex. 2003).  The Plan satisfies all provisions of section 1129 and complies with all other applicable sections of the Bankruptcy Code, Bankruptcy Rules, Local Rules, and applicable nonbankruptcy law.

> A.   Section 1129(a)(1):  Plan Complies with Applicable Provisions of Bankruptcy Code

81.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and contents of a plan, respectively.  *See* H.R. Rep. No. 95-595, First Session at 412 (1977); S. Rep. No. 95-989, at 126 (1978).  As explained below, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code, as well as other applicable provisions.

> **1.     *Section 1122:  Plan's Classification Structure Is Proper***

82.     Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  A plan proponent is afforded "significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar."  *In re Idearc Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009); *see also Phx. Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278 (5th Cir. 1991) ("'[S]ubstantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class."); *In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (noting that "[section] 1122 is permissive of any classification scheme that is not proscribed, and that substantially similar

claims may be separately classified") (emphasis omitted); *In re Eagle Bus Mfg., Inc.*, 134 B.R. 584, 596 (Bankr. S.D. Tex. 1991) ("A classification scheme satisfies section 1122(a) of the Bankruptcy Code when a reasonable basis exists for the choices made and all claims within a particular class are substantially similar."); *In re Heritage Org., L.L.C.*, 375 B.R. at 303 (the "general rule" remains that "the division of creditors into classes under a plan of arrangement be according to the nature of the creditors' respective claims"); *In re Premiere Network Servs., Inc.*, 333 B.R. 130, 133 (Bankr. N.D. Tex. 2005) (claims may be separated for "good business reasons").

83.     Here, the Plan provides for the following six Classes of Claims against and Interests in the RemainCo Debtors:  (i) Class 1 (Other Priority Claims), (ii) Class 2 (Other Secured Claims), (iii) Class 3 (Senior Secured Term Loan Claims), (iv) Class 4 (General Unsecured Claims), (v) Class 5 (Intercompany Interests), and (vi) Class 6 (Existing Equity Interests).

84.     The classification structure of the Plan is rational and complies with the Bankruptcy Code.  The Plan provides for the separate classification of Claims and Interests based upon the different legal nature and priority of such Claims and Interests, which classification generally tracks the RemainCo Debtors' prepetition capital structure and divides the applicable Claims and Interests into Classes based on the underlying instruments, debts, or circumstances giving rise to such Claims and Interests.  *See* Plan, <u>Art. 3</u>.  Generally, the Plan incorporates a "waterfall" classification and distribution scheme that strictly follows the statutory priorities prescribed by the Bankruptcy Code.  *See* Plan, <u>Art. 4</u>.  Within a given Class, all Claims and Interests have the same or similar rights against the RemainCo Debtors.  *See* Plan, <u>Art. 4</u>.

### 2.     Section 1123(a):  Plan's Content Is Appropriate

85.     Section 1123(a) of the Bankruptcy Code sets forth seven requirements that a plan must satisfy.  *See* 11 U.S.C. § 1123(a).  The Plan satisfies each such applicable requirement:

o       Section 1123(a)(1).  The Plan designates Classes of Claims and Interests as required by section 1123(a)(1).  *See* Plan, Art. 3.1.

o       Section 1123(a)(2).  The Plan specifies whether each Class of Claims or Interests is Impaired or Unimpaired under the Plan as required by section 1123(a)(2).  *See id.* at Art. 3.3.

o       Section 1123(a)(3).  The Plan specifies the treatment of any Class of Claims or Interests that is Impaired as required by section 1123(a)(3).  *See id.* at Art. 4.

o       Section 1123(a)(4).  Except as otherwise agreed to by a holder of a particular Claim or Interest, the opportunity for recovery to each holder of a Claim or Interest in each Class is the same as the opportunity for recovery to all holders in such Class, as required by section 1123(a)(4).  *See id.* at Art. 4.

o       Section 1123(a)(5).  The Plan provides adequate means for its implementation as required by section 1123(a)(5) through, among other things, the (i) appointment of the WindDown Agent to administer the Plan, *see id.* at Art. 5.1, (ii) establishment of the WindDown Reserve to fund wind-down costs, *see id.*, (iii) governance of the GUC Trust, *see id.* at Art. 5.2, (iv) preservation of certain Claims and Causes of Action, *see id.* at Art. 10.8, (v) release by the RemainCo Debtors and by the Releasing Parties of the Released Parties, *see id.* at Art. 10.6, and (vi) exculpation of the Exculpated Parties, *see id.* at Art. 10.7.

o       Section 1123(a)(6).  The governing corporate documents of the RemainCo Debtors have been or will be amended on or prior to the Plan Effective Date to prohibit the issuance of non-voting equity securities in accordance with section 1123(a)(6).

o       Section 1123(a)(7).  The Plan provisions governing the manner of selection of any officer, manager, director, or trustee, as applicable, under the Plan are consistent with the interests of creditors and equity security holders and with public policy in accordance with section 1123(a)(7).  *See* Plan, Art. 5.3.

86.    Accordingly, the Plan satisfies section 1123(a) of the Bankruptcy Code.

### 3.    Section 1123(b):  Plan's Content Is Permitted

87.    Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a plan.

o       Section 1123(b)(1).  Article 4 of the Plan describes the treatment for Impaired and Unimpaired Classes and Impaired Interests.  *See* Plan, Art. 4.

45

o    Section 1123(b)(2).  The Plan provides for the rejection of the executory contracts and unexpired leases of the RemainCo Debtors as of the Plan Effective Date, unless such executory contract or unexpired lease (a) previously has been assumed, assumed or assigned, or rejected pursuant to a Final Order of the Court, including the Sale Order, (b) is the subject of a separate assumption or rejection motion filed by the RemainCo Debtors under section 365 of the Bankruptcy Code before the Confirmation Date, (c) is specifically designated as a contract or lease to be assumed on the Schedule of Assumed Contracts, or (d) is the subject of a pending Cure Dispute.  Subject to the occurrence of the Plan Effective Date, entry of the Confirmation Order by the Court will constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  *See* Plan, Art. 8.1.

o    Section 1123(b)(3)(B).  The Plan preserves and retains certain rights, Claims, and Causes of Action to be pursued by the RemainCo Debtors, the GUC Trust, or the WindDown Co, as applicable.  *See id.* at Art. 10.8.

o    Section 1123(b)(4).  The Plan provides for the distribution of the proceeds of the ECP Sale Transaction to the holders of Claims and Interests at the RemainCo Debtors.  *See id.* at Art. 5.1.

o    Section 1123(b)(5).  As permitted by section 1123(b)(5) of the Bankruptcy Code, Article 4 of the Plan (i) modifies the right of holders of Senior Secured Term Loan Claims (Class 3), General Unsecured Claims (Class 4), and Existing Equity Interests (Class 6), (ii) leaves unimpaired the rights of holders of Other Priority Claims (Class 1) and Other Secured Claims (Class 2), and (iii) either modifies or leaves unimpaired the rights of holders of Intercompany Interests (Class 5).  *See id.* at Art. 4.

o    Section 1123(b)(6).  Articles 10.6 and 10.7 of the Plan contain certain release and exculpation provisions that are essential to the Plan and consistent with the applicable provisions of the Bankruptcy Code and the law in this Circuit.  *See id.* at Arts. 10.6, 10.7.

88.    In addition, the Plan's releases and settlements are permitted pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and applicable law, as set forth in paragraphs 55-71 above.

B.    Section 1129(a)(2):  RemainCo Debtors Have Complied with Bankruptcy Code

89.    Under section 1129(a)(2) of the Bankruptcy Code, "[t]he proponent of the plan [must] compl[y] with the applicable provisions of this title."  11 U.S.C. § 1129(a)(2).  The

46

"applicable provisions" of the Bankruptcy Code have been interpreted to include, principally, sections 1125 and 1126 of the Bankruptcy Code. *See, e.g.*, *In re Cajun Elec. Power*, 150 F.3d at 512 n.3 (noting that section 1129(a)(2) includes requirement of compliance with section 1125); *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 262 (Bankr. S.D. Tex. 2015) ("Courts interpret this language to require that the plan proponent comply with the disclosure and solicitation requirements set forth in Bankruptcy Code §§ 1125 and 1126.") (citation omitted). Often, courts have also considered whether the debtor "is a proper debtor under [s]ection 109 of the Bankruptcy Code and a proper proponent of [a plan] under [s]ection 1121(a) of the Bankruptcy Code." *J T Thorpe*, 308 B.R. at 786 (holding that debtor's compliance with sections 109, 1125, and 1126 satisfied requirements of section 1129(a)(2)); *see also Moody Nat'l*, 2010 WL 5116872, at *4 (same); *In re Harborwalk, LP*, Nos. 10-80043, 10-80044, 10-80045, 2010 WL 5116620, at *4 (Bankr. S.D. Tex. Oct. 25, 2010) (same).

90.     Under section 109(a) of the Bankruptcy Code, "a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor . . . ." 11 U.S.C. § 109(a). Further, "a person that may be a debtor under chapter 7 of [the Bankruptcy Code, with exceptions not applicable here] . . . may be a debtor under chapter 11 . . . ." 11 U.S.C. § 109(d). The RemainCo Debtors have a domicile, a place of business, and property in the United States and are eligible for relief under chapter 7 of the Bankruptcy Code. Therefore, the RemainCo Debtors are each a proper chapter 11 debtor. The Plan satisfies all applicable requirements of section 1129 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules, and applicable nonbankruptcy law.

47

C.    Section 1129(a)(3):  Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law

91.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Good faith is determined through consideration of whether the plan was proposed with "the legitimate and honest purpose to reorganize and has a reasonable hope of success."  *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).  The plan must also achieve a result consistent with the Bankruptcy Code.  *See In re Block Shim Dev. Co.-Irving*, 939 F.2d 289, 292 (5th Cir. 1991).  The good faith standard is "viewed in light of the totality of circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start."  *In re Sun Country Dev.*, 764 F.2d at 408; *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013) ("Good faith should be evaluated 'in light of the totality of the circumstances' . . . mindful of the purposes underlying the Bankruptcy Code.") (citing *In re Cajun Elec. Power*, 150 F.3d at 519); *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997); *see also In re Couture Hotel Corp.*, 536 B.R. 712, 735 (Bankr. N.D. Tex. 2015) (finding that plan that is "the result of arm's-length discussions and negotiations among the Debtor [and other relevant parties and stakeholders] . . . clearly promotes the objectives and purposes of the Bankruptcy Code and is being proposed in good faith").

92.    The Plan has been proposed in good faith and for the legitimate purposes of (i) winding down the Estates, through the establishment of the WindDown Reserve and the Senior Claims Recovery Pool, which reserves for certain priority claims under the Plan, including Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Professional Fee Claims, and (ii) distributing the sale proceeds from the ECP Sale Transaction to holders of Claims against the RemainCo Debtors.  The RemainCo Debtors engaged in extensive, arm's-length

48

negotiations over the Plan with the Senior Secured Lenders, the DIP Lenders, and the Creditors' Committee, all of whom are represented by experienced and sophisticated counsel and financial advisors. Such negotiations culminated in agreement on the terms of the Plan. Furthermore, the Plan is not by any means forbidden by law, and indeed, is in full compliance with the Bankruptcy Code and applicable nonbankruptcy law. Accordingly, the RemainCo Debtors have proposed the Plan in good faith in compliance with section 1129(a)(3) of the Bankruptcy Code.

D.    Section 1129(a)(4): Plan Provides that Professional Fees and Expenses Are Subject to Court Approval

93.    Section 1129(a)(4) requires that "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4). Section 1129(a)(4) has been construed to require that all payments of professional fees made from estate assets be subject to review and approval as to their reasonableness by the court. *See In re Cajun Elec. Power*, 150 F.3d at 513–14; *see also In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting "there must be a provision [in the plan] for review by the Court of any professional compensation"). This is a "relatively open-ended standard" involving a case-by-case inquiry and, under appropriate circumstances, does not necessarily require that a bankruptcy court review the amount charged. *See In re Cajun Elec. Power*, 150 F.3d at 517 (finding with respect to routine legal fees and expenses that have been approved, "the court will ordinarily have little reason to inquire further with respect to the amount charged").

94.    All payments for professional services provided to the RemainCo Debtors during these Chapter 11 Cases that require Court approval will continue to be subject to such requirement through the Plan Effective Date in accordance with section 1129(a)(4) of the

49

Bankruptcy Code. Specifically, Article 2.5 of the Plan provides that all Professional Fee Claims must be approved by the Court pursuant to fee applications. Further, Article 11.1 of the Plan provides that the Court will retain jurisdiction to "hear and determine all Professional Fee Claims." Plan, Art. 11.1(g). Accordingly, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

E.     Section 1129(a)(5): RemainCo Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders

95.     Section 1129(a)(5) of the Bankruptcy Code requires (i) a plan proponent to disclose the identity and affiliations of the proposed officers and directors of the debtors post-confirmation, (ii) that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy, and (iii) to the extent that there are any insiders that will be retained or employed by the debtors post-confirmation, that there be disclosure of the identity and nature of any compensation of any such insiders. 11 U.S.C. § 1129(a)(5).

96.     The RemainCo Debtors have disclosed that Brian Cejka, through Alvarez & Marsal North America, LLC, will serve as the WindDown Agent. *See* Plan Suppl., Ex. D. Upon the Plan Effective Date, the WindDown Agent is authorized to and may take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of each of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan. *See* Plan, Art. 5.7. Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

F.      Section 1129(a)(6):  Plan Does Not Contain Any Rate Changes

97.     Section 1129(a)(6) of the Bankruptcy Code requires applicable government approval of "any rate change provided for in the plan."  *See* 11 U.S.C. § 1129(a)(6). Section 1129(a)(6) is inapplicable to these Chapter 11 Cases, as the Plan does not provide for any rate changes.

G.      Section 1129(a)(7):  Plan Satisfies Best Interests Test

98.     Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired claim or interest has either accepted the plan or will receive or retain property having, as of the effective date of the plan, a present value of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time—commonly referred to as the "best interests" test.  *See* 11 U.S.C. § 1129(a)(7).  The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the debtor's plan of reorganization.  *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1159 n.23 (5th Cir. 1988) (noting that a bankruptcy court is required to determine whether impaired claims would receive no less under a reorganization than through a liquidation).  A party's speculation that it would fare better in a hypothetical chapter 7 liquidation is insufficient to challenge a plan proponent's liquidation analysis.  *Block Shim*, 939 F.2d at 292.

99.     The best interests test is satisfied with respect to the holders of Claims and Interests in Class 4 (General Unsecured Claims), Class 5 (Intercompany Interests), and Class 6 (Existing Equity Interests), all of whom either abstained from voting on, voted to reject, or were

deemed to reject the Plan. The RemainCo Debtors' financial advisor, Alvarez & Marsal North America, LLC, with input from the RemainCo Debtors' management, performed a liquidation analysis that was attached as Exhibit B to the Disclosure Statement (the "**Liquidation Analysis**"). Subject to the assumptions and qualifications contained therein, the Liquidation Analysis establishes that all Classes of Claims and Interests will receive or retain property under the Plan in an amount greater than or equal to the value that they would receive if the RemainCo Debtors were liquidated under chapter 7. *See* Disclosure Statement Ex. B; *see* Liquidation Analysis Decl. ¶ 13.

100. The Liquidation Analysis is sound, reasonable, and incorporates justified assumptions and estimates regarding the liquidation of the RemainCo Debtors' assets and Claims, such as the (i) additional costs and expenses that would be incurred by the RemainCo Debtors as a result of a chapter 7 trustee's fees, (ii) additional costs and expenses that would be incurred by the Debtors as a result of a chapter 7 trustee's retention of financial and legal advisors to assist in the administration of the chapter 7 liquidation, and (iii) additional costs associated with the wind-down of the Debtors' remaining operations after the chapter 7 conversion. *See generally* Disclosure Statement Ex. B; *see* Liquidation Analysis Decl. ¶¶ 14, 17.

H.      Section 1129(a)(8):  Plan Has Been Accepted by Impaired Voting Class

101. Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accept the plan. 11 U.S.C. § 1129(a)(8). Section 1126(c) of the Bankruptcy Code provides that a plan is accepted by an impaired class of claims if the accepting class members hold at least two-thirds in amount and more than one-half in number of the claims voted in their respective class. 11 U.S.C. § 1126(c).

102. As set forth above, Class 3 (Senior Secured Term Loan Claims) voted to accept the Plan at each RemainCo Debtor, and Class 4 (General Unsecured Claims) voted to, or were deemed to, accept the Plan at certain RemainCo Debtors and to reject the Plan at other

RemainCo Debtors.[16]  Holders of Claims in Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) are Unimpaired and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Interests in Class 5 (Intercompany Interests) are either (i) Impaired and deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or (ii) Unimpaired and presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Interests in Class 6 (Existing Equity Interests) are Impaired and deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

103.    As discussed more fully below, the RemainCo Debtors have satisfied the "cram down" requirements under section 1129(b) of the Bankruptcy Code and may obtain confirmation of the Plan notwithstanding the rejection of the Plan at certain RemainCo Debtors by Class 4 (General Unsecured Claims) and the deemed rejection by Class 5 (Intercompany Interests) and Class 6 (Existing Equity Interests).

I.    <u>Section 1129(a)(9):  Plan Provides for Payment in Full of All Allowed Priority Claims</u>

104.    Section 1129(a)(9) of the Bankruptcy Code requires that claims entitled to priority under section 507(a) of the Bankruptcy Code be paid in full in cash unless the holders thereof agree to a different treatment with respect to such claims.  *See* 11 U.S.C. § 1129(a)(9).  The Plan complies with section 1129(a)(9) of the Bankruptcy Code.  <u>Article 2</u> of the Plan provides for the payment in full in Cash of the Allowed Administrative Expense Claims, Allowed Priority Tax

---

[16] Holders of Claims in Class 4 (General Unsecured Claims) voted to accept or were deemed to accept the Plan at all but the following six RemainCo Debtors:  (i) TPI APAC II, Inc., (ii) TPI Composites, Inc., (iii) TPI International, LLC, (iv) TPI Turkey II, LLC, (v) TPI Turkey Izbas, LLC, and (vi) TPI Turkey, LLC. No holders of Claims in Class 4 (General Unsecured Claims) at Debtors Ponto Alto Holdings, LLC, TPI Holdings Mexico, LLC, or TPI Texas, LLC were entitled to vote on the Plan, accordingly pursuant to <u>Article 3.5</u> of the Plan, such Classes were eliminated for voting purposes.

Claims, and Allowed Professional Fee Claims and for the full and final satisfaction of the Allowed DIP Claims from the ECP Sale Proceeds as proceeds of collateral of the DIP Lenders (other than Vestas) under the DIP Orders, in each case, consistent with sections 1129(a)(9)(A)–(C) of the Bankruptcy Code. *See* Plan, Arts. 2.2–2.5.

> J.      Section 1129(a)(10): At Least One Class of Impaired Claims Has Accepted Plan

105.    Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of a chapter 11 plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). As set forth above, Class 3 (Senior Secured Term Loan Claims) is Impaired and has voted to accept the Plan. Thus, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

> K.      Section 1129(a)(11): Plan Is Feasible

106.    Section 1129(a)(11) of the Bankruptcy Code requires the Court to determine that the Plan is feasible. Specifically, the Court must determine that confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the debtor (or any successor thereto), unless such liquidation or reorganization is proposed in the plan. Even if a plan proposes liquidation (rather than reorganization), the feasibility test set forth in section 1129(a)(11) focuses on whether a plan may be implemented and has a reasonable likelihood of success. *See United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 801; *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988).

107.    The key element of feasibility is whether there is a reasonable probability that the provisions of the plan can be performed. The purpose of the feasibility test is to protect against visionary or speculative plans. *See Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 COLLIER ON BANKRUPTCY ¶ 1129.02[11] at 1129–34 (15th ed. 1984)); *see also In re Lakeside Glob. II, Ltd.*, 116 B.R. 499,

506 (Bankr. S.D. Tex. 1989) (holding that feasibility "contemplates whether the debtor can realistically carry out its plan . . . and whether the plan offers a reasonable prospect of success and is workable") (citations omitted).  "To establish the feasibility of a plan, [a] debtor must present proof through reasonable projections that there will be sufficient cash flow to fund the plan" and "[s]uch projections cannot be speculative, conjectural or unrealistic."  *In re Idearc Inc.*, 423 B.R. at 167.

108.    The feasibility standard is greatly simplified when a liquidating chapter 11 plan is tested against section 1129(a)(11) of the Bankruptcy Code.  In the context of a liquidating chapter 11 plan, feasibility is established by demonstrating that a debtor is able to satisfy the conditions precedent to the effective date and otherwise has sufficient funds to make the payments required under such plan and to meet its post-effective date obligations to pay for the costs of administering and fully consummating the plan and closing the chapter 11 case.  *See, e.g.*, *In re J. Reg. Co.*, 407 B.R. 520, 539 (Bankr. S.D.N.Y. 2009) (explaining that the feasibility test is "whether the things which are to be done after confirmation can be done as a practical matter under the facts"); *In re Finlay Enters., Inc.*, No. 09-14873 (JMP), 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010).

109.    The RemainCo Debtors have demonstrated that they will have sufficient funds, which include Cash on hand and the ECP Sale Proceeds, to meet their obligations under the Plan.  *See* Cejka Decl. ¶ 12.  As established herein, the Plan embodies an orderly wind-down of the RemainCo Debtors and their Estates and the delivery of distributions from the ECP Sale Proceeds to holders of Allowed Claims following the closing of the ECP Sale Transaction.  Further, on the Plan Effective Date, the Plan provides for the establishment, in part from the ECP Sale Proceeds, of the WindDown Reserve to fund wind-down costs and the WindDown Co to

55

oversee the administration of the Plan and the establishment of the Senior Claims Recovery Pool to pay holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed DIP Claims, Allowed Other Priority Claims, and Professional Fee Claims.[17]  *See* Plan, Art. 5.1.

110.    Under the Plan, the RemainCo Debtors will be able to satisfy the conditions precedent to the Plan Effective Date.  As set forth in the Cejka Declaration, the RemainCo Debtors will have sufficient funds to fulfill their obligations under the Plan, satisfy their estimated administrative expenses, and satisfy the conditions precedent to the Plan Effective Date.  *See* Cejka Decl. ¶ 12.  Further, the $5.5 million Cash reserve to be established on the Plan Effective Date from the ECP Sale Proceeds is sufficient to fund any wind-down costs in connection with the Plan.  *Id.*  Accordingly, the Plan has more than a reasonable likelihood of success and satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

L.    Section 1129(a)(12):  All Statutory Fees Have Been or Will Be Paid

111.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan."  11 U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses.  *Id.* at § 507(a)(2).  In accordance with these provisions, Article 12.1 of the Plan provides that, on the Plan Effective Date or as soon as practicable thereafter, such fees will be paid by the RemainCo Debtors.  *See* Plan, Art. 12.1.  The Proposed Confirmation Order also provides for the payment of all such statutory fees.  Proposed

---

[17] On June 15, 2026, the effective date of the TPI MX V & VI Plan, the GUC Trust, which will reconcile Claims and make distributions to holders of Allowed General Unsecured Claims, was established in accordance with the terms of the TPI MX V & VI Plan and the GUC Trust Agreement.

Confirmation Order ¶ 27.  The Plan therefore complies with section 1129(a)(12) of the Bankruptcy Code.

M.      <u>Sections 1129(a)(13)–(16) and 1129(e):  Inapplicable Provisions</u>

112.     Section 1129(a)(13) of the Bankruptcy Code is applicable only to debtors that maintain "retiree benefits," as that term is defined in section 1114 of the Bankruptcy Code. The RemainCo Debtors will not maintain any such retiree benefits.  As such, section 1129(a)(13) is inapplicable to these Chapter 11 Cases.

113.     Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  The RemainCo Debtors are not subject to any domestic support obligations and, as such, section 1129(a)(14) does not apply.

114.     Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code).  The RemainCo Debtors are not "individuals" and, accordingly, section 1129(a)(15) is inapplicable.

115.     Section 1129(a)(16) of the Bankruptcy Code applies to transfers of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.  The RemainCo Debtors are each a moneyed, business, or commercial corporation and, accordingly, section 1129(a)(16) is inapplicable.

116.     The provisions of section 1129(e) of the Bankruptcy Code apply only to "small business case[s]" as defined by that section.  These Chapter 11 Cases are not "small business cases" and, accordingly, section 1129(e) of the Bankruptcy Code does not apply.

N.      <u>Section 1129(b):  Plan Satisfies "Cram Down" Requirements for Non-Accepting Classes</u>

117.     Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the

plan is not accepted by all impaired classes of claims. Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes. *See In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 862 (Bankr. S.D. Tex. 2001).

118. The Classes to which cramdown is relevant here are the Classes that have rejected or are deemed to reject the Plan: Class 4 (General Unsecured Claims) at the six RemainCo Debtors identified herein,[18] Class 5 (Intercompany Interests), and Class 6 (Existing Equity Interests). The Plan satisfies the cramdown requirements with respect thereto.

### 1. Plan Does Not Discriminate Unfairly

119. Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment. *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (noting that the "'hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination'") (citing *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003), *aff'd*, 308 B.R. 672 (D. Del. 2004)). As between two classes of claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment.[19]

---

[18] *See supra* note 16.

[19] *See, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom.*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *In re Drexel Burnham Lambert Grp., Inc.,* 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).

120.     The Plan does not discriminate unfairly with respect to any Class of Claims or Interests.  Specifically, Class 3 (Senior Secured Term Loan Claims) contains secured claims under the Senior Secured Credit Agreement only and Class 4 (General Unsecured Claims) contains unsecured Claims.   Further, Class 5 (Intercompany Interests) contains Interests held by a RemainCo Debtor in another RemainCo Debtor, which are distinct from other General Unsecured Claims, and Class 6 (Existing Equity Interests) is comprised of Interests in Parent.  Accordingly, the Debtors have a reasonable basis for the differing classification and treatment of such Classes as they are not similarly situated.  Therefore, there is no unfair discrimination in the Plan in accordance with section 1129(b) of the Bankruptcy Code.

## 2.     Plan Is Fair and Equitable

121.     Sections 1129(b)(2)(B)(ii) and (b)(2)(C)(ii) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if, under the plan, no holder of any junior claim or interest will receive or retain property under the plan on account of such junior claim or interest.

122.     Distributions under the Plan are made in the order of priority prescribed by the Bankruptcy Code and in accordance with the rule of absolute priority.  The Plan does not skip or otherwise favor any creditor Class at the expense of a "priority" unsecured creditor Class or senior Class.  While the Plan provides that Intercompany Interests in Class 5 may be reinstated, this is not structured to unfairly prejudice holders of Claims in Class 4 (General Unsecured Claims) at the applicable RemainCo Debtors.  Rather, the treatment preserves the legal structure of the RemainCo Debtors and allows the implementation of the wind-down as set forth in the Plan. Importantly, holders of Interests in Class 5 (Intercompany Interests) will receive no value on account of their Interests.  Accordingly, the Plan is "fair and equitable" and, therefore, consistent with the requirements of section 1129(b) of the Bankruptcy Code.

O.      Section 1129(c):  Plan Is Only Plan on File

123.    The Plan is the only plan currently on file in these Chapter 11 Cases for the RemainCo Debtors and, accordingly, section 1129(c) of the Bankruptcy Code does not apply.

P.      Section 1129(d):  Principal Purpose of Plan Is Not Avoidance of Taxes

124.    The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act, and no party has objected on any such grounds.  The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

Q.      Request for Waiver of Bankruptcy Rules 3020(e) and 6004(h)

125.    As set forth in Article 12.11 of the Plan, the RemainCo Debtors respectfully request that the Court direct that the Proposed Confirmation Order be effective immediately upon its entry, notwithstanding the 14-day stay imposed by operation of Bankruptcy Rules 3020(e) and 6004(h).  Bankruptcy Rule 3020(e) provides that "[u]nless the court orders otherwise, a confirmation order is stayed for 14 days after its entry."  Fed. R. Bankr. P. 3020(e).  As such, and as the Advisory Committee notes on Bankruptcy Rule 3020(e) state, "the court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately."  Fed. R. Bankr. P. 3020(e), Adv. Comm. Notes, 1999 Amend.  Similarly, Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use . . . of property (other than cash collateral) is stayed for 14 days after the order is entered."  Fed. R. Bankr. P. 6004(h).  The Advisory Committee Notes on Bankruptcy Rule 6004(h) (when it was codified as subsection (g)) similarly state that "[t]he court may, in its discretion, order that Rule 6004(g) is not applicable so that the property may be used . . . immediately."  Fed. R. Bankr. P. 6004(h), Adv. Comm. Notes, 1999 Amend.  It is appropriate for the Court to exercise its discretion to order that Bankruptcy Rules 3020(e) and 6004(h) are not applicable.  *See, e.g.*, *In re Energy Partners, Ltd.*,

60

No. 09-32957, 2009 WL 2898876, at *19 (Bankr. S.D. Tex. Aug. 3, 2009) (waiving stay of confirmation order); *In re Idearc*, 423 B.R. at 158 (same).

126.    Under the circumstances, good cause exists for waiving the stay.  A waiver of the stay would permit the RemainCo Debtors to consummate the Plan and commence implementation thereof without delay after the Plan is confirmed.  Each day the RemainCo Debtors remain in chapter 11, they incur administrative and professional costs—expenses that are unnecessary in light of the support for the Plan.  Cejka Decl. ¶ 14.  The requested waiver of the stay will facilitate a smooth transition to the WindDown Co for the liquidation of any remaining assets of the RemainCo Debtors, and the wind-down of the RemainCo Debtors and their Estates in a cost-efficient manner after the Plan Effective Date.  *Id*.  Accordingly, waiver of the 14-day stay imposed by operation of Bankruptcy Rules 3020(e) and 6004(h) is in the best interests of the RemainCo Debtors' Estates and creditors and will not prejudice any parties in interest.

## IV.    COURT SHOULD OVERRULE UNRESOLVED U.S. TRUSTEE OBJECTION AND CONFIRM PLAN

127.    The only objection received in connection with confirmation of the Plan is the U.S. Trustee Objection.  The U.S. Trustee objects to confirmation of the Plan on the basis that (i) the Plan contains non-consensual third-party releases that are impermissible under *Purdue* (*see* U.S. Trustee Obj. ¶¶ 12–16), (ii) the Plan's proposed opt-out provisions in the Notice of Non-Voting Status for Classes 1 and 2 are ineffective to confer affirmative consent to the Third-Party Releases (*see* U.S. Trustee Obj. ¶¶ 35–37), and (iii) the Plan should expressly state that it does not release claims asserted by governmental entities acting under their police and regulatory authority (see U.S. Trustee Obj. ¶¶ 51–52).[20]  Specifically, the U.S. Trustee asserts that the Plan's opt-out

---

[20] The RemainCo Debtors have agreed to include language in the Proposed Confirmation Order, addressing Claims asserted by Governmental Units, which the RemainCo Debtors believe resolves this portion of the U.S. Trustee Objection.  *See* Proposed Confirmation Order ¶ 20.

feature for Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) is insufficient to render the Third-Party Releases consensual in light of the Supreme Court's decision in *Purdue*. *See* U.S. Trustee Obj. ¶¶ 33–50. In doing so, the U.S. Trustee reads words into the *Purdue* opinion that are not there. The Court should deny the U.S. Trustee's effort to reconsider and upend settled law in this jurisdiction.

A.    <u>Third-Party Releases, Including Opt-Out Feature, Are Consensual and Consistent with Precedent in District</u>

128.   The Third-Party Releases, including the opt-out feature with respect to Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims), are consensual and consistent with precedent in the Fifth Circuit, including *Container Store*.[21] Nevertheless, the U.S. Trustee raises the same arguments in the U.S. Trustee Objection with respect to the Third-Party Releases that the Court has repeatedly overruled (*i.e.*, that state law, rather than bankruptcy law, should govern third-party releases and that opt-outs are insufficient to confer consent), including in a written decision in *Robertshaw*. *See Robertshaw*, 662 B.R. at 322 ("Even before *Purdue*, Fifth Circuit case law appeared to prohibit non-consensual third-party releases."). There, as here, the U.S. Trustee "want[ed] to use the *Purdue* holding as an opportunity to advance its long-held position that consensual third-party releases in a plan should require an opt-in feature, rather than an opt-out." *See id.*

129.   Although the Supreme Court in *Purdue* held that non-consensual releases by third parties are impermissible, it did not say that all third-party releases are impermissible, and the Supreme Court was careful to be clear that it was not expressing a view on what qualifies as a "consensual" release:

---

[21] The RemainCo Debtors' Plan is also consistent with the Court's rulings in *Nine Energy*, *Pine Gate*, and *PosiGen*.

> As important as the question we decide today are ones we do not. Nothing in what we have said should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan; those sorts of releases pose different questions and may rest on different legal grounds than the nonconsensual release at issue here. ***Nor do we*** have occasion today to ***express a view on what qualifies as a consensual release*** or pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor.

*Purdue*, 603 U.S. at 226 (emphasis added) (internal citations omitted).  Accordingly, the Supreme Court (i) preserved consensual third-party releases and (ii) did not restrict the ability of courts to determine what constitutes consent.

130.    In the Southern District of Texas, a process in which third parties have the opportunity to opt-out of granting releases is sufficient to render a release consensual and has been for some time, as "[h]undreds of chapter 11 cases have been confirmed in this District with consensual third-party releases with an opt-out." *Robertshaw*, 662 B.R. at 323.  That is because, as the Court found in *Robertshaw*, "[t]here is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan," when parties giving such releases receive a "meaningful opportunity to opt out." *Id.*  Importantly, as the Court recognized, "*Purdue* did not change the law in this Circuit." *Id.*[22]  Nor does *Container Store*.

---

[22] *See also In re TPI Composites, Inc.*, No. 25-34655 (CML) (Bankr. S.D. Tex. May 21, 2026) (Docket No. 929) (approving chapter 11 plan with opt-out third-party releases); *In re Nine Energy Service, Inc.*, No. 26-90295 (CML) (Bankr. S.D. Tex. Mar. 4, 2026) (Docket No. 189) (same); *In re PosiGen, PBC*, No. 25-90787 (CML) (Bankr. S.D. Tex. Feb. 24, 2026) (Docket No. 613) (same); *In re Pine Gate*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 19, 2026) (Docket No. 1483) (same); *In re Everstream Sols. LLC*, No. 25-90144 (CML) (Bankr. S.D. Tex. Nov. 11, 2025) (Docket No. 594) (same); *In re DocuData Sols., L.C.*, No. 25-90023 (CML) (Bankr. S.D. Tex. June 23, 2025) (Docket No. 834) (same); *In re Wellpath Holdings, Inc.*, No. 24-90533 (ARP) (Bankr. S.D. Tex. May 1, 2025) (Docket No. 2596) (same); *In re MLN US Holdco LLC*, No. 25-90090 (CML) (Bankr. S.D. Tex. Apr. 17, 2025) (Docket No. 263) (same); *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 15, 2025) (Docket No. 227) (same); *In re DRF Logistics, LLC*, No. 24-90447 (CML) (Bankr. S.D. Tex. Nov 25, 2024) (Docket No. 530) (same); *In re Mobileum, Inc.*, No. 24-90414 (CML) (Bankr. S.D. Tex. Sept. 11, 2024), (Docket No. 194) (same); *In re Core Sci., Inc.*, No. 22-90341 (CML) (Bankr. S.D. Tex. Jan. 16, 2024) (Docket No. 1749) (same); *see also In re GOL Linhas Aéreas Inteligentes S.A.*, No. 24-10118 (MG) (Bankr. S.D.N.Y. May 22, 2025) (Docket No. 1658) (approving chapter 11 plan with opt-out third-party releases based upon a reading of *Purdue* and case law from the Fifth Circuit).

131.     Here, as discussed in greater detail in Section II of this Memorandum, the Plan, the Disclosure Statement, the Notice of Non-Voting Status for Classes 1 and 2, and the Combined Hearing Notice all provide a meaningful opportunity to opt-out of granting releases in compliance with the long-standing practice in this district and the Complex Case Rules.  Exhibit C of the Disclosure Statement clearly sets forth the releases contained in Article 10.6 of the Plan and adequately describes both the entities and claims being released.  The Notice of Non-Voting Status for Classes 1 and 2 and the Combined Hearing Notice conspicuously disclosed (in bolded text) the proposed Third-Party Releases, the procedures for opting out of the Third-Party Releases, and the consequences of failing to do so.  The RemainCo Debtors also prepared an abbreviated version of the Combined Hearing Notice that includes the full text of the Third-Party Releases contained in Article 10.6 of the Plan and was published in the national edition of *USA Today*, ensuring parties another meaningful opportunity to review the Third-Party Releases and opt out of them if they chose to do so.  Each of the foregoing instances provided ample notice and information specifically regarding the Third-Party Releases, what the Releasing Parties were being asked to do, and benefits they would forego should they choose to opt out.

132.     Further, the only Classes whose consent was obtained through the use of opt-outs under the Plan were the holders of Claims in Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims), both of which are entitled to a full recovery under the Plan.[23]  As stated above, it is well established in the Fifth Circuit that establishing consent through the failure to opt out is appropriate for holders of Claims and Interests receiving recovery under a Plan.  *See Cole v. Nabors Corp. Servs., Inc. (In re CJ Holding Co.)*, 597 B.R. 597, 609 (S.D. Tex. 2019) (finding

---

[23] The Plan already requires consent to the Third-Party Releases for Class 4 (General Unsecured Claims) through opt-in elections given the holders of Claims in such Class are projected to receive a 0% recovery under the Plan.

that, with respect to chapter 11 plan releases, construing a creditor's silence as consent "serves the bankruptcy law's purpose of quick and efficient resolution of claims to permit a debtor's business to continue"); *Container Store*, 676 B.R. at 388 ("For these reasons, consistent with its longstanding precedent, the court holds that the failure to opt-out constitutes consent to a third-party release under the appropriate circumstances.").

133.    Moreover, the District Court recently held that federal law, not state law, should apply to determining whether third-party releases are consensual.  *Container Store*, 676 B.R. at 375 ("The court concludes that there are two separate and independent bases of federal authority that require the application of federal law, rather than state contract law, to the question of whether claimants have 'consented' to third-party releases contained in a bankruptcy reorganization plan.").  The District Court actually went a step further and acknowledged that even if state law did apply, opt out releases would still be permissible.  *Id.* at 385 ("A rule that permits opt-outs on a case-by-case basis also complies with the 'general rules' of contract law.") (citing *Elec. Reliability Council of Tex. v. May (In re Tex. Com. Energy)*, 607 F.3d 153, 158 (5th Cir. 2010)).  The Debtors submit that the reasoning adopted by *Container Store* is sound and consistent with historical practice in this Circuit.

134.    For the reasons set forth in Section II.B herein and above, the Debtors submit that the Third-Party Releases, which afforded non-voting parties with an opportunity to opt out, are consensual and comply with well-established Fifth Circuit precedent.  Accordingly, the U.S. Trustee Objection to the Third-Party Releases should be overruled because the opt-out feature is sufficient to establish consent as such releases were properly noticed to all affected claimants in compliance with precedent in this jurisdiction.

135.    For the reasons set forth herein, the Debtors submit that the U.S. Trustee Objection should be overruled.

## RESERVATION OF RIGHTS

136.    The RemainCo Debtors reserve all of their rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Memorandum, to seek discovery, or to introduce evidence and to raise additional arguments at any hearing to consider confirmation of the Plan.

## CONCLUSION

137.    For the foregoing reasons, the Disclosure Statement and the Plan comply with all of the requirements of the Bankruptcy Code and the Bankruptcy Rules.  Accordingly, the RemainCo Debtors respectfully request that the Court enter the Proposed Confirmation Order to approve the Disclosure Statement on a final basis and confirm the Plan, to grant related relief requested herein, and to grant such other and further relief as the Court may deem just and appropriate.

Dated:  June 29, 2026
      Houston, Texas

/s/ Gabriel A. Morgan
WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Emma Wheeler (24145695)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:  Gabriel.Morgan@weil.com
       Clifford.Carlson@weil.com
       Emma.Wheeler@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Lauren Tauro (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  Matt.Barr@weil.com
       Lauren.Tauro@weil.com


*Attorneys for Debtors
and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on June 29, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/Gabriel A. Morgan
Gabriel A. Morgan